EXHIBIT C

**PRIVATE & CONFIDENTIAL**

## MANAGEMENT AGREEMENT

## FOR THE

## PARK HYATT ST. KITTS CHRISTOPHE HARBOUR

## BETWEEN

## RANGE DEVELOPMENTS LIMITED

## AND

## HYATT SERVICES CARIBBEAN, L.L.C.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

## MANAGEMENT AGREEMENT

### Park Hyatt St. Kitts Christophe Harbour

## TABLE OF CONTENTS

ARTICLE I
    The Sites, Title, the Hotel, and Formal Opening ................................................... 2

    Section 1. The Sites. ................................................................................................ 2
    Section 2. Construction, Furnishing and Equipping of the Hotel and the
           Residences. ........................................................................................ 3
    Section 3. The Hotel. ............................................................................................... 3
    Section 4. Title to the Hotel and the Residences. .................................................. 5
    Section 5. Formal Opening of the Hotel.................................................................. 6
    Section 6. Master Declaration; Common Areas...................................................... 6
    Section 7. Affiliates ................................................................................................. 8
    Section 8. Key Money.............................................................................................. 8

ARTICLE II
    Operating Term ....................................................................................................... 9

ARTICLE III
    Operation of the Hotel .......................................................................................... 10

    Section 1. Standards of Operation........................................................................ 10
    Section 2. Chain Conflicts. ................................................................................... 10
    Section 3. Hyatt Control of Operation................................................................... 11
    Section 4. Leases and Concessions...................................................................... 11
    Section 5. Management Services........................................................................... 12
    Section 6. Operating Bank Account(s)................................................................... 14
    Section 7. Consultations with Owner. ................................................................... 14
    Section 8. Hyatt's Right to Contract...................................................................... 15
    Section 9. Contracts with Hyatt Affiliates. ........................................................... 16
    Section 10. Agency Relationship. ......................................................................... 16
    Section 11. Hyatt's Right to Reimbursement. ...................................................... 17
    Section 12. Employees of the Hotel...................................................................... 18
    Section 13. The General Manager; Owner Appointment Approvals .................. 19
    Section 14. Hyatt's Management Modules. ........................................................... 19
    Section 15. Staff Facilities. .................................................................................... 20

ARTICLE IV
    Management Fees and Owner's Profit Distribution ............................................ 20

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

PB

**PRIVATE & CONFIDENTIAL**

Section 1.  Hyatt's Fees.................................................................. 20
Section 2.  Payment of Fees............................................................ 21
Section 3.  Owner's Profit Distribution. ............................................ 22
Section 4.  Year-end Adjustment. .................................................... 22
Section 5.  Fiscal Years................................................................... 23

ARTICLE V
Determination of Adjusted Gross Operating Profit and Net Operating
Income............................................................................................ 23

Section 1.  Books and Records. ...................................................... 23
Section 2.  Adjusted Gross Operating Profit and Net Operating Income. ........... 25

ARTICLE VI
Repairs and Changes ...................................................................... 27

Section 1.  Normal Repairs and Maintenance. .................................. 27
Section 2.  Replacements of and Additions to Furnishings and Equipment........ 27
Section 3.  Routine, Minor Alterations. ............................................. 28
Section 4.  Essential Repairs, Changes, and Replacements............................ 28
Section 5.  Other Changes, Replacements and Additions................................ 29
Section 6.  Refurbishment Program.................................................. 29

ARTICLE VII
General Covenants of Hyatt and Owner .......................................... 30

Section 1.  Opening Inventories and Working Capital. ...................... 30
Section 2.  System Services. .......................................................... 30
Section 3.  Reports. ....................................................................... 32
Section 4.  Annual Plan. ................................................................. 33
Section 5.  Employees of Hyatt, its Affiliates or Other Hyatt Hotels. ................. 36

ARTICLE VIII
Insurance & Indemnification ............................................................ 36

Section 1.  Property Insurance. ...................................................... 36
Section 2.  Operational Insurance. ................................................. 37
Section 3.  Payment of Fees and Expenses. ................................... 38
Section 4.  Application of Business Interruption Insurance Proceeds................ 38
Section 5.  Payment of Other Operating Expenses. .......................... 38
Section 6.  Cost and Expense. ....................................................... 39
Section 7.  Policies and Endorsements. .......................................... 39
Section 8.  Insurance Claims........................................................... 39
Section 9.  Indemnity. .................................................................... 40

ii

**PRIVATE & CONFIDENTIAL**

ARTICLE IX
    Damage to and Destruction of the Hotel ............................................................. 41

ARTICLE X
    Condemnation ...................................................................................................... 42

ARTICLE XI
    Right to Perform Covenants and Reimbursement ............................................. 43

ARTICLE XII
    Defaults .............................................................................................................. 43

ARTICLE XIII
    Trade Name......................................................................................................... 45

ARTICLE XIV
    Arbitration ........................................................................................................... 47

        Section 1. Amicable Resolution. ....................................................................... 47
        Section 2. Agreement to Arbitrate...................................................................... 47
        Section 3. Exclusive Remedy. ........................................................................... 48
        Section 4. No Disruption. ................................................................................... 48
        Section 5. Confidentiality. .................................................................................. 48

ARTICLE XV
    Successors and Assigns .................................................................................... 48

        Section 1. Assignment by Hyatt.......................................................................... 48
        Section 2. Assignment by Owner......................................................................... 49
        Section 3. Successors and Assigns..................................................................... 50

ARTICLE XVI
    Further Instruments ............................................................................................ 50

ARTICLE XVII
    Notices ................................................................................................................ 50

ARTICLE XVIII
    Applicable Law ................................................................................................... 52

ARTICLE XIX
    Miscellaneous..................................................................................................... 52

        Section 1. Right to Make Agreement. ................................................................. 52
        Section 2. Consents and Approvals.................................................................... 52
        Section 3. Entire Agreement............................................................................... 52
        Section 4. Survival and Continuation.................................................................. 53

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

Section 5.  Waiver.................................................................53
Section 6.  Indexation. ...........................................................53
Section 7.  Proration. ............................................................53
Section 8.  Language & Counterparts. .............................................53
Section 9.  Confidentiality.......................................................53
Section 10. Exclusivity. ..........................................................54
Section 11. Corrupt Practices. ....................................................56
Section 12. Non-Recourse. .........................................................58
Section 13. Waiver of Certain Damages. ............................................58
Section 14. Ground Leases.........................................................59
Section 15. Ownership Representation..............................................59
Section 16. Intentionally Omitted. ................................................59
Section 17. Use of Hotel Facilities. ..............................................60
Section 18. Reasonable Access to Property. ........................................60
Section 19. Loyalty Program. ......................................................61
Section 20. Additional Hyatt Covenant.............................................61

ARTICLE XX
Owner Financing..................................................................61

Section 1.  Owner Financing.......................................................61
Section 2.  Non-Disturbance. ......................................................61
Section 3.  Provisions Governing Sale of LP Interests.............................62
Section 4.  Limited Cash Flow Guarantee...........................................63

ARTICLE XXI
Early Termination................................................................65

Section 1.  Performance Termination...............................................65

ARTICLE XXII
Provisions Relating to the Residences.............................................69

Section 1.  Project Documents.....................................................69
Section 2.  Rental Program........................................................70
Section 3.  Required Documents. ...................................................74
Section 4.  Unsold Residences. ....................................................75
Section 5.  Miscellaneous. ........................................................76

ARTICLE XXIII
Development Milestones............................................................76

ARTICLE XXIV
Range Limited Guaranty ...........................................................78

78

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

ARTICLE XXV
      Special Conditions................................................................................................ 78

Exhibit A1    Hotel Site Description
Exhibit A2    Residences Site Description
Exhibit B     Addendum to Management Agreement
Exhibit C     Statement of Profit & Loss

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

## MANAGEMENT AGREEMENT

### Park Hyatt St. Kitts Christophe Harbour

THIS AGREEMENT (this "**Agreement**") is dated and executed this 31st day of May, 2012, (the "**Effective Date**") and between Range Developments Limited ("**Owner**"), a limited liability company organized and existing under the laws of St. Kitts and Nevis, with its principal place of business at P.O. Box 1859, Suite 302, 3rd Floor, The Cable Building, Canyon Street, Basseterre, St. Kitts, Federation of St. Kitts and Nevis., Range Capital Partners Limited (for the sole purpose of acknowledging Article XXIV), and Hyatt Caribbean Services, L.L.C. ("**Hyatt**"), a limited liability company organized in Delaware, U.S.A, with its principal place of business located at 71 South Wacker Drive, Chicago, Illinois 60606, U.S.A.

WHEREAS, KHT Land Holdings Limited ("**KHT**") is the master developer of an under-development planned resort community located on the southeast peninsula of Saint Kitts, in the Federation of Saint Kitts and Nevis (the "**Country**"), that may include a number of components, some of which may be developed and operated by KHT or its Affiliates or by third party operators or managers designated by KHT, including an 18-hole golf course, marina, beach clubs, assorted residential projects and the necessary infrastructure, and commonly utilized areas such as public walkways, parking and other works required for a major master-planned resort (collectively, the components of the resort community that are actually so developed from time to time are referred to as the "**Resort Project**");

WHEREAS, Owner has entered into two (2) ground leases for a site commonly known as "Banana Bay" on which it is prepared to finance, plan, build, furnish and equip, a modern and outstanding five-star, international, first class hotel of Park Hyatt standards that is intended to ultimately contain two hundred (200) guest rooms and suites but that shall contain no less than one hundred twenty-five (125) guest rooms and suites, with appropriate meeting, conference and banqueting facilities, food and beverage facilities, an appropriately-sized fitness center and spa (the "**Hotel**"), which hotel is to be operated under standards comparable to those prevailing in "Park Hyatt" hotels throughout the world;

WHEREAS, Owner has, or within a reasonable time period following execution of this Agreement, shall have entered into a third (3rd) ground lease for a site adjacent to the Hotel site on which Owner may finance, plan, build, furnish and equip, approximately fifty (50) villa units comprised of up to one hundred (100) bedroom units of Park Hyatt standards (collectively, the "**Residences**" and each bedroom, individually, a "**Residence**" and the Residences and the Hotel being collectively referred to as the "**Project**"); all of such Residences being intended to be made available for sale by Owner to third party purchasers (collectively, the "**Residence Owners**");

WHEREAS, concurrently with the execution of this Agreement, Owner and Hyatt or an Affiliate of Hyatt have entered into that certain Technical Services and Pre-

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

Opening Agreement (the "**Technical Services Agreement**"), pursuant to which Hyatt or its Affiliate will be providing certain technical services in connection with the planning, building, furnishing, equipping and decorating of the Hotel and, if developed, the Residences, to enable the Hotel and, if developed, the Residences to meet Hyatt standards for "Park Hyatt" hotels, all of which technical services shall be performed outside of the Country, and for certain pre-opening services to prepare the Hotel and, if developed, the Residences, for the commencement of hotel operations;

      **WHEREAS,** in the event the Residences are to be developed by Owner, after the execution of this Agreement, Owner and Hyatt (or, an Affiliate of Hyatt) shall enter into that certain Marketing License Agreement (the "**Marketing License Agreement**"), pursuant to which Hyatt shall grant to Owner a non-exclusive license or sublicense to use certain trademarks in connection with the marketing and sale of the Residences;

      **WHEREAS,** if the Residences are developed, Owner or an Affiliate of Owner is to establish a program whereby it will offer a voluntary rental program (the "**Rental Program**") for Residence Owners in accordance with Rental Program Agreements (as defined below), pursuant to which the Residence Owners may elect to make their Residences available for rental on a transient basis as part of the Hotel's rooms inventory (such participating Residences collectively referred to as "**Rental Program Units**" and such participating Residence Owners collectively referred to herein as "**Residence Program Owners**"); and

      **WHEREAS,** Owner and Hyatt desire to enter into an agreement for the provision of services and assistance in respect of the management and operation of the Hotel by Hyatt, upon the terms and conditions hereinafter set forth.

      **NOW THEREFORE,** the parties hereto covenant and agree as follows:

**ARTICLE I**
**The Sites, Title, the Hotel, and Formal Opening**

      **Section 1. The Sites.**
      The Hotel shall be constructed on approximately twenty one and seventy five one hundredths (21.75) acres of land that shall be ground leased to Owner as provided above and located within the Resort Project in an area commonly known as "Banana Bay," which area is as more specifically described in Part A of Exhibit A1 (the "**Phase I Site**") and Part B of Exhibit A1 (the "**Phase II Site**", and collectively with the Phase I Site, the "**Hotel Site**"), which exhibit is, by this reference, incorporated herein (the "**Hotel Site**"). The Residences shall be constructed on approximately seven and seventy five one hundredths (7.75) acres of land that is to be ground leased by Owner as provided above and located adjacent to the Hotel Site, which land is as more specifically described in Exhibit A2, which exhibit is, by this reference, incorporated herein (the "**Residences Site**" and, along with each of the Phase I Site and the Phase II Site, each a "**Site**" and, collectively, the "**Project Site**").

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

**Section 2. Construction, Furnishing and Equipping of the Hotel and the Residences.**

Owner shall use its commercially reasonable endeavours to construct and deliver the Hotel and the Residences for management by Hyatt pursuant to the terms of this Agreement, and, if constructed,  the Hotel and the Residences shall be in conformity with Hyatt's Design Criteria for newly-constructed "Park Hyatt" hotels (except as elsewhere herein or in the Technical Services Agreement expressly provided to the contrary, as in effect on the Effective Date) pursuant to the terms of this Agreement and the Technical Services Agreement (the "**Hyatt Design Standards**"), and with all reasonable diligence build, equip, furnish and decorate the Hotel and the Residences.

Hyatt acknowledges that it is Owner's intent, as of the Effective Date, to complete the Hotel in two (2) Phases, as follows: (a) Phase I of the Hotel consisting of one hundred twenty-five (125) keys plus the necessary amenities and certain back-of-the-house areas for a two hundred (200) key hotel on the Phase I Site ("**Phase I**"); and (b) if developed, Phase II of the Hotel consisting of seventy-five (75) keys and, if applicable, certain back-of-the-house areas on the Phase II Site ("**Phase II**"). Furthermore, as a third (3rd) Phase of the Project, Owner may develop on the Residences Site the Residences ("**Phase III**" and, along with Phase I and Phase II, each a "**Phase**"); provided that, if developed, Phases II and III shall only be licensed under the "Hyatt" names and marks (and not that of any other hotel operator), the terms of which shall be consistent with the requirements of this Agreement. The timing of each Phase shall be subject to the discussion and reasonable agreement of Owner and Hyatt. In respect of the construction of Phase II and Phase III, Owner shall use its best endeavours to ensure that activities relating to the construction of these Phases does not materially and adversely affect the guest experience of guests staying at the Hotel or otherwise materially and adversely affect Hyatt's ability to operate the Hotel in accordance with the terms of this Agreement. Owner shall use its best endeavours to modify its construction activities to minimize the impact of such activities on the operations of the Hotel in such manner as may be reasonably requested by Hyatt, from time to time.

**Section 3.  The Hotel.**
The Hotel shall consist of:

A.      the Hotel Site, as delineated in Exhibit A1; and

B.      all improvements situated thereon, as designed, constructed and outfitted in accordance with the Hyatt Design Standards and subject to the terms and conditions of the Technical Services Agreement, including the hotel building or buildings, completely air conditioned, with:

(1)      Areas and facilities including (a) at least one hundred twenty-five (125) (and up to two hundred (200)) guest rooms and suites, each

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

3

PRIVATE & CONFIDENTIAL

with bathroom, (b) restaurants, bars and banquet, meeting, conference and other public rooms, (c) hotel ancillary commercial space, such as sundry shops, Resort Project sales office (which shall be operated and located at the Hotel pursuant to the terms of this Agreement), and car rental offices, for the sale of merchandise, goods or services, (d) parking space for guests and employees, (e) storage and service support areas, (f) offices for employees, (g) health (fitness) and spa facility, (h) a business center, and (i) recreational facilities and areas typically found in a luxury resort hotel;

(2)    If developed, the Rental Program Units;

(3)    All installations and building systems necessary for the operation of the building(s) for hotel purposes (including, without limitation, millwork, elevator, heating, ventilating, air conditioning, electrical including lighting, plumbing including sanitary, refrigerating, telephone and communications, safety and security installations and systems);

(4)    All furniture and furnishings, which shall include guest room, office, public area, and other furniture, carpeting, draperies, lamps and other items;

(5)    Kitchen and laundry equipment;

(6)    Special hotel equipment, and adequate spare parts therefor, which shall include (a) all equipment required for the operation of (i) guest rooms, including television, mini-bars and safes, (ii) banquet rooms, (iii) a print shop, (iv) employee locker rooms and (v) a health club and spa, (b) office equipment, including computer hardware and software as selected by Hyatt, (c) dining room wagons, (d) material handling equipment, (e) cleaning and engineering equipment, and (f) motor vehicles as required for guest and employee transportation;

(7)    Dining room accessories, kitchen utensils, engineering tools and equipment, housekeeping utensils and miscellaneous equipment and accessories ("**Ancillary Hotel Equipment**"); and

(8)    Uniforms, china, glassware, linens and silverware and the like ("**Operating Equipment**");

C.    Public grounds, gardens and other landscaping features and facilities located within the Hotel Site;

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

4

PRIVATE & CONFIDENTIAL

D.    if located on the Hotel Site, fully furnished residential accommodation for the General Manager and, subject to Section 15 of Article III, other key expatriate personnel of the Hotel, furnished in accordance with Hyatt's standards and specifications pertaining to such facilities and generally applied in hotels operated by Hyatt and its Affiliates within the Caribbean; and

E.    Other facilities and appurtenances, as are necessary or desirable for the operation of the Hotel under Hyatt Design Standards.

The items to be supplied by Owner under (4), (5) and, with the exception of spare parts, (6) of subsection B above are hereinafter collectively referred to as "**Furnishings and Equipment**".

### Section 4.  Title to the Hotel and the Residences.

Owner warrants that it will enter into three (3) separate ground leases with KHT or an Affiliate of KHT (each, a "**Ground Lease**"); two (2) Ground Leases for the Hotel Site (Phase I and Phase II) and one (1) Ground Lease for the Residences Site (Phase III); and, pursuant to such Ground Leases, Owner's interest in each Site shall, upon completion and opening of each respective Phase, convert to fee ownership of such Site via the exercise by Owner of a purchase option contained in each such Ground Lease.  Throughout the Operating Term (as defined below), Owner will maintain full control of the Hotel and the Residences (exclusive of the ownership of Residences that are conveyed to Residence Owners), free and clear of any liens, encumbrances, covenants, charges, burdens or claims, except (a) any that do not materially and adversely affect the operation of the Hotel and Residences by Hyatt and (b) mortgages or other encumbrances that provide that this Agreement shall not be subject to forfeiture or termination, except only in accordance with the provisions of this Agreement or as otherwise agreed by Owner and Hyatt, notwithstanding a default under such mortgage or other encumbrance. To the extent Owner's right and interest in the Hotel is derived through a lease, concession or other agreement, Owner shall keep and maintain said lease, concession or other agreement in full force and effect throughout the Operating Term pursuant to Article XIX, Section 14 of this Agreement. Owner further warrants that Hyatt, on distributing the profits to Owner in accordance with the terms of this Agreement and fulfilling its other obligations hereunder, shall and may peaceably and quietly manage and operate the Hotel during the entire Operating Term. As to the Residences, Owner shall keep and maintain the Rental Program Agreements in full force and effect in accordance with the terms of Article XXII.

Owner shall pay and discharge any ground rents, or other rental payments, concession charges and any other charges payable by Owner in respect of the Hotel and, at its expense, undertake and prosecute all appropriate actions, judicial or otherwise, required to assure such quiet and peaceable management to Hyatt. Owner shall further pay all real estate taxes and assessments that may become a lien on the

Confidential and Proprietary Information of
Hyatt Services Caribbean. L.L.C.

5

**PRIVATE & CONFIDENTIAL**

Hotel and that may be due and payable during the Operating Term, unless payment thereof is being contested by Owner in good faith and enforcement thereof is stayed. Owner shall not later than twenty (20) days following written request by Hyatt furnish to Hyatt copies of official tax bills and assessments and tax receipts showing the payment of such taxes and assessments, or the proof of the contested tax. The above-mentioned rents, charges, taxes, assessments and the like shall be an Owner expense and shall not be charged against the operation of the Hotel.

The parties agree that Hyatt shall have full access to the Hotel and the Residences throughout the entire Operating Term as necessary or appropriate to comply with its obligations under this Agreement or any other related agreements.

**Section 5.  Formal Opening of the Hotel.**

The formal opening of the Hotel ("**Formal Opening**") shall occur on a date to be mutually agreed upon by Hyatt and Owner in writing, but in any event only after (a) Hyatt acting reasonably deems (i) Phase I and Common Areas (as defined below) including, without limitation, all access points from the Resort Project to the Hotel to be substantially completed and (ii) the Furnishings and Equipment, Ancillary Hotel Equipment and Operating Equipment to have been substantially installed therein, all in accordance with the provisions of Section 2 of this Article I, (b) the architect has issued a certificate of substantial completion for Phase I as provided in the Technical Services Agreement, (c) all licenses and permits required for the occupancy and operation of the Hotel (including liquor and restaurant licenses and police, fire, occupancy, and health department permits) have been obtained, (d) adequate working capital has been furnished by Owner in accordance with Section 1 of Article VII, and (e) the Hotel has been accepted by Hyatt and is ready to render first-class service to guests on a fully operational basis consistent with Hyatt Operating Standards (as defined below). Notwithstanding the occurrence of the Formal Opening, Owner shall proceed diligently thereafter to fulfill all of its obligations hereunder regarding the construction, furnishing, equipping and decorating of the Hotel and other aspects of any part of a larger project of which the Hotel may be a part that would materially affect Hotel operations, including, without limitation, if developed, Phases II and III, and to cure all defects or deficiencies as to which notice shall be given by Hyatt to Owner as soon as practicable after said Formal Opening. Hyatt and Owner shall execute an addendum to this Agreement, substantially in the form attached hereto as Exhibit B, setting forth the date of the Formal Opening and a counterpart of such addendum shall be attached to and become a part of each counterpart of this Agreement.

**Section 6.  Master Declaration; Common Areas.**

Subject to the applicable laws of the Country, Hyatt acknowledges that the entire Resort Project will be subject to a declaration of covenants, conditions and restrictions or other similar agreement (the "**Master Declaration**") and such sub-condominium regimes for each condominium component, including the Hotel and the Residences or a similar structure selected by Owner and subject to the reasonable approval of Hyatt.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

6

**PRIVATE & CONFIDENTIAL**

Hyatt shall have the right to review and approve of all of the Project Documents (as defined below) including those governing the sub-condominium regimes applicable to the Hotel and Residences as well as any other documents pertaining to or burdening the Hotel and the Residences as components of the Resort Project. Hyatt shall have the right to object to the Project Documents solely in the event that such Project Documents do not or would not permit the Hotel or the Residences to be used, operated, maintained or repaired in accordance with the Hyatt Operating Standards and the terms of this Agreement. Owner acknowledges and agrees the Project Documents shall provide that any successor to or assignee of Owner thereunder shall be subject to the Project Documents pursuant to the terms and conditions thereof.

As used in this Agreement, "**Common Areas**" are all of the areas identified in the Master Declaration as being common as between the Hotel, Residences and any other components of the Resort Project. The Common Areas shall be accessed and shared between the Hotel, the Residences and the other components of the Resort Project upon reasonable rules and regulations established by Owner from time to time in accordance with the Master Declaration. In making such rules and regulations, Owner shall (i) take into account the Hyatt Operating Standards and shall use its good faith commercially reasonable endeavors to ensure that the Hotel enjoys access to all such areas at a level generally commensurate with such standards, (ii) ensure that the rules and regulations to do not have a materially detrimental impact on the operation of the Hotel or the Residences, and (iii) shall not discriminate against the Hotel or the Residences in favor of any other operations in the Resort Project (subject to the rights of members as to any "private" club established as to any component of the Common Areas). Prior to the adoption of the rules and regulations, or any subsequent modification thereto, Owner shall provide Hyatt with a copy for Hyatt's review. Owner shall consider, in good faith, Hyatt's comments and requests for changes in such rules and regulations and, if it determines not to accept Hyatt's comments, it shall be obligated to provide reasonable explanations for its refusal. It is anticipated that all Common Areas shall be managed by Owner, KHT or other Affiliates of Owner or KHT or professional, first-class third party operators as may be designated by Owner or KHT in its reasonable discretion. Owner acknowledges and agrees that Hyatt shall not have any obligations or responsibility under this Agreement or otherwise in respect of the management or operation of the Common Areas or any other element of the Resort Project unless specifically agreed by the parties in the form of a written agreement or amendment to this Agreement.

Owner hereby agrees that as soon as practicable, but in no event later than the Formal Opening, it shall enter into and/or shall cause its Affiliates or third party management companies on behalf of Owner or its Affiliates to enter into a reciprocal easement agreement and cost sharing arrangement with Hyatt, as agent of Owner, in form and content reasonably acceptable to Hyatt, providing for (1) satisfactory rights of control and access to the Hotel relating to the use of the Common Areas in question and fair, equitable and reasonable cost sharing arrangement for the costs and the

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

7

**PRIVATE & CONFIDENTIAL**

expenses incurred for the maintenance and operation the Common Areas, and (2) the terms and conditions of the Hotel's reasonable use of and access, when developed, of other areas, such as the 18-hole golf course and marina, with the understanding that such access and use rights shall be of a level commensurate with the Hyatt Operating Standards taking into consideration the reasonable rights of members as to any "private" club established as to the golf course and marina and the reasonable rights of guests of other hotels, if any, developed within the Master Project.

### Section 7. Affiliates

The term "**Affiliate**" shall mean, with respect to any person (as defined below), any other person, firm, corporation, limited liability company, partnership, association, trust or other entity which, directly or indirectly, controls, is controlled by, or is under common control with, the subject entity. For purposes of this Section 7, the term "**person**" shall mean an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof. For purposes hereof, the term "**control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, either alone or in combination with any one or more persons. Accordingly (and without limiting the generality of the preceding provisions), a corporation shall be deemed under the "control" of another corporation, if a majority of the directors of said corporation also compromise a majority of the directors of the other corporation. Persons who are Affiliates of each other are sometimes herein referred to as being "affiliated".

### Section 8. Key Money

Provided Owner is not in default (beyond any applicable notice and cure period) in the performance of any obligations pursuant to this Agreement or any other agreement between Hyatt or any Affiliate of Hyatt and Owner, including payment of all amounts owing to Hyatt's Affiliate pursuant to the Technical Services Agreement, Hyatt agrees to and shall pay to Owner "key money" in the amount of ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮      ▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "**Key Money**") within thirty (30) days following the date of the Formal Opening of the Hotel with the full inventory of guestrooms in Phase I.

The Key Money shall be amortized on a straight-line basis over a period of fifteen (15) years commencing as of the first (1st) day of the calendar month following the date of the payment of the Key Money. The amount of Key Money remaining unamortized as of any date is herein referred to as the "**Unamortized Key Money**". If this Agreement is terminated for any reason, other than as a result of a Hyatt default,  Owner shall immediately pay to Hyatt, concurrent with the effective date of the termination of this Agreement, the Unamortized Key Money. For purposes of determining the Unamortized Key Money, no interest shall be charged or imputed to the Key Money. With respect to any termination of this Agreement as permitted pursuant to the terms of this Agreement, the obligation of Owner to pay to Hyatt the Unamortized Key Money shall survive the

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

termination of this Agreement. In the enforcement of the obligation, Hyatt shall have all rights and remedies available at law or in equity.

**ARTICLE II**
**Operating Term**

The term of this Agreement shall commence upon the date hereof and the initial operating term hereunder (the "**Initial Term**") shall commence at the Formal Opening and expire at midnight on December 31 of the twentieth (20th) full Fiscal Year following the year that includes the Formal Opening. "**Operating Term**" shall mean and include the Initial Term and any Extension Period (as defined below).

The Operating Term may be extended by Hyatt for up to three (3) periods of ten (10) years each as follows (each an "**Extension Period**"):

(a)     As to the first Extension Period following the Initial Term, Hyatt shall have the right provided Hyatt is not in default (beyond any applicable notice and cure period) in the performance of any obligations under this Agreement, in the exercise of its sole discretion, to extend the Operating Term for a period of ten (10) years, upon the same terms and conditions as set forth in this Agreement. To exercise its right to extend the Operating Term, at least one hundred eighty (180) days before the expiration of the Initial Term, Hyatt must send a written notice (an "**Extension Notice**") to Owner of the exercise of the right to extend the Operating Term for the first Extension Period. If Hyatt does not send the Extension Notice to Owner within the requisite time period, the Operating Term shall expire as of the end of the Initial Term.

(b)     As to each of the second and third Extension Periods, subject to the terms of this subsection (b), Hyatt shall have the right provided Hyatt is not in default (beyond any applicable notice and cure period) in the performance of any obligations under this Agreement, in the exercise of its sole discretion, to extend the Operating Term for successive periods of ten (10) years each, upon the same terms and conditions as set forth in this Agreement. Hyatt's right to extend the Operating Term for each of the second and third Extension Periods is subject to there not having occurred a failure of the Performance Test (regardless of whether or not Hyatt cures such failure) in any two (2) Fiscal Years during the last five-years of the then-current Extension Period. To exercise its right to extend the Operating Term for each of the second and third Extension Period, Hyatt must send an Extension Notice to Owner at least one hundred (180) eighty days prior to the end of each subsequent term. If Hyatt does not send Owner an Extension Notice within the requisite time period, the Operating Term shall expire as of the end of the then current Extension Period.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

PRIVATE & CONFIDENTIAL

## ARTICLE III
### Operation of the Hotel

**Section 1. Standards of Operation.**
Hyatt shall provide the day-to-day management services as appropriate and required to operate and manage the Hotel consistent with the standards comparable to those generally prevailing in luxury "Park Hyatt" hotels operated by Hyatt and its Affiliates (which standards Owner covenants and agrees with Hyatt, subject to any provisions of this Agreement providing to the contrary, including, without limitation, the below provisions of this Article III, to cause the Hotel to be in compliance with during the Operating Term), and Hyatt shall conduct all activities of the Hotel in a manner that is customary and usual to such an operation and, insofar as feasible and in its opinion advisable, local character and traditions (the "**Hyatt Operating Standards**").  In the performance of its duties and obligations hereunder, Hyatt agrees that it shall endeavor to manage and operate the Hotel for the account and benefit of the Owner in a business-like and efficient manner, and, in all events, in accordance with all terms of this Agreement, offering a high level of quality of guest amenities and services in a manner that is customary and usual to such an operation and consistent with the purpose and intention of balancing the maximization of the short-term profitability and long-term value of the Hotel subject in all respects to the terms of this Agreement.  A description of the 2012 Hyatt Operating Standards has been provided to Owner as of the Effective Date, with the acknowledgement that such standards may change from time to time in Hyatt's sole discretion.  Hyatt agrees to provide to Owner prompt written notice of any such changes.

Notwithstanding anything above or elsewhere herein to the contrary, subject to compliance with applicable law, Owner shall not be obligated to make any expenditures to comply with changes made to the Hyatt Operating Standards after Effective Date (i) in connection with the replacement of any Furnishings and Equipment until the expiration of the useful life of such Furnishings and Equipment, subject to required technology upgrades implemented at substantially all similarly situated Park Hyatt hotels, (ii) whatsoever prior to the three (3) year anniversary of the Formal Opening, subject to required technology upgrades implemented at substantially all similarly situated Park Hyatt hotels, or (iii) for any major capital expenditure unless agreed to in writing by Owner pursuant to the terms of this Agreement.   "**Useful Life**" for the purposes of clauses (i) and (ii) above shall mean the cycle for replacement of an asset or property as reasonably determined by the practice and custom of Hyatt implemented at substantially all similarly situated Park Hyatt hotels (which period may or may not correspond with the item's actual physical or economic life).

**Section 2. Chain Conflicts.**
Owner acknowledges that it has selected Hyatt for the supervision, direction, control, management and operation of the Hotel in substantial part because of Hyatt's management and operation of its chain of first-class hotels and resorts, and the

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

10

**PRIVATE & CONFIDENTIAL**

benefits, which Owner expects to derive by including the Hotel as part of the chain of hotels operated by Hyatt and its Affiliates (collectively, "**Hyatt Hotels**"). Owner further acknowledges that it has been determined, on an overall basis, that the benefits of operation as part of Hyatt Hotels are substantial notwithstanding that not all Hyatt Hotels will benefit equally by inclusion therein. Owner further acknowledges that in certain respects all hotels compete with all other hotels and that conflicts may, from time to time, arise between the Hotel and other Hyatt Hotels. Hyatt agrees, however, that it shall use reasonable efforts to minimize conflicts among the Hyatt Hotels, and will in all events proceed, both in its operation and management of the Hotel and in the operation and management of its other hotels, in a good faith manner and in a manner reasonably deemed to serve the overall best interests, on a long term basis, of all Hyatt Hotels including the Hotel. Owner hereby consents to the ownership, management, licensing and operation by Hyatt and its Affiliates of other chains of hotels, and to the addition of other hotels to the chain of Hyatt Hotels, wherever located (including the operation or addition of other hotels or hotel chains that may otherwise be deemed competitive with the Hotel), except as otherwise herein expressly prohibited or restricted, including, without limitation, Article XIX, Section 10.

> **Section 3. Hyatt Control of Operation.**
> Subject to the terms of this Agreement, Hyatt shall have complete control and exclusive discretion in the operation of the Hotel. Nothing herein shall constitute or be construed to be or to create a partnership or joint venture between the Owner and Hyatt, and the right of Owner to receive financial returns based upon the operation of the Hotel shall not be deemed to give Owner any rights or obligations with respect to the operation or management of the Hotel. The control and discretion by Hyatt shall include the use of the Hotel for all customary purposes, terms of admittance, charges for rooms and commercial space, entertainment and amusement, food and beverages, labor policies, wage rates and the hiring and discharging of employees (notwithstanding that Hyatt shall not be the employer of such employees), maintenance of the bank accounts and holding of funds in such bank accounts, and all phases of promotion and publicity relating to the Hotel.

> **Section 4. Leases and Concessions.**
> Hyatt shall operate in the Hotel all facilities and provide all services and shall not lease or grant concessions in respect of such services or facilities, except that Hyatt shall have the right on behalf of Owner (it being acknowledged and agreed that such right is being expressly granted in writing by Owner to Hyatt pursuant to the terms of this Agreement) or, if appropriate, in the name of Owner, which shall execute the necessary documents upon request of Hyatt, to lease or grant concessions in respect of commercial space or services of the Hotel that are customarily subject to lease or concession consistent with Hyatt Operating Standards.

> Leases and concessions other than those cancelable without material fee or penalty that extend for terms beyond (i) three (3) years, or (ii) the current expiration of

11

**PRIVATE & CONFIDENTIAL**

the Operating Term, are subject to the reasonable approval of Owner. Hyatt will negotiate in good faith in connection with leases and concessions to ensure that all terms are in the best interest of the Hotel. The rentals or other payments received by Hyatt or Owner under each such lease or concession shall be included in the Gross Revenue (as defined below).

Hyatt, on behalf of Owner, shall ensure that any lessee, licensee or concessionaire in the Hotel does not utilize the name "Park Hyatt St. Kitts" or "Park Hyatt" or "Hyatt" as part of its trade name or in its advertising or promotional materials (unless any such use has been previously approved by Hyatt in its reasonable discretion); provided, however, notwithstanding the foregoing, during the Operating Term, lessees, licensees or concessionaires operating in the Hotel shall be at liberty to state the name "Park Hyatt St. Kitts" as part of a geographic reference of their address, without any use of the "Park Hyatt" or "Hyatt" logos or any other trademark or logo of Hyatt or any of its Affiliates.

Hyatt and Owner acknowledge and agree that Owner may elect to cause all portions of the Hotel in which alcoholic beverages are served and/or the spa facilities within the Hotel to be leased to a third party or an Affiliate of Owner; provided however, (i) Hyatt, acting reasonably, shall have the right to approve the material terms of such leases, (ii) notwithstanding such lease(s), Hyatt shall manage all leased facilities as provided in this Agreement and (iii) the execution of such lease(s) shall not alter or effect the economic terms of this Agreement (*i.e.*, the Base Fee and Incentive Fee shall be calculated as though all such leased premises (and the revenue and expenses attributable thereto) are included in the Hotel).

### Section 5. Management Services.

Without limiting the generality of the foregoing, during the Operating Term subject to this Agreement, Hyatt shall, in consideration of its fees and subject to reimbursement of its expenses as hereinafter provided, inter-alia, (a) ask for, demand, collect and give receipts for all charges, rents and other amounts due from guests, patrons, tenants, sub-tenants, concessionaires and other third parties providing services to guests of the Hotel and, when desirable or necessary, cause notices to be served on such guests, patrons, tenants, sub-tenants and concessionaires to quit and surrender space occupied or used by them; (b) arrange for association with one or more credit card systems in conformity with general policy of Hyatt and its Affiliates in such regard; (c) subject to Owner's approval right as provided by Article III, Section 13 recruit, interview, and hire, on behalf of Owner, all employees of the Hotel and assign all salaries, wages, taxes thereon as appropriate, and social benefits, notwithstanding that Hyatt will not be the employer of such employees; (d) establish purchasing policy for the selection of suppliers and negotiate supply contracts to assure purchases are comparable to the prices and terms that would be offered by reputable and qualified unrelated third parties on an arm's length basis for similar goods and/or services (and, for purposes of such comparison, the goods and/or services being purchased may be

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

12

**PRIVATE & CONFIDENTIAL**

grouped in reasonable categories, rather than being compared item by item); (e) arrange for the purchase of utilities, equipment maintenance, telephone and other communications services, vermin extermination, security protection, garbage removal and other services necessary for the operation of the Hotel, and for the purchase of all food, beverages, operating supplies and expendables, Furnishings and Equipment and such other services and merchandise necessary for the proper operation of the Hotel; (f) provide appropriate sales and marketing staff (some or all of whom shall be located on-site during the Operating Term) and services including definition of policies, determination of annual and long-term objectives for occupancy, rates, revenues, clientele structure, sales terms and methods; (g) provide appropriate advertising and promotional services including definition of policies and preparation of advertising and promotional brochures (folders, leaflets, tariffs and fact sheets, guide books, maps, etc.) to be distributed in Hyatt Hotels and sales offices; (h) cause its Affiliates to furnish the sales and marketing services and centralized reservation services as provided for in Section 2 of Article VII; (i) make available its own and its affiliated companies' personnel for the purpose of reviewing all plans and specifications for alteration of the premises, and advising with reference to the design of replacement Furnishings and Equipment and the quantities required, and in general for the purpose of eliminating operational problems or improving operations; (j) establish and implement training and motivational programs for employees of the Hotel separate and distinct from Hyatt Hotels or in which the Hotel participates with one or more Hyatt Hotels; (k) arrange for the insurance coverage to be maintained by Hyatt as provided in Article VIII and comply with the terms of all applicable insurance policies; (l) institute or contest in the name of Owner lawsuits or other legal actions in connection with the operation of the Hotel deemed necessary or advisable by Hyatt, Owner shall promptly be advised of any such proceeding and shall have the right to participate in and approve any settlement or compromise thereof; (m) install and maintain the accounting books and records relating to the Hotel in accordance with the provisions of Section 1 of Article V and other information systems required for the efficient operation of the Hotel; (n) subject the accounting books and records and operations systems of the Hotel to review by internal auditors of Hyatt or its Affiliates; and (o) maintain and enhance the computer software for the hotel operations management system, all in accordance with Hyatt Operating Standards and Hyatt Design Standards, as applicable. To the extent necessary to enable Hyatt to comply with its obligation provided in this Section 5 or elsewhere in this Agreement, Owner shall from time to time, upon the reasonable request of Hyatt, provide to Hyatt one or more specific and limited powers of attorney in form and content reasonable approved by Owner.

In addition to the foregoing, throughout the Operating Term, Hyatt or its Affiliates may make available to and for the benefit of the Hotel certain services to be provided to Hyatt Hotels as may be reasonably required to be provided pursuant to the terms of this Agreement, on a centralized services platform including for finance, accounting, human resources, information technology and other operating systems (as such services may be added, deleted or altered by Hyatt or its Affiliates, from time to time), and if such

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

13

**PRIVATE & CONFIDENTIAL**

services are so made available by Hyatt or its Affiliates on a centralized basis, the Hotel shall participate in such services. The cost of such services shall be allocated in a reasonable manner determined in good faith by Hyatt or its Affiliate intended to reflect the portion of time devoted by employees in rendering such services to the Hotel and, with respect to other costs, so as to reflect, as nearly as reasonably possible, the portion of such costs fairly and reasonably attributable to the rendition of such services to the Hotel and at no profit to Hyatt or its Affiliates. Hyatt and its Affiliates may revise the allocation of such costs, from time to time, as may be necessary in the reasonable business judgment of Hyatt or its Affiliates to determine the costs attributable to the rendition of such services for some or all Hyatt Hotels. Any allocation of shared personnel or other costs made by Hyatt or its Affiliates in good faith and with the intention of fairly allocating such costs shall be binding on Owner.

### Section 6. Operating Bank Account(s).

Hyatt shall deposit all funds received from the operation of the Hotel into one or more bank account(s) (collectively, the "**Operating Bank Accounts**") opened on behalf of, and in the name of, Owner in a depository reasonably designated by Hyatt and reasonably approved by Owner, provided that in all cases it shall be with one of the approved banks from which Hyatt receives such services. From the Operating Bank Accounts disbursements of the entire cost and expense of maintaining, conducting and supervising the operation of the Hotel, the payments pursuant to Sections 1 and 3 of Article IV, Section 2 of Article VII, capitalized alterations, additions and improvements pursuant to Section 3 of Article VI, and any other expenditures in accordance with the terms of this Agreement shall be made by such employees of the Hotel designated by Hyatt whose signatures shall be authorized by resolution of the board of directors of Owner. The sole authorized signatories of the Operating Bank Account(s) shall be the General Manager or an Executive Assistant Manager of the Hotel (as "A" signatories) and the "**Director of Finance**" (herein so called) or Assistant Director of Finance of the Hotel (as "B" signatories). Owner and Hyatt agree to cooperate in connection with the establishment and operation of the Operating Bank Accounts pursuant to this Section 6. Subject to Hyatt continuing to be provided access to the Operating Bank Accounts as contemplated in this Agreement to ensure the uninterrupted operation of the Hotel including, without limitation, payment of all costs and expenses of its operation whenever arising and agreement of Owner's lenders on the Hotel to the same in writing, in form reasonably satisfactory to Hyatt, Owner may grant such lenders a security interest over the Operating Bank Accounts.

### Section 7. Consultations with Owner.

The General Manager and Director of Finance of the Hotel shall meet with Owner monthly to review, explain and discuss with Owner the monthly financial and operating results and cash flows of the Hotel, to review the "three-months' outlook" of the Hotel, and to discuss other operational matters of the Hotel and other operational matters pertaining to this Agreement as requested by Owner.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

14

**PRIVATE & CONFIDENTIAL**

### Section 8. Hyatt's Right to Contract.

In order to carry out its duties under this Agreement, Hyatt shall have the right, in the name of Owner, or in its own name as agent for Owner, subject to the terms of this Agreement and compliance with applicable law, to incur expenses and to enter into contracts with third parties in the ordinary course of business of the Hotel, in connection with Pre-Opening Services pursuant to the Technical Services Agreement as well as during the Operating Term, which contracts shall include, without limitation, contracts for sales of rooms, food and beverages and other facilities of the Hotel, the purchase of food and beverages and Operating Supplies, employment of personnel, advertising and business promotion, repairs and maintenance, administration, heat, light and power, insurance legal and accounting services, and other goods and services. Hyatt shall be required to obtain Owner's reasonable consent to enter into any contract or other arrangement (or series of related contracts or arrangements) if the expenditures thereunder would, or are reasonably anticipated to, exceed ██████████████ ████████████ (subject to CPI adjustment) in the aggregate, or if the non-cancelable term of such contract or other arrangement is in excess of one (1) year or the Operating Term; provided that Owner's consent shall not be required with respect to the following: (i) except as expressly provided in <u>Section 13</u> of this <u>Article III</u>, individual employment or compensation arrangements; (ii) contracts or expenditures in connection with System Services Charges (as defined below); (iii) expenditures incident to the booking of rooms, food and beverage and other Hotel business entered into in the ordinary course of business and performing Hotel obligations under any such booking arrangements; or (iv) contracts or expenditures reasonably required in order to protect life, health, safety or property in cases of emergency or casualty. Where appropriate, Hyatt shall competitively bid all contracts for goods and services and all such contracts shall be on market terms. Pursuant to <u>Section 5</u> of this Article, all amounts due and payable to the suppliers and goods and services in accordance with the terms of such contracts shall be paid from the Operating Bank Account(s), which shall be replenished, to the extent necessary to make all such payments, by Owner, as required under <u>Section 1</u> of <u>Article VII</u> of this Agreement. Any such contracts entered into by Hyatt as agent for Owner in compliance with this Agreement shall be honored by Owner if they shall survive the expiration or earlier termination of this Agreement, and Owner agrees to indemnify and hold Hyatt and its Affiliates harmless against any loss or liability arising out of the failure of Owner to comply therewith.

Hyatt shall have the right to institute, prosecute, defend, or settle (in Hyatt's name or in the name of the Hotel or Owner, as appropriate), legal actions and proceedings relating to the operation (as distinct from the ownership) of the Hotel, including actions or proceedings required to collect charges, rent or other income for the Hotel, to dispossess guests, tenants or other persons in possession therefrom, or to cancel or terminate any lease, license or concession agreement, and Owner shall cooperate with Hyatt in connection therewith, it being acknowledged and agreed that (i) Hyatt shall promptly notify Owner of legal disputes for which a summons, complaint, or other correspondence from an attorney has been received, and (ii) Owner's approval

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

15

**PRIVATE & CONFIDENTIAL**

shall be required to settle any claims where the proposed settlement payment exceeds ███████████████████████████████████). Notwithstanding the foregoing, Owner shall have the right to manage, defend and prosecute all property insurance claims that arise as a result of a loss due to an interruption in the operations of the Hotel or that exceed ████████████████████████████████████ ███████████ in value of claims. In addition, Owner shall have the right to institute, defend or settle any legal or equitable proceeding with respect to the Hotel, including the selection of counsel, where such proceeding relates specifically to the Site, building, or building systems, as opposed to the operation of the Hotel (such as, for example, but without limitation, environmental claims not arising from Hotel operations, and building compliance with zoning and building laws), it being acknowledged and agreed that any such legal or equitable proceeding shall be conducted by Owner, with counsel of its choice, and shall be an Owner expense and not an expense of the Hotel.

### Section 9. Contracts with Hyatt Affiliates.

In its management of the Hotel, Hyatt may purchase goods, supplies, insurance and services from or through Hyatt or any of its Affiliates so long as the prices and terms thereof are competitive with the prices and terms of goods, supplies and services of equal quality available from third parties. In addition, Hyatt may retain itself or any of its Affiliates as a consultant and to perform technical services in connection with the maintenance and enhancement of computer software for the hotel operations management system and substantial remodeling, repairs, construction or other capital improvements to the Hotel and Hyatt or its Affiliate shall be reasonably compensated for its services as agreed by Hyatt and Owner. Hyatt shall have the right to utilize the Hotel and its facilities to train employees of other Hyatt Hotels. The Hotel shall be reimbursed for any additional expenses that may be caused as a result of such training, unless such expenses shall be offset by benefits accruing to the Hotel arising out of services performed by such trainees.

### Section 10. Agency Relationship.

In the performance of its duties as manager of the Hotel, Owner herby appoints Hyatt as its sole and exclusive agent to supervise, direct, control, manage and operate the Hotel, and all of the facilities and amenities compromising any part of the Hotel, for the Operating Term, subject to, and in accordance with, the terms of this Agreement. Hyatt hereby accepts said appointment and shall supervise, direct, control, manage and operate the Hotel during the Operating term in accordance with the terms and conditions herein set forth. In the performance of its duties and obligations hereunder, Hyatt agrees that it shall at all times manage and operate the Hotel for the account and benefit of the owner in a business-like, efficient and profitable manner, and in accordance with all terms of this Agreement, offering guest amenities and services consistent with the Hyatt Operating Standards, subject in all respects to the terms of this Agreement. In the performance of its duties and responsibilities hereunder, Hyatt will use that degree of skill, care and diligence as is customary and usual of operators of first-class hotels in the Caribbean region, subject in all cases to the Hyatt Operating

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

16

**PRIVATE & CONFIDENTIAL**

Standards and to the provisions of this Agreement. Hyatt shall act solely as agent of Owner. As such, all debts and liabilities to third persons incurred by Hyatt in the course of its operation and management of the Hotel shall be the debts and liabilities of Owner only and, except as provided in Article VIII, Section 9, Hyatt shall not be liable for any such obligations by reason of its management, supervision, direction and operation of the Hotel for Owner. Hyatt may so inform third parties with whom it deals on behalf of Owner and may take any other reasonable steps to carry out the intent of this paragraph.

From time to time, in connection with the performance of its duties pursuant to this Agreement, Hyatt may be requested to provide to third parties evidence of its authority to manage the day-to-day operations management assistance and technical assistance services as appropriate and required to operate and manage the Hotel. As provided above in Section 5 of this Article III, in order to facilitate Hyatt's response to these third party requests, and to avoid unnecessarily disclosing the terms and provisions of this Agreement, Owner hereby agrees, upon request, to provide evidence to such third parties as needed.

**Section 11. Hyatt's Right to Reimbursement.**
During the Operating Term, Hyatt may elect to advance or to cause any of its Affiliates to advance its own funds in payment of any costs and expenses incurred for the benefit of the hotel operation that Hyatt shall have the right or the obligation to incur or cause to be incurred in accordance with the provisions of this Agreement, (a) whether incurred (i) separately and distinctly from costs and expenses incurred on behalf of other hotels of Hyatt or its Affiliates (collectively, the "**Hyatt Group**") or (ii) in conjunction therewith (including, without limitation, insurance premiums, advertising, business promotion, training and internal auditing programs, management operations reviews, social benefits of the Hyatt Group for which employees of the Hotel (including expatriate personnel) may be eligible, attendance of such employees at meetings and seminars conducted by members of the Hyatt Group and the System Services provided in accordance with Section 2 of Article VII), and (b) irrespective whether such funds shall be paid to any third party or to any member of the Hyatt Group or any other hotels operated by any member of the Hyatt Group. If any member of the Hyatt Group or any hotel operated by any member of the Hyatt Group shall advance its own funds as aforesaid, Hyatt shall be entitled to promptly reimburse itself, any member of the Hyatt Group or any hotel operated by any member of the Hyatt Group from the Hotel as set forth in this Agreement from the Operating Bank Account(s), without interest. Notwithstanding the preceding, neither Hyatt nor any of its Affiliates shall have any obligation to advance funds hereunder.

Reimbursable costs related to the above services, benefits or premiums shall be allocated in a reasonable manner determined by Hyatt or its Affiliates on a fair and reasonable basis, with the intention of fairly allocating such costs to the affected hotels.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

Any amount required to be reimbursed to Hyatt or any of its Affiliates in accordance with the provisions of this Agreement (but not the Base Fee or Incentive Fee with respect to which Hyatt shall be responsible for any and all income tax or withholding) shall be payable in US Dollars without reduction for sales, income, withholding, value added or any other taxes imposed by the Country, or bank charges or any other charges, at the principal office of Hyatt or its Affiliate or such other place as Hyatt may, from time to time, designate. In the event that the Country shall impose any sales, income, withholding, value added or other tax, upon such reimbursements of costs and expenses, or deem such reimbursements to be income taxable to Hyatt and/or its Affiliates, such taxes shall be for the account of and shall be borne by Owner, which shall promptly pay any such taxes in order that Hyatt and/or its Affiliates shall receive full and timely reimbursement for all of its advances hereunder.  Hyatt shall have the right to withdraw the amount of such reimbursements from the Operating Bank Accounts of the Hotel, utilizing such US Dollars or other currency freely convertible into US Dollars that may be available in such bank accounts and/or convert such amount from the currency of the Country to US Dollars.  If exchange control regulations of the Country delay the conversion of such amounts into US Dollars, Hyatt or its Affiliate may elect to receive and retain such amounts in the currency of the Country (at the official exchange rate published by the Eastern Caribbean Central Bank at the time payment is made) during the period of such delay, but such election shall not constitute a waiver of the right of Hyatt or its Affiliates to receive payment thereof in US Dollars.

### Section 12.  Employees of the Hotel.

Subject to Section 13 of this Article III, Hyatt shall select and appoint, on behalf of Owner, the General Manager of the Hotel. Hyatt shall, through the General Manager, on behalf of Owner and in accordance with the provisions of Section 3 of this Article III, select and appoint all employees of the Hotel, including the Hotel's executive committee members, expatriate personnel and other key executives of the Hotel. For each Fiscal Year, Hyatt shall forecast in the Annual Plan the overall amount of remuneration of employees of the Hotel including salary and benefit information by job category or department, as applicable.

As required by the laws of the Country, each employee of the Hotel, including the General Manager, shall be registered with those governmental authorities overseeing labor matters as employed by Owner or an Affiliate of Owner created by Owner to serve as the employer of the Hotel employees and not by Hyatt. Hyatt shall not be liable to such employees for their wages or compensation, and every person performing services in connection with this Agreement, including any agent or employee of Hyatt or any of its Affiliates or any agent or employee of Owner hired by Hyatt, shall be acting as the agent of Owner or the Affiliate of Owner designated by Owner to serve as employer. The aforesaid notwithstanding, Hyatt may elect to assign employees of Hyatt or any of its Affiliates or of other hotels of Hyatt temporarily or permanently as full-time members of the executive staff of the Hotel and pay the compensation, including social benefits, of such employees. In such event Owner shall reimburse Hyatt monthly for the total

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

PRIVATE & CONFIDENTIAL

aggregate compensation, including social benefits paid or payable to or with respect to such employees at cost, without any mark up for profit to Hyatt.

Owner may inform Hyatt about certain commitments that KHT has made to the governmental authorities of the Country concerning the hiring and training of employees at the Resort Project. Upon receipt of such information, the General Manager shall give due consideration to such commitments in the selection and training of the employees of the Hotel, subject to Hyatt's standard policies and procedures on employment. Owner acknowledges and agrees that KHT alone is responsible for the commitments it has with the governmental authorities of the Country.

### Section 13. The General Manager; Owner Appointment Approvals

Hyatt shall fulfill its obligations to operate and manage the Hotel under this Agreement and shall exercise its control and discretion in such operation by designating the General Manager to be employed by Owner (the "**General Manager**"), which General Manager shall (a) be familiar with Hyatt's method of hotel operation, (b) be furnished with Hyatt's policies and systems and procedures manuals from time to time in effect, and (c) as to major activities, be subject to the review and supervision of Hyatt, on behalf of Owner, while he or she shall retain full autonomy to make day-to-day decisions with respect to operations.

Owner shall have the right to approve of the persons Hyatt proposes to be appointed as the General Manager and the Director of Finance of the Hotel. Prior to appointing a General Manager or a Director of Finance, Hyatt shall provide Owner with a written summary of the proposed candidate's professional experience, proposed compensation and benefits, and qualifications, and shall offer Owner the opportunity to interview the candidate at the Hotel or another mutually acceptable location. Following such review and, if elected by Owner, interview, Owner shall provide its approval or disapproval of a candidate. Owner shall be deemed to have disapproved candidates selected by Hyatt if Owner has not notified Hyatt, in writing, of Owner's approval of such candidates within ten (10) calendar days following the later of Hyatt's providing Owner with the information noted above as to the candidate, or, if elected by Owner, the interview of the candidate in question. Owner may not reject more than three (3) candidates as to any opening for a designated position. In the event that Owner rejects all three (3) such candidates proposed by Hyatt for a designated position, and the Parties cannot thereafter in good faith agree upon which of the three (3) previously rejected candidates should be selected, Hyatt may appoint one (1) of the three (3) previously proposed candidates notwithstanding the failure of Owner to approve the candidate.

### Section 14. Hyatt's Management Modules.

The parties understand further that all of Hyatt's management modules including, but not limited to, policies and procedures, operations, accounting and training, which are furnished by Hyatt in connection with its management of the Hotel are and shall be

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

at all times, without further act or action, the exclusive property of Hyatt shall have the right to remove such management modules from the Hotel upon the expiration or sooner termination of this Agreement.

### Section 15. Staff Facilities.

During the Pre-Opening Period (as defined in the Technical Services Agreement) and throughout the Operating Term, Owner shall provide the General Manager with fully furnished accommodations with the necessary related facilities, furnished in accordance with the standards and specifications of Hyatt generally applied in Hyatt Hotels operating in the Caribbean region. For the expatriate personnel of the Hotel designated by Hyatt, Owner shall either provide such personnel with fully furnished accommodations (furnished in accordance with the standards and specifications of Hyatt generally applied in Hyatt Hotels operating in the Caribbean region) or housing subsidies as agreed upon in the approved Pre-Opening Budget or set forth in the Annual Plan. The third party costs and expenses of providing, maintaining and operating such accommodation, as well as the costs of any housing subsidies, shall be provided for in the Pre-Opening Budget or the Annual Plan, as applicable. Hyatt and Owner acknowledge that expatriate personnel will be employed at the Hotel; provided that Hyatt shall in good faith endeavor from time to time to maintain the minimum number of expatriate personnel reasonably necessary to operate the Hotel according to the Hyatt Operating Standards.

Hyatt shall provide Owner with summaries of local wage surveys every two years and shall keep Owner reasonably informed with respect to any changes in such pay scales, staffing levels and labor policies which are likely to have a material effect on the profitability of the Hotel. Hyatt shall have the right to engage in collective bargaining with the bargaining representative or representatives of Hotel employees, and to enter into collective bargaining agreements. Hyatt shall keep Owner advised on a current basis of the status of such collective bargaining negotiations, shall consult with Owner with respect thereto and shall, in good faith, endeavor to follow Owner's suggestions and recommendations. Specifically, in advance of any negotiations, Owner and Hyatt shall meet to jointly determine appropriate parameters and Hyatt shall thereafter endeavor to not enter into any agreement that is materially, in the aggregate, outside of such parameters.

### ARTICLE IV
### Management Fees and Owner's Profit Distribution

### Section 1. Hyatt's Fees.

During the Operating Term and during any period of partial operations prior to the Formal Opening, if any, Hyatt shall be entitled to receive management fees consisting of a base fee component ("**Basic Fee**") and an incentive fee component ("**Incentive Fee**") (collectively, the Basic Fee and the Incentive Fee are the "**Management Fees**") as follows:

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

A.    Monthly, as preliminary installments of its Basic Fee, an amount equal to three percent (3.0%) of the annual Gross Revenue during the current Fiscal Year, after deducting from such installment of Basic Fee all Basic Fees previously accrued on account of such Fiscal Year; and

B.    Monthly, as preliminary installments of its Incentive Fee, an amount equal to the following percentages of the cumulative annual Adjusted Gross Operating Profit during the current Fiscal Year (determined on an accrual basis from the beginning of the applicable Fiscal Year), after deducting from such installment of Incentive Fee all Incentive Fees previously accrued on account of such Fiscal Year as follows:

    (1)    six percent (6.0%) during the period commencing from the Formal Opening or, if applicable, from the commencement of partial operations of the Hotel prior to the Formal Opening, until the end of the second (2nd) full Fiscal Year;

    (2)    eight percent (8.0%) during the third (3rd) and fourth (4th) full Fiscal Years; and

    (3)    ten percent (10.0%) during fifth (5th) full Fiscal Year and each Fiscal Year thereafter until the end of the Operating Term.

The monthly preliminary installments of the Incentive Fee shall be equitably adjusted to reflect both seasonality and the then current projections for the balance of the Fiscal Year.

**Section 2.  Payment of Fees.**

The Management Fees shall be determined in East Caribbean dollars ("**XCD**") and shall be payable, monthly, in arrears, in US Dollars converted at the official exchange rate published by The Eastern Caribbean Central Bank on the date such fees are remitted, which shall not be later than thirty (30) days after the end of each calendar month but in no event earlier than the monthly report is delivered to Owner as provided in Article VII, Section 3. Owner, with Hyatt's assistance when necessary, shall be responsible, as an operating expense of the Hotel, for promptly obtaining all necessary government approvals, consents, licenses and authorizations as may be required by the applicable laws of the Country to make payment of the Management Fees under this Agreement. In the event of a delay and Hyatt's fees are not remitted within said thirty (30) day period, then such fees shall be converted at the official rate of exchange prevailing for US Dollars on such dates as such fees were originally determined. Hyatt shall have the right to withdraw the amount of the Management Fees from the Operating Bank Account, and after deducting such income or withholding taxes of the Country as may be applicable to such fees (which shall be the responsibility of Hyatt), remit its fees to its principal office or such other place as Hyatt may, from time to time, designate. If exchange control regulations of the Country delay the conversion of its

21

**PRIVATE & CONFIDENTIAL**

fees into US Dollars, Hyatt may elect to receive and retain such fees in XCD during the period of such delay, but such election shall not constitute a waiver of Hyatt's right to receive payment thereof in US Dollars. In the event that such fees shall be subject to any value added tax on turnover imposed by the Country, such fees shall be increased by the amount of such value added tax, and Hyatt hereby authorizes Owner and Owner hereby accepts to be Hyatt's accredited representative responsible for Hyatt's conformance with the applicable regulations of the Country, including the declaration and payment of such value added tax. Hyatt shall be responsible for any income or withholding tax(es) imposed by the tax authorities of the Country on the Management Fees.

To the extent that the Country tax authorities provide a reduction or rebate on occupancy or room taxes for the benefit of Owner, such rebate shall be payable to Owner, shall not be remitted to the Hotel and shall not affect the calculation of Adjusted Gross Operating Profit or Net Operating Income.

### Section 3. Owner's Profit Distribution.

Subject to the provisions hereinafter set forth, and subject always to the retention of working capital sufficient  to assure the uninterrupted and efficient operation of the Hotel in accordance with the Hyatt Operating Standards during the upcoming sixty (60) day period taking into consideration seasonality of Hotel operations, Hyatt shall cause to be transferred to Owner (at the Owner's principal office, or at such other place as Owner may, from time to time, designate in writing) from the Operating Bank Account, on a monthly basis concurrently with the payment of the Management Fees, the Adjusted Gross Operating Profit after deduction of the Management Fees provided for in Section 1 of this Article IV (without duplication of the deduction) and payment of all other fees and reimbursements due in connection with the Hotel, including, without limitation, those due and payable to any Affiliate of Hyatt in accordance with the terms of this Agreement and the required contributions to the Replacement Reserve ("**Owner's Profit Distribution**"), in installments as follows:

A.    A preliminary installment of Owner's Profit Distribution based on the Adjusted Gross Operating Profit for such Fiscal Year, after deducting any preliminary installments previously paid during such Fiscal Year; and

B.    Within sixty (60) days after the end of each Fiscal Year, a final installment based upon the Adjusted Gross Operating Profit for the entire Fiscal Year, after deducting therefrom, however, the amount of the preliminary installments paid under the preceding paragraph (A).

### Section 4. Year-end Adjustment.

If, for any Fiscal Year, the amount of the Owner's Profit Distribution due under Section 3 or the amount of the Management Fees payable to Hyatt under Section 1 of this Article IV as determined in accordance with the Certified Financial Statements

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

22

PRIVATE & CONFIDENTIAL

provided by the independent public accountant pursuant to underline subsection B of underline Section 3 of underline Article VII shall be less or greater than the preliminary installments paid without interest in accordance with underline Section 3 and underline Section 1 of this underline Article IV, respectively, then Owner or Hyatt, as may be the case, shall receive or repay the difference within thirty (30) days after receipt by Owner of said profit and loss statement.

### Section 5. Fiscal Years.

"**Fiscal Years**" under this Agreement shall coincide with and be identical to calendar years for all purposes, except that the first fiscal year shall be the period between the date of the Formal Opening and December 31 of that calendar year, unless the period is six (6) calendar months or less, in which event the first Fiscal Year would be the period from the Formal Opening until December 31st of the next succeeding year, and the last Fiscal Year shall be the period between January 1 of the year of that contains the effective date of termination and the date of such termination.

## ARTICLE V
## Determination of Adjusted Gross Operating Profit and Net Operating Income

### Section 1. Books and Records.

Hyatt shall keep full and adequate books of account and other records reflecting the results of the operation of the Hotel. Such books and records shall be kept in XCD on the accrual basis and in all material respects in accordance with the then current version of the "Uniform System of Accounts for the Lodging Industry", as adopted by the American Hotel and Lodging Association (the "**Uniform System**"), except as otherwise specified in this Agreement.

Owner shall have reasonable electronic access to the Hotel's accounting books and records. Upon termination of this Agreement, Owner will receive copies of all such books and records.

In addition to the Hotel's books and records, Hyatt shall maintain at the Hotel any guest profiles, contact information, histories and other information obtained or collected by Hyatt at the Hotel in the ordinary course of business from guests of the Hotel relating specifically to such guests' stay at the Hotel including, but not limited to, the following information about each guest: the frequency of such guest's visits to the Hotel; guest name, address, telephone numbers and electronic addresses (collectively, the "**Hotel Guest Data**"). Hotel Guest Data shall not include any additional proprietary and confidential guest or customer information maintained by Hyatt or its Affiliates in its corporate databases or elsewhere (*e.g.*, information regarding customer preferences that Hyatt tracks based on its guests' buying and usage patterns or information relevant to Hyatt's frequent guest program) and information that Hyatt has destroyed in compliance with its document retention policies. Owner and Hyatt shall jointly own all Hotel Guest Data and, upon termination of this Agreement, subject to applicable privacy laws, copies thereof shall be provided to Owner. Owner agrees to comply with all

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

23

**PRIVATE & CONFIDENTIAL**

policies and procedures regarding the collection, storage, use, processing and transfer of Hotel Guest Data that Hyatt may promulgate from time to time. Additionally, Owner agrees to execute any agreements or other documents, and to take any actions, that Hyatt may reasonably require Owner to execute or take from time to time in furtherance of the implementation of any data privacy or data security compliance program identified by Hyatt. Without limiting the generality of the foregoing, if Owner receives, accesses, transmits, stores or processes any Cardholder Data (defined below), then Owner agrees to maintain the confidentiality and security of that Cardholder Data at all times, both during the Operating Term and after this Agreement's termination or expiration. For purposes of this Agreement, "**Cardholder Data**" means any data that relates to either (a) a payment card authorized by or bearing the logo of a member of the Payment Card Industry ("**PCI**") Security Standards Council (the "**PCI SSC**") or any similar organization that Hyatt periodically specifies, or alternative technology or non-cash transaction method relating to payment that Hyatt periodically specifies, or (b) a person to whom such a payment card or alternative technology as described in (a) has been issued. Owner further covenants that it will, at all times during the Operating Term, in accessing, transmitting, storing or processing Cardholder Data, or in providing technology that accesses, transmits, stores or processes Cardholder Data, comply with (and cause all technology provided by or on behalf of Owner to comply with) the standards and measures required under the then current Payment Data Security Guidelines. For purposes of this Agreement, "**Payment Data Security Guidelines**" means the then current version of the PCI Data Security Standards ("**PCI DSS**") or any successor standards and measures that Hyatt periodically specifies for payment cards, alternative technologies or non-cash transaction methods relating to payment, including all associated audit and certification requirements, and any other applicable standards, measures, or requirements that may be periodically promulgated by the PCI SSC or similar organization that Hyatt periodically specifies, by any member thereof, or by any entity that functions as an acquirer, issuer, processor, card association, payment network or similar actor (each, individually an "**Acquirer**") with respect to a payment card or alternative technology. In addition, if Owner uses or provides (i) any payment applications that store, process or transmit Cardholder Data as part of authorization or settlement, or (ii) any personal identification number ("**PIN**") entry terminals used for payment card transactions or alternative technology relating to payment transactions that Hyatt periodically specifies, then Owner must ensure that such payment applications, PIN entry terminals, or alternative technologies (as the case may be) comply with applicable security standards and requirements, including the then current PIN entry device security requirements and Payment Data Security Guidelines. Hyatt has the right (but no obligation), in its sole discretion at any time and from time to time during the Operating Term, to audit Owner's compliance with this paragraph and to require Owner (the cost of which shall be an Operating Expense) to enroll or maintain enrollment in a third party audit and/or validation program that Hyatt monitors. Hyatt further reserves the right, in its sole discretion at any time and from time to time during the Operating Term, to disclose the results of such audits and/or validation programs to any Acquirer that provides services to Owner. Without limiting any of its other

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

24

PRIVATE & CONFIDENTIAL

obligations under this Agreement, Owner represents and warrants that all software, hardware and other materials used by Owner, or provided or made available to Hyatt by or on behalf of Owner, shall comply, and will not prevent Hyatt from complying, with all applicable Payment Data Security Guidelines and other data privacy or data security compliance programs that Hyatt identifies, and Owner agrees that during the Operating Term it will continue to comply, and will not prevent Hyatt from complying, with these requirements.   Owner's obligations with respect to Hotel Guest Data shall survive termination or expiration of this Agreement.

**Section 2.  Adjusted Gross Operating Profit and Net Operating Income.**
The term "**Adjusted Gross Operating Profit**" as used in this Agreement shall mean, for any relevant period, an amount, not less than zero, equal to the excess (if any) of (x) "Gross Operating Profit" as defined by the Uniform System over (y) the sum of the following amounts (but only to the extent that such amounts are not otherwise deducted in computing Gross Operating Profit):

      (a)    The Basic Fee and any Rental Fee paid for such period (but not the Incentive Fee) to the extent not already deducted in computing Gross Operating Profit; and

      (b)    The portion of the Hotel's association fees paid for such period allocable to the Hotel as a component of the Resort Project; and

      (c)    "Owner Splits" paid to Residence Owners of Rental Program Units under any Rental Program Agreement and, to the extent not already deducted in computing Gross Operating Profit, any costs and expenses to be paid from rental proceeds pursuant to the express terms of the Rental Program Agreement; provided that such costs and expenses shall not include those costs related to the "incidence of ownership" such as, but not limited to, the following: taxes, debt service, utilities and depreciation.

The term "**Net Operating Income**" as used in this Agreement shall mean, for any relevant period, an amount, not less than zero, equal to the excess (if any) of (x) Adjusted Gross Operating Profit over (y) the sum of the following amounts:

      (a)    The premiums paid for the Property Insurance coverage mandated under Section 1 of Article VIII for such period; and

      (b)    Amounts paid for real estate property taxes on the Hotel Site during such period; and

      (c)    Contributions to the Replacement Reserve for such period; and

      (d)    the Incentive Fee.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

25

**PRIVATE & CONFIDENTIAL**

By way of clarification, Exhibit C attached hereto and made a part hereof depicts in detail the calculation of Adjusted Gross Operating Profit and Net Operating Income.

Owner and Hyatt agree that in no event shall any payments under a Capital Lease (as defined below), any Capital Expenditures (as defined below), or any of the contribution to the Replacement Reserve or any expenditures made from funds on deposit in the Replacement Fund, or from the proceeds of insurance recoveries or condemnation awards, be deducted in computing Adjusted Gross Operating Profit. For the purposes of this Agreement, "**Capital Expenditures**" shall mean any costs or expenses with respect to the Hotel that are properly categorized as capital in nature under generally accepted accounting principles as such may be applied consistently with Hyatt Operating Standards. "**Capital Lease**" shall mean any lease of Furnishings and Equipment or other items of personal property used or proposed to be used in connection with the operation of the Hotel and which, under generally accepted accounting principles, is classified as a "capital lease". Owner shall provide Hyatt with such information (including, without limitation, a copy of the lease in question) as shall be relevant for purposes of determining whether said lease is properly classified as a capital lease under generally accepted accounting principles.

It is the intention of the parties that the term "**Gross Revenue**" shall mean all amounts properly accounted for as Total Revenue for "Total Operated Departments" (as such term is defined in the Uniform System) in accordance with, and as defined in, the Uniform System. Notwithstanding the foregoing, there shall be excluded in determining Gross Revenue for any period the sum of: (i) any sales, excise or occupancy or other taxes actually collected during such period in accordance with Legal Requirements from guests or patrons of the Hotel and either remitted, or required to be remitted, to appropriate taxing authorities, (ii) gratuities to the extent paid directly or otherwise remitted to Hotel employees; (iii) amounts collected from guests or patrons of the Hotel on behalf of Hotel tenants and other third parties; (iv) interest earned on funds held in Operating Bank Accounts (if any); and (v) insurance proceeds, condemnation proceeds, financing or refinancing proceeds and the proceeds of sale of any real or personal property comprising part of the Hotel (as distinguished from the sale of merchandise, food and beverage and other consumer goods or services). Gross Revenue shall in all events include only amounts actually paid to the Hotel (in cash or services), and shall not include, except as otherwise herein expressly provided, the value of any goods or services provided by the Hotel on a complimentary or discounted basis in excess of actual amounts paid (in cash or services).

Any and all costs associated with any component of the Resort Project other than the Hotel (including, without limitation, costs relating to management, operation, repair and maintenance, refurbishment programs, etc.) shall not, under any circumstances, be deemed to be operating costs of the Hotel, and no such cost or expense shall ever be subtracted from Gross Revenue in determining Adjusted Gross Operating Profit. There shall, however, be subtracted from Gross Revenue in determining Adjusted Gross

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

26

**PRIVATE & CONFIDENTIAL**

Operating Profit (i) that portion of Common Area costs that is a fair and equitable allocation to the Hotel in accordance with Section 6 of Article I and (ii) costs incurred by Hyatt or the Hotel in operating the Rental Program. In computing Adjusted Gross Operating Profit, the Hotel shall bear only its fair, equitable and reasonable portion of any common expenses and costs.

Furthermore, it is understood and agreed that neither (1) Owner's costs and expenses nor (2) the costs and expenses of the Residence Owners in respect of their Residences shall be operating expenses of the Hotel, and therefore none of such costs shall be deducted from Gross Revenue in determining Adjusted Gross Operating Profit. Owner's costs and expenses shall include, but not be limited to, (a) Owner's administrative costs and expenses, (b) Owner's costs for any Owner initiated audits, (c) property damage insurance premiums ("building and contents" insurance) against fire, boiler explosion and such other risks (although these costs shall be deducted in calculating Net Operating Income; (d) ground rent and other payments made for the use or occupation of the Hotel Site; (e) real estate taxes and assessments, rates, real and personal property taxes related to the ownership of the property (although such property taxes shall be deducted when calculating Net Operating Income), withholding tax, value added tax and similar taxes, Owner's corporate profits and income taxes or like taxes; (f) debt service or any costs relating to the sale, marketing or maintenance of the LP Interests; (g) depreciation and amortization; and (h) any costs and liabilities Owner incurs in the sale and marketing of the Residences. As to the Residence Owners, costs and expenses of the Residence Owners shall include, where applicable, the expenses of the nature identified in clauses (c), (d), (e), (f) and (g), as well as costs of utilities and contributions to any Furnishings and Equipment or capital reserve funds.

In determining the Adjusted Gross Operating Profit or Net Operating Income for any Fiscal Year, no adjustment shall be made for or on account of any deficiency in the Adjusted Gross Operating Profit or Net Operating Income of any prior Fiscal Year.

## ARTICLE VI
## Repairs and Changes

### Section 1. Normal Repairs and Maintenance.
Subject to the provision of adequate working capital by Owner pursuant to Section 1 of Article VII, Hyatt shall (save as provided in Section 4 of this Article VI), repair and maintain the Hotel in good order and condition, ordinary wear and tear excepted, recognizing the need to maintain the Hyatt Operating Standards, in accordance with maintenance programs established and implemented by Hyatt, from time to time, under the terms of this Agreement.

### Section 2. Replacements of and Additions to Furnishings and Equipment.
An amount annually equal to (a) two percent (2.0%) of Gross Revenue from the partial opening of the Hotel through the end of the first (1st) full Fiscal Year of the

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

27

**PRIVATE & CONFIDENTIAL**

Operating Term, (b) three percent (3.0%) of Gross Revenue during the second (2nd) full Fiscal Year of the Operating Term, (c) four percent (4.0%) of Gross Revenue during the third (3rd) and fourth (4th) full Fiscal Years of the Operating Term; (d) five percent (5.0%) of Gross Revenue during the fifth (5th) through seventh (7th) full Fiscal Years of the Operating Term, (d) six percent (6.0%) of Gross Revenue during the eighth (8th) and ninth (9th) full Fiscal Years of the Operating Term, and (e) thereafter, in each succeeding Fiscal Year of the Operating Year, seven and one half percent (7.5%) of Gross Revenue, together with all proceeds from the sale of Furnishings and Equipment, shall be credited to a reserve for replacements of and additions to Furnishings and Equipment (the "**Replacement Reserve**"). The amounts shall be transferred monthly by Hyatt from the Operating Bank Account(s) of the Hotel into another bank account under the control of Hyatt (the "**Replacement Fund**") bearing interest, which interest, less any income taxes assessed there against, shall be credited to the Replacement Reserve and accumulated in the Replacement Fund or, if the parties so mutually agree, otherwise invested. The Replacement Fund shall be maintained with the same bank as the Operating Bank Account(s), and the authorized signatories of the Replacement Fund shall be the same individuals as are authorized signatories of the Operating Bank Account(s) in accordance with <u>Section 6</u> of <u>Article III</u>. As contemplated in the Annual Plan, and subject in all respects to the limitations provided in <u>Article III, Section 1</u> above, the General Manager shall be entitled to withdraw from the Replacement Fund and shall charge against the Replacement Reserve any amounts required to make replacements of and additions to Furnishings and Equipment deemed by him or her to be necessary or desirable in order for the Hotel to meet Hyatt Operating Standards and Hyatt Design Standards, which Furnishings and Equipment shall be and become, forthwith upon acquisition and installation and without further act or action, the property of Owner. Except for emergency situations or as necessary to comply with applicable law, in no event shall Hyatt make any expenditures from the Replacement Reserve except as provided in the Annual Plan.

**Section 3.  Routine, Minor Alterations.**
As contemplated in the Annual Plan, Hyatt shall have the right to make, from time to time, such minor alterations, or improvements or routine repairs and maintenance (collectively referred to herein as "**Routine Maintenance**") in or to the Site, building(s), installations and building systems as are customarily made in the operation of first-class hotels and are deemed by Hyatt to be necessary or desirable according to Hyatt Operating Standards, to more efficiently operate the Hotel. The costs of such Routine Maintenance shall be charged as Hotel expenses in accordance with sound hotel accounting practices.

**Section 4.  Essential Repairs, Changes, and Replacements.**
If at any time during the Operating Term major repairs to the building(s), installations or building systems, changes to the Hotel, or replacements (including without limitation, repairs, changes and replacements by reason of items (other than Furnishings and Equipment) having become worn, obsolete, or being no longer

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

28

**PRIVATE & CONFIDENTIAL**

serviceable) which are not provided for in the Capital Budget (a) shall be required in order to comply with any laws, ordinances or regulations or any order of governmental authority or (b) shall be essential to the functioning or safety of the Hotel, including its structural integrity such repairs or replacements shall be made promptly by Owner and paid for by Owner, at its expense, not as a charge against Hotel operations pursuant to Section 2 of Article V. Such repairs and replacements shall be made promptly and with as little hindrance to the operation of the Hotel as possible.  The cost of major alterations or improvements and non-routine repairs and maintenance (whether or not such maintenance are Capital Expenditures) in or to the Hotel Site, building(s), building systems, structure, roof or other installations as are necessary due to obsolescence, malfunction or general disrepair, shall, to the extent agreed and set forth in the approved Capital Budget, be paid out of the Replacement Reserve.

**Section 5.  Other Changes, Replacements and Additions.**

Any changes, replacements, additions, or improvements of a capital nature not otherwise provided for in this Agreement shall, if mutually agreed in writing by the parties, be made promptly by Owner and strictly in accordance with plans, specifications and designs approved by Hyatt, and shall be paid for by the Owner at its expense and not as a charge against Hotel operations pursuant to Section 2 of Article V.

**Section 6.  Refurbishment Program.**

During the Operating Term, in the event the Hotel undergoes any refurbishment or renovation pursuant to a Refurbishment Program (as defined below), Owner, at its option, may elect to enter into a separate agreement with Hyatt or its Affiliates pursuant to which (a) Hyatt or its Affiliates shall be retained to provide technical consultative services for the planning, design and construction associated with the Refurbishment Program for an agreed fee, (b) such Refurbishment Program shall be required to meet the then applicable Hyatt Design Standards (as specifically set forth in such separate agreement), and (c) Owner shall be required to retain and hire the project consultants, including, without limitation, the design consultants (interior designers, design architects, and landscape architects) recommended by Hyatt and its Affiliates and approved by mutual agreement of the parties. To minimize disruption to the Hotel and its operations, any Refurbishment Program to be undertaken shall require the approval of Hyatt in terms of timing, scope, planning, and any other matters affecting Hotel operations.

For purposes of this Agreement, a "**Refurbishment Program**" shall mean: (i) any program for replacement of or additions to a major portion of Furnishings and Equipment as part of a program to renovate a block of not less than fifteen (15) guest rooms and suites; (ii) any program of replacement of carpeting, furnishings, fixtures or wall coverings in ten percent (10%) or more of the Hotel's public space, such as lobbies, guest room corridors, restaurants, banquet and meeting rooms and pre-function areas; or (iii) any material change in theme of any of the Hotel's restaurants or bars.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

29

**PRIVATE & CONFIDENTIAL**

## ARTICLE VII
### General Covenants of Hyatt and Owner

**Section 1. Opening Inventories and Working Capital.**
In conjunction with the pre-opening budget to be prepared by Hyatt or an Affiliate of Hyatt in accordance with the terms of the Technical Services Agreement (the "**Pre-Opening Budget**"), Hyatt shall submit to Owner, for Owner's review and approval, a budget for the initial inventories and working capital for the Hotel. All such costs shall be funded by Owner, as and when requested by Hyatt. In no event will the budget for initial inventories and working capital exceed ██████████████████ █████████ without the approval of Owner, not to be unreasonably withheld, conditioned or delayed. Owner shall provide funds for the initial inventories and working capital, including costs and expenses for the initial bank accounts, house cash funds, and inventories of food, beverages and Operating Supplies, and Owner shall, subject to the provisions of Section 3 of Article IV relating to a "rolling sixty (60) day period", initially and throughout the Operating Term at its sole expense provide working capital sufficient to assure the timely payment of all current liabilities of the Hotel (including the Management Fees payable under Section 1 of Article IV, the System Services Charges payable under Section 2 of this Article VII, and reimbursements for out-of-pocket and other expenses incurred by Hyatt or its Affiliates for the account of the hotel operation in accordance with the terms of this Agreement) and to assure the uninterrupted and efficient operation of the Hotel and the performance by Hyatt of its obligations hereunder. The total amount required for initial inventories and working capital is estimated to be approximately ████████████████████████ ███████. Owner shall make such funds available to Hyatt no later than six (6) months prior to the projected date of the Formal Opening. The amount required for initial inventories and working capital is exclusive of value added taxes and may vary from those indicated above if the assumptions on which the estimate is based change, including, without limitation, a material delay in the anticipated date of the Opening of the Hotel. In no event will Hyatt exceed the approved budget for initial inventories and working capital without obtaining the prior reasonable approval of Owner.

Owner agrees that the General Manager shall have discretionary control over the distribution of funds that the Owner is required to make available hereunder with respect to the provision for initial inventory and working capital, subject to the observance of the overall budget allocations as agreed upon by the parties in accordance with the terms of this Section.

**Section 2. System Services.**
Throughout the Operating Term, Hyatt shall make available to and for the benefit of the Hotel the full range of System Services made generally available by Hyatt to other "Park Hyatt" branded hotels ("**Park Hyatt Hotels**") from time to time (as such System Services are added, deleted or altered by Hyatt from time to time). The Hotel's participation in all such System Services shall be mandatory except with respect to

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

those System Services, if any, that Hyatt, from time to time at its election, designates as "non-mandatory".

"**System Services**" shall mean those services generally made available by Hyatt, or Affiliates of Hyatt, from time to time during the Operating Term on a central, regional or other shared or group basis in whole or in part to Park Hyatt Hotels and such other hotels operated or licensed by Hyatt or its Affiliates that Hyatt reasonably determines shall be provided such services. System Services may include, by way of example, (i) convention, business and sales promotion services (including the maintenance and staffing of Hyatt's corporate office worldwide sales force, national sales forces and regional sales offices located in various parts of the United States and the world), (ii) chain-wide marketing, advertising and public relations services, (iii) centralized reservations services, (iv) the frequent guest program of Hyatt and its Affiliates, and (v) control services for, among others, food and beverage, rooms, accounting, engineering, risk and human resource departments, some or all of which may, from time to time, be provided from a shared services center; provided, however, such control services shall not include any amounts for Hyatt's overhead in providing headquarters supervision over the management of the Hotel or over the management of any regional or shared services offices, without a profit to Hyatt. The scope of, and manner of providing, the System Services is subject to modification (including addition and deletion of services) from time to time during the Operating Term.

The Hotel shall be charged for its equitably allocable share of the System Services Costs (defined, below) attributable to the System Services in which the Hotel participates (or is obligated to participate); the amounts so charged (the "**System Services Charges**") shall be determined on the same basis as such amounts are determined for substantially all other Park Hyatt Hotels that participate in such System Services without mark-up, except as may be required by law. The method of allocation of the System Services Costs among participating Park Hyatt Hotels may change from time to time at the reasonable discretion of Hyatt, provided that such method of allocation shall at all times be determined on a reasonable, equitable and non-discriminatory basis.

For the purposes of this Agreement, "**System Services Costs**" shall mean, with respect to any of the System Services in which the Hotel participates (or is required to participate), all costs actually incurred or properly accrued by Hyatt or by any of its Affiliates during the period of determination in respect of the provision of such System Services, including (v) any costs or expenses payable to third party vendors or employees of Hyatt or its Affiliates (including support personnel) directly engaged in the rendition of such System Services, (w) occupancy costs, (x) costs of equipment leases and capital improvements, (y) administrative expenses allocable to such services, and (z) allocation of related carrying costs. In any case in which employees of Hyatt or any Affiliate of Hyatt devote less than all of their time to the provision of the applicable System Services, employee costs shall be allocated in a reasonable manner

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

31

**PRIVATE & CONFIDENTIAL**

determined in good faith by Hyatt to reflect the portion of time devoted by such employees to such System Services. Other shared costs such as occupancy costs, utilities, and the like relating only partially to System Services shall likewise be allocated by Hyatt to System Services Costs on a fair and reasonable basis as determined in good faith by Hyatt so as to reflect, as nearly as reasonably possible, the portion of such costs fairly and reasonably attributable to the provision of System Services. Any such allocation of shared personnel or other costs made by Hyatt and its Affiliates in good faith and with the intention of fairly allocating such costs, shall be binding on the parties hereto. System Services Costs shall include only the actual costs incurred by Hyatt, and shall not be subject to any mark up, premium or profit, except as otherwise specifically identified in this Agreement. Moreover, to the extent that Hyatt or any Affiliate of Hyatt receives (i) a fee or cost reimbursement from any third party, hotel, or hotel chain (including any of the Hyatt Hotels other than Park Hyatt Hotels) in consideration of the provision of one or more of the System Services to such third party, hotel or hotel chain, or (ii) any rebates, commissions or discounts from vendors or service providers whose costs are included as part of System Services Costs, such amounts so received (including any profit element) will be offset against System Services Costs. There shall likewise be credited against System Services Costs with respect to any period any amounts that Hyatt or any of its Affiliates are entitled to be paid in respect of System Services furnished during such period to hotels participating in System Services that (because they are under construction or are otherwise being prepared for opening), are not included (or, if partially included, to the extent not so included) in the group of hotels among which System Services Costs are then being allocated.

A current list of all System Services (including their designation as "mandatory" and "non-mandatory") and of the applicable System Services Charges payable by the Hotel with respect to such System Services shall be provided to Owner prior to each Fiscal Year as part of the Annual Plan for such Fiscal Year and Hyatt shall provide reasonable notice to Owner of material changes with respect to such System Services as they are thereafter implemented. A 2012 "System Cost Disclosure" schedule of mandatory and non-mandatory services provided by Hyatt or its Affiliates, as well as a description of the cost reimbursements and formulas and calculations attributable thereto, has been provided to Owner, prior to the Execution Date, subject to Owner's acknowledgement that the list of services and allocations may change from time to time in Hyatt's sole discretion. Hyatt agrees that the matters described on the 2012 System Cost Disclosure are applicable to substantially all similarly situated Hyatt Hotels and that any changes thereto shall be equitable and fair as to allocations among similarly situated Hyatt Hotels and shall be enforced as to substantially all similarly situated hotels in the Hyatt Hotels system.

**Section 3. Reports.**
Hyatt shall deliver to Owner:

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

32

**PRIVATE & CONFIDENTIAL**

A.      On or prior to the 15th of each month, a profit and loss statement for the prior month showing the results of the operation of the Hotel for the preceding month and the year to date, and containing computations of the Adjusted Gross Operating Profit, Net Operating Income, the Management Fees and Owner's Profit Distribution. The figures contained in such statement shall be taken from the books of account of the Hotel maintained by Hyatt. Such statement shall reflect the terms of this Agreement and shall be prepared, insofar as feasible, in all material respects in accordance with the Uniform System.

B.      Within sixty (60) days after the end of each Fiscal Year, with the exception of the last Fiscal Year of the Operating Term, the parties agree to cause a profit and loss statement for the prior year to be drawn up and certified by an Independent Auditor (as defined below) based upon the books of account of the Hotel, which statement shall show the results of the operation of the Hotel during the preceding Fiscal Year and shall contain a computation of the Adjusted Gross Operating Profit, Net Operating Income, Management Fees, other payments due to Hyatt and its Affiliates under the this Agreement, and the Owner's Profit Distribution for such period, with a schedule annexed thereto showing all deposits in and withdrawals from the Replacement Fund made during such Fiscal Year and the balance thereof (the "**Certified Financial Statements**"). "**Independent Auditor**" shall mean a reputable firm of certified public accountants having substantial international hotel experience as shall be selected in accordance with this subsection. The cost of the audit shall be charged to the operations of the Hotel. Within sixty (60) days after the end of the last Fiscal Year (or a portion thereof) of the Operating Term, the Owner shall deliver to Hyatt a profit and loss statement certified by the aforesaid Independent Auditor, showing the results of the operations of the Hotel during such last Fiscal Year and containing computations of Adjusted Gross Operating Profit, Net Operating Income, the Management Fees, payments due to Hyatt and its Affiliates under the this Agreement, and the Owner's Profit Distribution for such period. In the event that the said Independent Auditor's opinions shall be unqualified, such certified statements shall be deemed correct and conclusive for all purposes. The Independent Auditor shall be appointed by the Owner, subject to the approval of Hyatt, from among international firms having the relevant reputation and experience, provided that such auditor is not otherwise the independent auditor of Owner or any of its Affiliates.

**Section 4. Annual Plan.**

On or before the first day of November of each Fiscal Year during the Operating Term, a proposed annual plan (the "**Annual Plan**") shall be provided by Hyatt to Owner, which shall include a marketing program, a forecast of replacements of and additions to

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

33

**PRIVATE & CONFIDENTIAL**

Furnishings and Equipment to be made pursuant to <u>Section 2</u> of <u>Article VI</u>, alterations, additions or improvements pursuant to <u>Section 3</u> of <u>Article VI</u> (the "**Capital Budget**"), and a budget of the estimated revenues and operating expenses of the Hotel for the following Fiscal Year (the "**Operating Budget**"), in reasonable detail and in such form as then utilized by Hyatt in the Hyatt Hotels for such purpose. In preparing the Annual Plan, Hyatt shall consider, among other things, the maximization of the Hotel's profitability over the near term and long term of the Agreement.

In addition, Hyatt shall provide to Owner (a) a summary of Hyatt's then applicable incentive compensation program at the time of delivery of the Annual Plan, and (b) notice of any changes in Systems Services and of the applicable System Services Charges as well as a description of cost reimbursements and formulas and calculations attributable thereto. Owner agrees that it shall promptly review all Operating Budgets and Capital Budgets submitted to it, and Hyatt agrees that it shall provide Owner with such additional and supplemental information with respect thereto as shall be reasonably requested by Owner and which may be prepared or compiled without unreasonable delay, expense or interruption of normal operations.

A.   <u>Operating Budget Review</u>. Within thirty (30) days following delivery of the Annual Plan by Hyatt to Owner, if Owner shall so request, Hyatt shall make available in the Country both the General Manager and a qualified representative of Hyatt to explain and discuss with the appointed representative(s) of Owner said Annual Plan and the opinions and recommendations of Owner with respect thereto. In this connection, Owner shall have the right to suggest changes in operating policies and in the proposed Operating Budget which it considers reasonably necessary to achieve the objectives of near-term and long-term maximization of the Hotel's profitability and value, subject in all respects to Hyatt Operating Standards. To the extent Hyatt disagrees with Owner's suggestions and comments, Hyatt shall provide Owner with written explanations for its disagreements. Hyatt shall consider Owner's opinions and recommendations in good faith and, to the extent that Owner's opinions and recommendations are reasonable and are in accordance with the then current market conditions in the Caribbean region and with the Hyatt Operating Standards, shall make appropriate adjustments to the Operating Budget to reflect such opinions and recommendations. If there is a disagreement with Owner's opinions and recommendations, Hyatt, acting reasonably, shall have the final authority to decide such disagreement based on Hyatt's hotel management expertise and after giving due consideration to current market conditions in the Caribbean region and the current operations of other similarly situated Park Hyatt hotels; however, Hyatt shall provide Owner with written explanations for Hyatt's final decision on the points of disagreement.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

34

**PRIVATE & CONFIDENTIAL**

Hyatt shall use its commercially reasonable endeavors to operate the Hotel in a manner consistent with the Annual Plan, including, without limitation, the Operating Budget. Notwithstanding anything to the contrary in this Section 4(A), Owner and Hyatt both acknowledge that the forecasts of revenues and estimated expenses contained in the Operating Budget represent Hyatt's best estimate of the same for the following calendar year and are not in any way a guarantee of actual results. Actual revenues and expenses can vary from forecasts and estimates for reasons beyond the reasonable control of Hyatt. Owner acknowledges that so long as Hyatt adheres to its covenant to use commercially reasonable endeavors to operate the Hotel in a manner consistent with the Operating Budget, Hyatt shall have no liability to Owner, and shall not otherwise be deemed in default hereunder, if actual operating results vary from the Operating Budget. Hyatt shall submit monthly reforecasts containing updated and revised cash flow forecasts, and, to the extent Hyatt reasonably anticipates declines in cash flow, promptly notify Owner and initiate reasonable and appropriate cost containment measures, and shall discuss with Owner additional measures intended to increase revenues or reduce expenses, or both.

B.    Capital Budget Approval

(1)    All items of expenditure contained in the Capital Budget shall be subject to Owner's approval; provided, however, subject to Section 1 of Article III, Owner agrees that it shall approve all Capital Budgets or relevant portions thereof that are reasonably necessary in order to enable the Hotel to meet the Hyatt Operating Standards. If Owner does not approve a proposed Capital Budget, or any line items or specific Capital Expenditure projects within a proposed Capital Budget, within thirty (30) days after delivery of the same to Owner, then such Capital Budget, or such line item(s) or Capital Expenditure projects not specifically approved by Owner, as the case may be, shall be deemed disapproved. In such event, Owner and Hyatt shall meet and confer in good faith in an effort to reconcile differences and reach consensus during the thirty (30) day period thereafter.

(2)    If, by the end of the sixty (60) day period following Hyatt's submission of the Capital Budget to Owner, Owner has yet to approve a Capital Budget or a specific Capital Expenditure project, or any portion thereof, Hyatt shall notify Owner in writing of any Capital Expenditure(s) Hyatt deems necessary for the Hotel to meet the Hyatt Operating Standards (collectively, the "**Disputed Capital Expenditures**"). If Owner does not agree to include the

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

PRIVATE & CONFIDENTIAL

Disputed Capital Expenditures in the approved Capital Budget, or as an approved Capital Expenditure project, within thirty (30) days after delivery of notice, such dispute shall be resolved in accordance with the provisions of Article XIV.

(3)    Hyatt may not incur any Capital Expenditures that are in excess of those required or permitted under the approved Capital Budget without Owner's prior written approval, except for: (i) expenditures for the replacement of or additions to Furnishings and Equipment (other than expenditures relating to Refurbishing Programs) from funds then on deposit which do not exceed ███████████████ ███████████████████████ (subject to CPI adjustment) for any single expenditure, or █████████████ ███████ ██████ ███████████ (subject to CPI adjustment) in the aggregate in any calendar year; (ii) expenditures including Capital Expenditures, which Hyatt reasonably deems necessary to minimize personal injury and property damage in cases of casualty or other emergency (in which event the expenditure in question may not exceed such reasonable amounts as are necessary to protect against personal injury or property damage, until more permanent measures are approved by Owner), or which Hyatt deems reasonably necessary in order to comply with applicable legal requirements.

### Section 5. Employees of Hyatt, its Affiliates or Other Hyatt Hotels.

Irrespective that all employees of the Hotel shall be employees of Owner, Owner hereby covenants and agrees that during the Operating Term and for a period of two (2) years, after the expiration or earlier termination thereof, neither Owner nor any Affiliate of Owner shall employ or utilize without the prior consent of Hyatt, in connection with the operation of the Hotel or otherwise, any person who served as the General Manager or Director of Finance of the Hotel; provided, however, any such person who contacts Owner seeking employment shall be excluded from the provisions of this paragraph, provided that Owner did not solicit such contact.

### ARTICLE VIII
### Insurance & Indemnification

### Section 1. Property Insurance.

Owner shall procure and maintain the following "Property Insurance" coverages with respect to the Hotel with reputable and financially responsible insurance companies selected by Hyatt having an A.M. Best rating of A- or better, the cost of which shall be a Hotel expense and, to the extent such insurance is procured by Hyatt, the cost thereof shall be reimbursed to Hyatt upon notice and delivery of an invoice, advice, document or other demand from Hyatt to Owner:

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

A.  All Risk Property insurance in an amount equal to the full replacement cost of the Hotel, to include the perils of flood, named windstorm, and earthquake (if the Hotel is in a zone warranting such coverages). If flood, earthquake and windstorm are not obtainable for replacement cost, a reasonable amount must be carried relative to other hotels of similar value and type located in the Hotel's market area.

B.  Boiler and machinery coverage, in amounts reasonably acceptable to Hyatt.

C.  Business interruption insurance for all risk perils (including flood, named windstorm, and earthquake to the extent applicable as reasonably determined by Hyatt) covering at least one (1) years' loss of profits and necessary continuing expenses for interruption of the Hotel. If business interruption is not obtainable, a reasonable amount must be carried relative to other hotels of similar value and type located in the Hotel's market area. Hyatt may maintain such coverage either in separate policies of insurance or as part of Hyatt's property and boiler and machinery coverage.

All policies of such insurance shall be carried in the name of Owner, with Hyatt and such of its Affiliates as Hyatt shall identify being named as additional insureds.

All insurance procured in accordance with this Section shall be obtained from reputable insurance companies of recognized responsibility and financial standing.

**Section 2. Operational Insurance.**

Hyatt shall procure and maintain the following "Operational Insurance" coverages with respect to the Hotel with reputable and financially responsible insurance companies selected by Hyatt having an A.M. Best rating of A- or better and licensed and authorized to do business in the jurisdiction in which the Hotel is located the cost of which shall be a Hotel expense which shall be paid or reimbursed to Hyatt out of the Operating Bank Accounts:

A.  Comprehensive public liability insurance, to include excess liability coverage, against claims for bodily injury, death or property damage occurring on, in or about the Hotel or in conjunction with the operations of the Hotel, and automobile liability insurance on vehicles operated in conjunction with the operation of the Hotel (whether owned, rented or leased in Owner's name or Hyatt's name).

B.  Workers' compensation insurance covering the Hotel employees, to include employer's liability, in compliance with or at a minimum not less than the statutory amount as required under applicable provisions of law.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

C. Crime insurance including (i) employee dishonesty coverage, covering Hyatt's employees in job classifications normally bonded or insured in other Hyatt Hotels or as otherwise required by law, (ii) loss inside the premises coverage, (iii) loss outside the premises coverage, (iv) money orders and counterfeit paper currency coverage, (v) depositor's forgery coverage, and (vi) computer fraud.

D. Employment practices liability insurance, relative to the Hotel employees, covering employment discrimination, harassment and wrongful discharge actions.

E. Subject to the reasonable agreement of Owner and Hyatt, such other insurance in amounts as Hyatt considers advisable for protection against claims, liabilities and losses arising out of or in connection with the operation of the Hotel taking into consideration what is appropriate for this type of hotel in its region.

**Section 3.  Payment of Fees and Expenses.**

Subject to Section 4 below, if the Hotel suffers damage or loss that results in an interruption in the operations of the Hotel, Owner shall nevertheless be obligated to pay to Hyatt all amounts that would be due to Hyatt under this Agreement had such damage or loss not occurred, including Management Fees, the allocated System Services Charges and all reimbursable expenses, but not any contributions to the Replacement Reserve.  Hyatt shall, however, use its good faith effort to minimize the allocated System Services Charges and reimbursable expenses.

**Section 4.  Application of Business Interruption Insurance Proceeds.**

If the business of the Hotel is interrupted by any event or peril covered by business interruption insurance, the proceeds of any such insurance, less any portion thereof that may be payable to a Lender to cover payments of regularly scheduled debt service, shall be paid to Owner and to Hyatt, as applicable, for the payment of the amounts described in Section 3 above. Provided that Owner has obtained business interruption insurance pursuant to the terms of this Agreement, the payment of Hyatt's Management Fees as set forth in Section 3 shall be satisfied solely from the proceeds of such insurance.  Except to the extent expressly provided in this Section 4 , all proceeds of business interruption insurance shall belong solely to Owner and Hyatt hereby waives any claim thereto.

**Section 5.  Payment of Other Operating Expenses.**

If the Hotel suffers damage or loss that results in an interruption in the operation of the Hotel, Owner shall nevertheless be obligated to pay all expenses of operating and maintaining the Hotel at a level that is reasonably jointly determined by Hyatt and Owner to be practicable given the damage or loss that occurred, subject to Hyatt's obligation to use commercially reasonable efforts to minimize such costs and expenses,

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

regardless of whether there are available to Owner any business interruption insurance proceeds to cover such amounts and Owner shall be responsible for depositing all amounts necessary for the operation and maintenance of the Hotel in the Operating Bank Accounts during the period of business interruption.

### Section 6. Cost and Expense.

Premiums on policies covering more than one (1) policy year shall be charged pro rata over the applicable period of the policies and allocated to the appropriate policy year. Any reasonable reserves, losses, costs, damages or expenses which are not fully insured, or which fall within deductible limits, shall be treated as a cost of insurance and shall be deducted in computing Adjusted Gross Operating Profit except for Capital Expenditures incurred for repair or reconstruction of the Hotel, or any part thereof, following a casualty occurrence.

All insurance coverage to be procured by Hyatt in accordance with Section 2 is a mandatory Centralized Service and the premiums therefore shall be included in the System Services Charges. Although premiums allocated to the Hotel for inclusion in Hyatt coverage shall be determined on an equitable allocation basis without an intention to operate the program to earn any profits to Hyatt or its Affiliates, Hyatt makes no assurance, representation or warranty that there may not be an element of profit to Hyatt, such profit being of an incidental nature.

### Section 7. Policies and Endorsements.

Where permitted, all insurance provided under this Article VIII shall name Hyatt, any Affiliate that Hyatt may designate, Owner, each member or partner of Owner, and each Lender and ground lessor as additional insureds on all liability policies and as loss payee on all property and crime policies, as their interests may appear. Specifically, without limitation, any policies providing for business interruption insurance shall name Hyatt as loss payee with respect to the Management Fees, System Services Charges and reimbursable expenses. If either Hyatt or Owner retains contractors to perform work at or with respect to the Hotel under contracts requiring the contractor to provide insurance coverage for the benefit of the contracting party, all such insurance shall name both Hyatt and Owner as additional insureds, and any contractor indemnification provisions in any such contracts shall be provided for the benefit of both Hyatt and Owner. The party procuring such insurance shall deliver to the other party certificates of insurance. To the extent reasonably obtainable, all policies of insurance required to be obtained under this Article VIII shall have attached thereto an endorsement that such policy shall not be cancelled or materially changed without at least thirty (30) days prior notice to Owner, Hyatt, the Lenders or any additional insureds.

### Section 8. Insurance Claims.

Subject to Article III, Section 8, Hyatt shall, on behalf of Owner, promptly investigate all accidents on or about the Hotel made known to Hyatt, and report the same promptly to the appropriate insurance carrier. Hyatt shall make a full report to

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

39

**PRIVATE & CONFIDENTIAL**

Owner as to all material claims for damages relating to the ownership, operation and maintenance of the Hotel, and as to any damage or destruction to the Hotel and the estimated cost thereof, as such matters become known to Hyatt, and shall prepare any and all reports and furnish any and all information required by any insurance company in connection therewith to the extent such information is within the knowledge or possession of Hyatt.

Neither Hyatt nor Owner shall assert against the other, and both Hyatt and Owner hereby waive with respect to each other, or against any Affiliate or person, and on behalf of their insurers, any claims for any losses, damages, liability or expenses (including attorneys' fees) incurred or sustained by either of them on account of injury to persons or damage to property arising out of the ownership, development, construction, completion, operation or maintenance of the Hotel, to the extent that the same are covered by the insurance required pursuant to this Article VIII. Each policy of insurance shall contain a waiver of subrogation reflecting the provisions of this Section 8.

### Section 9. Indemnity.
Owner agrees:

A.    To indemnify and hold Hyatt free and harmless from any liability for injury to persons or damage to property by reason of any cause whatsoever, either in and about the Hotel, the Resort Project or elsewhere, arising out of or in any way related to the Hotel, the Resort Project or the performance of this Agreement by Hyatt, its Affiliates, agents or employees, irrespective of whether negligence on the part of Hyatt is alleged;

B.    To reimburse Hyatt within thirty (30) days after demand for any money or other property which the latter is required to pay out for any reason whatsoever, whether the payment is for operating expenses or any other charges or debts incurred or assumed by Hyatt, or any other party, or judgments, settlements, or expenses in defense of any claim, civil or criminal action, proceeding, charge, or prosecution made, instituted or maintained against Hyatt or Owner jointly or severally, affecting or because of the condition or use of the Hotel or any component of the Resort Project, or acts or failure to act of Hyatt, employees or agents of Hyatt, Owner, employees or agents of Owner, or arising out of or based upon any law, regulation, requirement, contract or award relating to the hours of employment, working conditions, wages and/or compensation of employees or former employees of Owner, or any other cause in connection with the Hotel or the Resort Project; and

C.    To defend promptly and diligently, at Owner's expense, any claim, action or proceeding brought against Hyatt or Owner jointly or severally arising

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

> out of or connected with any of the foregoing, and to hold harmless and fully indemnify Hyatt from any judgment, loss or settlement on account thereof, regardless of the jurisdiction in which any such claims, actions or proceedings may be brought.

Notwithstanding the foregoing, Owner shall not be liable to indemnify and hold Hyatt harmless from any such liability to the extent that it that results from (i) the Gross Negligence, Willful Misconduct (each as defined below), and/or fraud of Hyatt or any Hyatt Party, or (ii) a material event of default (as defined in Article XII below) of Hyatt under this Agreement, and Hyatt shall indemnify and hold harmless Owner from any such liability arising from (i) above (it being acknowledged that the foregoing shall not be construed to limit Owner's right to pursue its contractual damage remedies against Hyatt with respect to amounts paid by Owner to one or more third parties in connection with any material event of default by Hyatt under the terms of this Agreement). Notwithstanding any legal definition to the contrary, the following terms shall have the meanings set forth below for all purposes of this Agreement:

"**Gross Negligence**" shall mean the failure by a Hyatt Party (as defined below) to exercise even the minimum amount of care in a way that shows recklessness or willful disregard. The parties to this Agreement contractually agree that this definition controls their relationship irrespective of any definition of such term or any absence in distinction between negligence and gross negligence under applicable law.

"**Willful Misconduct**" shall mean any act or omission by a Hyatt Party, which constitutes intentional, deliberate and/or conscious disregard in the performance of its duties under this Agreement.

"**Hyatt Party**" shall mean Hyatt, its Affiliates, or the corporate personnel of any of the foregoing (regardless of where located), in the performance of Hyatt's (or their) duties under this Agreement.

The acts or omissions (including Grossly Negligent, willful or fraudulent acts or omissions) of Hotel employees (*i.e.*, employees located at the Site) including management personnel shall not be imputed to Hyatt, or be deemed to constitute Gross Negligence or Willful Misconduct committed by Hyatt unless such acts or omissions resulted from Gross Negligence or Willful Misconduct by a Hyatt Party in the selection, hiring, training, management or supervision of such Hotel employees or the establishment and/or implementation of policies or procedures in connection with any of the foregoing.

## ARTICLE IX
### Damage to and Destruction of the Hotel

Provided that there does not occur damage to the Hotel resulting from a fire or other casualty to such an extent that the cost of repairs or restoration exceeds fifty

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

41

**PRIVATE & CONFIDENTIAL**

percent (50%) of the full replacement cost (excluding land, excavations, footings and foundations) of the Hotel (a "**Total Casualty**"), Owner shall, at its cost and expense and with due diligence, subject to the availability of insurance proceeds, repair, rebuild or replace the same so that after such repairing, rebuilding or replacing, the Hotel shall be substantially the same as prior to such damage or destruction. Each of Hyatt and Owner shall promptly execute any documents that are reasonably necessary to process the claim with the insurance carriers, as well as any contract with contractors or suppliers.

If the Hotel is damaged or destroyed by a Total Casualty, or if the Hotel is damaged or destroyed to such an extent that the estimated time for repair or restoration thereof, in the reasonable opinion of Owner, shall exceed twenty four (24) months from the commencement of such repair or restoration, or the damage or destruction shall occur at any time within the last two (2) years of the then applicable Operating Term (taking into account any remaining Extension Periods) and if, in connection with any of the foregoing, Owner elects not to rebuild or restore the Hotel, then either party shall be entitled to elect to terminate this Agreement by notice to the other party given at any time within ninety (90) days after the occurrence of such damage or destruction without fee or penalty. Owner acknowledges and agrees that it shall pay Hyatt the Unamortized Key Money and any outstanding Guarantee Payments (defined below), notwithstanding the unavailability of insurance proceeds.

If one of the parties terminates this Agreement pursuant to the preceding provisions and, at any time within two (2) years following any such termination, Owner nevertheless commences repair or restoration or rebuilding of a luxury, first-class hotel on the Hotel Site, Hyatt shall have the right (but not the obligation), exercisable at any time within ninety (90) days after Hyatt has actual knowledge of the commencement of such repair, restoration or rebuilding, to elect to manage and operate the rebuilt, repaired or restored hotel in accordance with the provisions of this Agreement from the opening date of the rebuilt, repaired or restored hotel and for the unexpired Operating Term (including available Extension Periods) remaining as of the date of the damage or destruction event which resulted in Owner's termination hereof. This provision shall terminate and be of no further force or effect if Owner transfer the Hotel Site to an unaffiliated thirty party after the termination of this Agreement (*i.e.*, the provisions of this paragraph shall not run with the Hotel Site).

## ARTICLE X
### Condemnation

If the whole of the Hotel shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority for any public or quasi-public use or purpose, or if such portion thereof shall be taken or condemned so as to make it imprudent or unreasonable to use the remaining portion as a hotel of the type and class immediately preceding such taking or condemnation, then the Operating Term shall terminate as of the date of such taking or condemnation. Any

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

42

PRIVATE & CONFIDENTIAL

award for such taking or condemnation shall be the property of Owner; provided, however, that Owner shall allocate that portion of the award fairly and equitably between Owner and Hyatt to compensate Hyatt for its loss as a result of such condemnation. Payment of all condemnation proceeds shall be subject to satisfaction of any outstanding debt encumbering the Hotel.

If only a part of the Hotel shall be taken or condemned and the taking or condemnation of such part does not make it unreasonable or imprudent to operate the remainder as a hotel of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate, but so much of any award made to Owner shall be made available as shall be reasonably necessary for making alterations or modifications of the Hotel, or any part thereof, so as to make it a satisfactory architectural unit as a hotel of similar type and class prior to the taking or condemnation. The balance of the award, after deduction of the sum necessary for such alterations or modifications, shall be the property of Owner; provided, however, that Owner shall allocate that portion of the award fairly and equitably between Owner and Hyatt to compensate Hyatt for its loss as a result of such condemnation.

## ARTICLE XI
### Right to Perform Covenants and Reimbursement

If Hyatt at any time shall fail, within the time limit and after due notice as specified in Article XII, to make any payment or to perform any act to be made or performed by it pursuant to this Agreement, Owner may without further notice to or demand upon Hyatt, and without waiving or releasing Hyatt from any obligations under this Agreement, make such payment or perform such act. All sums so paid by Owner and all necessary incidental costs and expenses in connection with the performance of any such act by Owner, together with interest thereon at the prime commercial lending rate of interest charged by the Bank of America National Trust and Savings Association, Charlotte, North Carolina, U.S.A., to its most creditworthy commercial borrowers from the date of Owner's making such expenditures shall be payable to Owner upon demand.

With the exception of emergency cases, neither party shall have the right to make any payment or to perform any act if there is a bona fide dispute between the parties as to the necessity thereof and such dispute has been submitted to arbitration.

## ARTICLE XII
### Defaults

The following shall constitute events of default:

A.  The failure of either party to make any payment to the other provided for herein for a period of thirty (30) calendar days after such payment is payable;

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

B.   The filing of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by either party;

C.   The consent to an involuntary petition in bankruptcy or the failure to vacate within sixty (60) calendar days from the date of entry thereof of any order approving an involuntary petition by either party;

D.   The appointment of a receiver for all or any substantial portion of the property of either party;

E.   The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating either party as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or a substantial part of such party's assets, and such order, judgment or decree shall continue unstayed and in effect for any period of one hundred twenty (120) consecutive calendar days;

F.   The voluntary abandonment of the Hotel by Hyatt;

G.   The failure by Owner to cure defects or deficiencies in the initial construction of the Hotel as required by and subject to the cure periods set forth in the Technical Services Agreement of which Hyatt shall notify Owner under Section 5 of Article I; and

H.   The failure by either party to perform, keep or fulfill any of the other material covenants, under-takings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of sixty (60) calendar days after notice of said failure or, such longer period as is necessary so long as such cure is being diligently pursued; provided that in no event shall such cure period exceed one hundred twenty (120) days.

In any of such events of default, the non-defaulting party may give to the defaulting party notice of intention to terminate this Agreement after the expiration of a period of fifteen (15) calendar days from the date of such notice, and upon the expiration of such period, this Agreement shall automatically terminate. If, however, upon receipt of such notice, the defaulting party shall promptly cure the default, then such notice shall be of no force and effect or, when such default is not susceptible of being cured within fifteen (15) calendar days, if the defaulting party shall take action to cure such default with all due diligence, then the effective date of the termination notice shall be extended for such reasonable time as shall be required for the defaulting party to cure such default.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

44

**PRIVATE & CONFIDENTIAL**

The rights granted hereunder shall not be in substitution for, but shall be in addition to any and all rights and remedies for breach of contract granted by applicable provisions of law.

Notwithstanding the foregoing, neither party shall be deemed to be in default under this agreement if a bona fide dispute with respect to any of the foregoing events of default has arisen between the parties and such dispute has been submitted to arbitration.

Additionally, by way of clarification, Hyatt's sole and exclusive remedy for Owner's failure to meet any milestone provided in Article XXIII below with respect to the initial construction of Phase I of the Hotel shall be as provided in Article XXIII and such failure shall not constitute a default hereunder.

Except as otherwise provided in this Agreement, should either party hereto be delayed in or prevented, in whole or in part, from performing any obligation or condition hereunder with the exception of the payment of money, or from exercising its rights by reason or as a result of any force majeure, such party shall be excused from performing such obligations or conditions while such party is so delayed or prevented and for thirty (30) days thereafter. The term "**force majeure**" as used herein means acts of God, acts of government, acts of terrorism, strikes, lockouts, or other industrial disturbances, acts of public enemy, blockades, wars, insurrections or riots, epidemics, landslides, fires, storms, floods, explosions, or other similar causes beyond the control of such party.

**ARTICLE XIII**
**Trade Name**

During the Operating Term, the Hotel shall at all times be known and designated as "Park Hyatt St. Kitts Christophe Harbour" except as may otherwise be mutually agreed by Owner and Hyatt. It is recognized, however, that the names "Hyatt" and "Park Hyatt" (as well as "Grand Hyatt", "Park Hyatt", "Hyatt Place", "Andaz", "Hyatt House" and "Hyatt Summerfield Suites"), when used alone or in conjunction with some other word or words, are the exclusive property of Hyatt Corporation, an Affiliate of Hyatt. Accordingly, no right or remedy of Owner for any default of Hyatt, nor delivery of the operation and management of the Hotel to Owner upon expiration or sooner termination of this Agreement, nor any provision of this Agreement shall confer upon Owner, or any transferee, assignee or successor of Owner or any person, firm or corporation claiming by or through Owner, the right to use the names "Hyatt", "Park Hyatt", "Grand Hyatt", "Regency", "Hyatt Regency", "Hyatt Place", "Andaz", "Hyatt House" or "Hyatt Summerfield Suites", either alone or in conjunction with any other word or words, in the use or operation of the Hotel or otherwise. In the event of any breach of this covenant by Owner, Hyatt shall be entitled to damages, to seek relief by injunction, and to other legal rights or remedies, and this provision shall be deemed to survive the expiration or sooner termination of this Agreement. Owner further acknowledges that Hyatt alone

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

has the exclusive right to determine the form of presentation of the Hyatt names and
marks (collectively, the "**Hyatt Protected Marks**") in conjunction with the operation of
the Hotel, including the marketing, promotion, advertising and management thereof, for
the sales or marketing of any goods or services, or on any Hotel signage. Owner
hereby covenants and agrees on its own behalf and on behalf of any Affiliate or agent or
independent contractor of Owner, or any transferee, assignee or successor, not to use
any of the Hyatt Protected Marks, either alone or in conjunction with any other word or
words, or in conjunction with any other logos, trademarks, trade names or other marks,
in connection with the use or marketing or operation of the Hotel or otherwise including
any project of which the Hotel may be part without, in any such case, the prior approval
of Hyatt. In the event of any breach of this covenant by Owner, Hyatt shall be entitled to
damages, to relief by injunction, and to other legal rights or remedies, and this provision
shall be deemed to survive the expiration or sooner termination of this Agreement.

During the Operating Term, Hyatt acknowledges that Owner and its Affiliates
have protected marks including, without limitation, KHT's rights in the name "Christophe
Harbour" (collectively, the "**Owner's Protected Marks**"); Owner's rights in the name
"Christophe Harbour" being subject to that certain license agreement to be entered into
prior to the Formal Opening by and between Owner and KHT or an Affiliate of KHT. In
the event of any breach of Hyatt's use of Owner's Protected Marks, Owner shall be
entitled to damages, to seek relief by injunction, and to other legal rights or remedies,
and this provision shall be deemed to survive the expiration or sooner termination of this
Agreement. Hyatt further acknowledges that Owner alone has the exclusive right to
determine the form of presentation of Owner Protected Marks. Hyatt hereby covenants
and agrees on its own behalf and on behalf of any Affiliate or agent or independent
contractor of Hyatt, or any transferee, assignee or successor, not to use any of the
Owner Protected Marks, either alone or in conjunction with any other word or words, or
in conjunction with any other logos, trademarks, trade names or other marks, in
connection with any use other than that related to the marketing or operation of the
Hotel in the ordinary course without, in any case, the prior approval of Owner. In the
event of any breach of this covenant by Hyatt, Owner shall be entitled to damages, to
relief by injunction, and to other legal rights or remedies, and this provision shall be
deemed to survive the expiration or sooner termination of this Agreement. Owner's
obligation to maintain and enforce its rights with respect to the Owner Protected Marks
shall be an obligation and cost of Owner and not a Hotel operating expense.

Upon the expiration or early termination of this Agreement, Owner shall change
the name of the Hotel to exclude the names "Hyatt", "Park" or "Park Hyatt."

Any and all documents created In connection with the sales of the Residences
that evidence an affiliation with Hyatt or the Hyatt Protected Marks or grant Owner the
right to use the Hyatt Protected Marks shall be coterminous with this Agreement without
any further action by the parties. Except as permitted by and in accordance with the

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

46

**PRIVATE & CONFIDENTIAL**

terms of the Marketing License Agreement, no Hyatt Protected Marks shall be used in connection with the offering, marketing or sale of any Residence or the Rental Program.

Hyatt represents and warrants that Hyatt Protected Marks are owned by Hyatt and/or an Affiliate and are fully and properly registered in the Country.

The provisions of this Article XIII shall survive the expiration or earlier termination of this Agreement.

## ARTICLE XIV
### Arbitration

#### Section 1. Amicable Resolution.
The Parties shall initially attempt to settle all disputes pertaining to this Agreement amicably through good faith negotiations.

#### Section 2. Agreement to Arbitrate.
Except as may be expressly provided for in the Trademarks License Agreement to be entered into between Owner and an Affiliate of Hyatt or as elsewhere therein expressly provided to the contrary, if mutual agreement or resolution of any dispute cannot be reached within a period of thirty (30) days after the date written notice is delivered by one party to the other claiming the existence of a dispute hereunder, then any such dispute arising out of or in connection with this Agreement, including without limitation any question regarding its existence, validity or termination, or damages related to a breach or termination hereof, shall be referred to and finally resolved by final and binding arbitration in accordance with the Rules of Arbitration of the International Centre for Dispute Resolution, a Division of the American Arbitration Association, in force on the Effective Date (the "**Rules**"), which Rules are deemed to be incorporated by reference into this clause and the provisions of Article XIX, Sections 11 and 12 below.

The arbitration shall be heard and determined by three (3) arbitrators, one each of whom shall be selected by the parties, and the third of whom shall be appointed by the mutual agreement of the two (2) arbitrators selected by the parties. If, within thirty (30) days following the date upon which a claim is received by the respondent, the arbitrators selected by the parties cannot agree on the third arbitrator, then the appointing authority shall select the arbitrator. The appointing authority shall be the International Centre for Dispute Resolution, a Division of the American Arbitration Association.

The place of arbitration shall be Miami, Florida, U.S.A., and the language to be used in the arbitration shall be English, provided that the Owner (to the extent permitted by the Rules) shall be entitled to procure a concurrent translation, with the costs thereof to be split equally between the Hyatt and the Owner.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

47

**PRIVATE & CONFIDENTIAL**

Any monetary award shall be made and shall be payable in U.S. Dollars, free and clear of any withholdings or deductions (including, without limitation, on account of taxes). The award shall include interest from the date of any breach or other violation of this Agreement to the date when the award is paid in full and the costs and expenses of the prevailing party, including reasonable legal fees. The arbitration shall also fix an appropriate rate of interest. In no event, however, shall the interest rate during such period be lower than the prime commercial lending rate charged by the Bank of America National Trust and Savings Association, Charlotte, North Carolina, U.S.A., to its most creditworthy commercial borrowers.

**Section 3. Exclusive Remedy.**
The arbitration award shall be the sole and exclusive remedy between the parties regarding any and all claims and counterclaims presented to the arbitration panel. The parties hereby waive any rights to appeal any arbitration award or to seek determination of a preliminary point of law by the English courts (or any court within the Country or elsewhere). The jurisdiction of the English courts (or any court within the Country or elsewhere) to rule on a question of law affecting the arbitration, or to hear any appeal from or entertain any review of the judicial award, pursuant to the United Kingdom Arbitration Act of 1996 or otherwise, is hereby ousted in so far as the Parties are legally able to do so.

**Section 4. No Disruption.**
Pending resolution or determination, the dispute and the arbitration proceedings will not cause any delay or interruption in the management and operation of the Hotel.

**Section 5. Confidentiality.**
The parties agree that the matters related to any dispute pursuant to this Article XIV, including, without limitation, the nature of any dispute, status or terms of any negotiations, proposed or final settlements, agreements, resolutions, awards or the status of any arbitration or other proceedings, and all statements, reports, projections and other information relating thereto (collectively, "**Dispute Information**") are strictly confidential. Each party shall ensure that such Dispute Information is not disclosed to the press or to any other third person or entity without the prior consent of the other arty. The obligations set forth in this Section 5 shall survive any termination of this Agreement. The parties shall coordinate with one another on all public statements, whether written or oral and no matter how disseminated, regarding the Dispute Information.

## ARTICLE XV
### Successors and Assigns

**Section 1. Assignment by Hyatt.**
Hyatt shall have the right to assign its rights and obligations under this Agreement to (i) any one or more Affiliates including, without limitation, wholly-owned

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

48

**PRIVATE & CONFIDENTIAL**

subsidiaries of Hyatt or of Hyatt Hotels Corporation, a Delaware, U.S.A. corporation ("**HHC**"), (ii) to any person that may become an Affiliate of Hyatt or HHC as a result of a related and substantially concurrent transaction, or (iii) to any successor or assign of Hyatt or of HHC that may result from any merger, consolidation or reorganization, or to a person that shall acquire all or substantially all of the business and assets of Hyatt and its Affiliates, provided that in each case, the assignee enjoys the benefits of the Hyatt organization to the same degree as Hyatt. If Hyatt assigns its rights pursuant to this paragraph, the assignor will not have any continuing liability under this Agreement and shall be released therefrom if, and to the extent that, the assignee has acquired all or substantially all of the business and assets of Hyatt and has expressly assumed such rights and obligations of this Agreement in a writing delivered to Owner.

Except as hereinabove provided, Hyatt shall not assign this Agreement without the prior consent of Owner. No delegation by Hyatt of any part of its operating duties and responsibilities hereunder to an Affiliate of Hyatt, and no change in the identity of the party or parties directly or indirectly in control of Hyatt (including HHC), shall be deemed an assignment of this Agreement.

### Section 2. Assignment by Owner.

Owner shall have the right to assign its rights and obligations under this or its interest in the Hotel to any Affiliate of Owner, provided that Owner shall continue to be liable under this Agreement to the same extent as though such assignment had not been made.

Owner shall not sell, assign or transfer the Hotel or any interest therein, or issue or permit the transfer of any ownership interest in Owner or in the Hotel to any person without Hyatt's prior written approval (which approval may be granted or withheld in Hyatt's sole and absolute discretion) (i) that is a "Competitor;" (ii) who does not have the financial capacity to perform the obligations of Owner under this Agreement (provided that the requirement set forth in this clause (ii) shall be deemed satisfied if the assignee has a net worth, including equity in the Hotel, as of the date of the assignment, of at least fifteen percent (15%) of the purchase price paid by such assignee); (iii) who would be considered by regulators in the gaming industry to be unsuitable business associates of Hyatt or its Affiliates or would in any way jeopardize the Hotel's liquor licenses; (iv) who fails or refuses to execute an assumption document, if so required; or (v) who is a Restricted Person (as defined below). For the purposes of this Section 2, "Competitor" means any entity that owns, franchises and/or manages, or is an Affiliate of any entity that owns, franchises and/or manages a full service (i.e., typically offers to hotel guests three (3) meals per day) hotel brand, trade name or service mark for a system of at least four (4) hotels with an average daily room rate for all or substantially all of the hotels in the U.S. during the then most recent full calendar year that is at least sixty percent (60%) of the average daily room rate for Park Hyatt hotels, but specifically excludes both (i) KHT and its Affiliates, and (ii) any person or entity that has a passive investment or minority interest in a Competitor so long as such person or entity is not

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

49

PRIVATE & CONFIDENTIAL

directly involved in the day to day management of such Competitor. Further, mere ownership of hotels, including, without limitation, full service hotels, shall not, in and of itself, cause any person or entity to be a Competitor. Any consent granted by Hyatt to an assignment shall not be deemed a waiver of the covenant herein contained against assignment in any subsequent case. Notwithstanding anything else in this paragraph to the contrary, it is understood that Owner intends to sell LP Interests (as defined below) in the ownership entity and/or beneficial ownership interests in the Hotel to finance certain aspects of the Hotel project. The sale of individual LP Interests and/or beneficial ownership interests in the Hotel shall not be a transfer of ownership interest in Owner requiring the approval of Hyatt under the terms of this Section 2, however, Owner covenants and warrants to Hyatt that buyers of LP Interests and/or beneficial ownership interests in the Hotel shall not be Persons who would be prohibited transferees under clauses (i), (iii), or (v) of the first sentence of this paragraph.

Section 3. Successors and Assigns.

The terms, provisions, covenants, undertakings, agreements, obligations and conditions of this Agreement shall be binding upon and shall inure to the benefit of the successors in title and the assigns of the parties, except that no assignment, transfer, pledge, mortgage or lease by or through Hyatt or by or through Owner, as the case may be, in violation of the provisions of this Agreement shall vest any rights in the assignee, transferee, mortgagee, pledgee, lessee or in any occupant.

## ARTICLE XVI
### Further Instruments

The parties shall jointly register this Agreement, execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action, including obtaining any government approval, necessary to make this Agreement fully and legally effective, binding, and enforceable as between the parties and as against third parties. Any fees or expenses incurred in connection therewith shall be borne by Owner.

## ARTICLE XVII
### Notices

All notices hereunder shall be in writing and shall be deemed duly delivered (i) upon personal delivery thereof to, and actual receipt by, the other party; (ii) upon electronic facsimile transmission to the other party, at its fax number as set forth below, provided such delivery is followed by an original of the notice delivered to the other party by international air courier delivery service, and provided the facsimile copy sent by the sender provides an automatic notation confirming the delivery thereof; or (iii) on the next business day following delivery by the sender through an international air courier delivery service. Selection of the method of delivery shall be at the election and

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

risk of the party sending the notice. All notices delivered hereunder shall be pre-paid by the sending party and shall be addressed to the parties as follows:

to Owner at:
Range Developments Limited
c/o Range Capital Partners Limited
PO Box 450341
Dubai, United Arab Emirates
Attn:  Mr. Mohammed Asaria, Co-Founder and
Vice Chairman
Facsimile No. +971 4 325 9996

with a copy to:
KHT Land Holdings Limited
c/o Kelsick, Wilkin and Ferdinand
Fred Kelsick Building
Independence Square South
P.O. Box 174
Basseterre, St Kitts
Federation of St Kitts & Nevis
Attn: Mr. Phil Keb
Facsimile No.  +1 869 465 7808

with a copy to:
Gardere Wynne Sewell LLP
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201, U.S.A.
Attn: Mr. Cliff Risman
Facsimile No. (214) 999.3287

to Hyatt at:
Hyatt Services Caribbean, L.L.C.
Hyatt Center – 12th Floor
71 South Wacker Drive
Chicago, Illinois 60606, U.S.A.
Attn: General Counsel
Facsimile No.  +1 312 780 5284

with a copy to:
Hyatt Hotels Corporation
Hyatt Center – 12th Floor
71 South Wacker Drive
Chicago, Illinois 60606, U.S.A.
Attn: General Counsel
Facsimile No. +1 312 780 5284

Either party hereto shall have the right to change its address for notice or its fax number or the identity of persons entitled to receive copies of any such notices, by

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

delivery in the manner hereinabove provided of an appropriate notice to the other party setting forth the new address or the new fax number or the identity of the additional or replacement persons entitled to receive copies, or any one or more thereof.

## ARTICLE XVIII
## Applicable Law

This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of England and Wales, and the parties hereby irrevocably agree to such choice of law in respect of all matters related to the performance or breach of this Agreement except for those matters that pursuant to the laws of the Country are to be governed by the laws of the Country.

## ARTICLE XIX
## Miscellaneous

### Section 1. Right to Make Agreement.
Each party warrants, with respect to itself, that neither the execution of this Agreement nor the completion of the transactions contemplated hereby, shall violate any provision of law or the judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, other commitment or restriction to which it is a party or by which it is bound; or, except as provided in Article XXIV, require any consent, vote or approval which has not been taken, or at the time of the transaction involved shall not have been given or taken. Each party covenants that it has and will continue to have throughout the term of this Agreement and any extensions thereof, the full right to enter into this Agreement and perform its obligations hereunder.

### Section 2. Consents and Approvals.
Except as herein provided expressly to the contrary, wherever in this Agreement the consent or approval of Owner or Hyatt is required, such consent or approval shall not be unreasonably withheld, delayed or conditioned, shall be in writing and shall be executed by a duly authorized officer or agent of the party granting such consent or approval. If either Owner or Hyatt fails to respond within thirty (30) days to a request by the other party for a consent or approval, such consent or approval shall be deemed to have been given.

### Section 3. Entire Agreement.
This Agreement, together with other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be amended or changed only by a writing signed by the parties hereto. By way of clarification, except as provided in Article XXII, Section 2 below as to the terms of the Marketing License Agreement, that certain letter dated January 23, 2012, between Range Capital Partners

52

**PRIVATE & CONFIDENTIAL**

Limited and Hyatt International, Inc., each Affiliates of the parties hereto (the "**Letter of Intent**") is superseded in its entirety by this Agreement and is of no further force or effect.

**Section 4. Survival and Continuation.**
Notwithstanding the termination of this Agreement or Hyatt's management of the Hotel in accordance with this Agreement, all obligations of either party provided for herein, that in order to give effect to the intent of the parties need to survive such termination, including inter-alia, the payment of monies due by Owner to Hyatt, shall survive and continue until they have been satisfied or performed.

**Section 5. Waiver.**
The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

**Section 6. Indexation.**
Wherever in this Agreement there is reference to a fixed amount of money expressed in US Dollars, such amount shall be indexed from the Effective Date in accordance with the All Items Consumer Price Index of the Bureau of Labor Statistics of the Department of Labor of the United States of America.

**Section 7. Proration.**
Wherever in this Agreement there is a reference to the payment of a sum of money applicable to a Fiscal Year during the Operating Term, such payment shall be prorated for any part of such Fiscal Year that shall be less than twelve (12) calendar months.

**Section 8. Language & Counterparts.**
This Agreement may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same agreement and a party may enter into this Agreement by executing a counterpart. This Agreement is executed in the English language.

**Section 9. Confidentiality.**
All information regarding the Hotel or Owner not otherwise in the public domain by publication or otherwise shall, except as otherwise herein expressly permitted or provided, be received and maintained by Hyatt in a confidential manner and shall not be disclosed to any third party without the prior written consent of Owner or otherwise in accordance with the express provisions of this Agreement. Owner agrees that it will hold strictly confidential and not disclose (i) any information relating to Hyatt and its operating procedures and policies including, without limitation, all Proprietary Materials, (ii) any of the terms or provisions of this Agreement, except with prior written consent of Hyatt and except pursuant to court order or to KHT, potential Lenders or equity investors with whom Owner is engaged in good faith negotiations relating to the Hotel, or to Owner's

53



**PRIVATE & CONFIDENTIAL**

lawyers, accountants or other similar consultants or professionals on an "as needed" basis in connection with matters pertaining to the Hotel, and (iii) all information regarding the Hotel's operations (including, without limitation, financial results of operations, statistical data, pricing information, occupancy data including room rate information, bookings pace, customer or group information, and other such data and information), except for disclosures permitted by the preceding clause (ii). All disclosures of information pertaining to the Hotel by either party, to the extent otherwise permissible hereunder, shall be in conformity with applicable legal requirements, including, without limitation, applicable antitrust laws.

Notwithstanding the foregoing (but subject in all respects to applicable Legal Requirements), nothing contained herein shall be deemed to prohibit Hyatt from disclosing any such information to (v) reputable statistical computation firms who agree not to disclose the identity of the Hotel with respect to such confidential information; or (w) other persons when such disclosure is deemed reasonably necessary by Hyatt in order to perform its obligations hereunder; (x) other persons in accordance with lawful standard industry information sharing arrangements; (y) financing sources and prospective purchasers of Hyatt, or its assets, or of the Hotel, who have executed a confidentiality agreement; or (z) gaming regulators.

The provisions of this <u>Section 9</u> shall survive the expiration or earlier termination of this Agreement for any reason.

**Section 10. Exclusivity.**
Subject to the provisions of this <u>Section 10</u>, Hyatt understands and has agreed that from the Effective Date, neither Hyatt nor any of its Affiliates shall:

(a)     Operate, manage, license, franchise (or license any other party to operate, manage, license or franchise) another Park Hyatt hotel on the islands of St. Kitts and Nevis until the expiration of the Operating Term;

(b)     Develop, operate, manage, license, franchise, sell or market (or license any other party to develop, operate, manage, license, franchise, sell or market) any Park Hyatt branded residential project (whether whole ownership, fractional, timeshare, vacation club or otherwise) on the islands of St. Kitts and Nevis until the expiration of the Operating Term;

(c)     Operate, manage, license, franchise (or license any other party to operate, manage, license or franchise) any Park Hyatt hotel on the islands of St. Marteen, Barbuda, Saba, St. Eustatius, and Antigua until the end of the fifteenth (15th) year of the Operating Term;

(d)     Operate, manage, license, franchise, sell of market (or license any other party to operate, manage, license, franchise, sell or market) any Park Hyatt branded residential project (whether whole ownership, fractional,

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

54

**PRIVATE & CONFIDENTIAL**

timeshare, vacation club or otherwise) on the islands of St. Marteen, Barbuda, Saba, St. Eustatius, and Antigua until the end of the fifteenth (15th) year of the Operating Term;

(e)    Operate, manage, license, franchise (or license any other party to operate, manage, license or franchise) any Newly Constructed Hotel Park Hyatt hotel on the islands of Anguilla and St. Barts until the end of the seventh (7th) year of the Operating Term. "**Newly Constructed Hotel**" means any hotel on which construction commenced after the commencement of construction of the Hotel. It is agreed that Hyatt and its Affiliates shall be permitted to develop, sell, operate, manage, license or franchise a hotel either in operation as of the commencement of construction of the Hotel or on which construction has commenced prior to the commencement of construction of the Hotel. For purposes of this subsection (e) and subsection (h) below, "**commencement of construction**" means physical construction (including, at a minimum, excavation for foundations or the installation or erection of improvements, and not merely a ceremonial groundbreaking) at the primary site of the subject project has begun;

(f)    Develop, operate, manage, license, franchise, sell or market (or license any other party to develop, operate, manage, license, franchise, sell or market) any Newly Constructed Park Hyatt branded residential project (whether whole ownership, fractional, timeshare, vacation club or otherwise) on the islands of Anguilla and St. Barts until the end of the seventh (7th) year of the Operating Term;

(g)    Operate, manage license or franchise (or license any other party to operate, manage, license or franchise) an Andaz branded hotel on the islands of St. Kitts and Nevis until the end of the fifth (5th) year of the Operating Term; and

(h)    Develop, operate, manage, license, franchise, sell or market (or license any other party to develop, operate, manage, license, franchise, sell or market) any (1) Hyatt-branded (regardless of the specific brand and including any brand owned or controlled by Hyatt or its Affiliates) for-sale residential project or (2) Hyatt-branded (regardless of the specific brand and including any brand owned or controlled by Hyatt or its Affiliates) hotel that will be sold and/or financed through the Citizenship-by-Investment program, each until the first to occur of the commencement of construction on Phase II of the Hotel or 36 months from the Effective Date.

Collectively, the time periods set forth in subsections (a) through (h), above, are referred to as the "**Restricted Periods**" (and each, individually, as a "**Restricted**

55

**PRIVATE & CONFIDENTIAL**

**Period**") and the physical land areas are the "**Restricted Areas**" (and each, individually, as a "**Restricted Area**").

Owner agrees that except as expressly provided above, nothing herein contained shall limit or restrict the right or ability of Hyatt or any of its Affiliates to: (i) operate, license, franchise, or manage Park Hyatt or Andaz hotels outside of any of the Restricted Areas at any time; (ii) operate, license, franchise, manage any other hotel outside or within any of the Restricted Areas (other than Park Hyatt or, in the case of clause (d) above, Andaz hotels and/or as provided in clause (e) above) at any time; or (iii) enter into any management agreements, joint venture or other understandings or contractual arrangements contemplating the future management or operation of Park Hyatt or Andaz hotels in Restricted Areas so long as such hotels shall either not be opened for business to the public (whether because it is under construction or otherwise), or Hyatt's active management or marketing thereof has not commenced, until after the expiration of the applicable Restricted Period.

Notwithstanding the restrictions described in this Section 10, if Hyatt or any of its Affiliates acquires (whether through purchase, sale, merger, consolidation, or other transaction) during any of the Restricted Periods another chain, franchise system, group or portfolio of at least five (5) hotels, or acquires the right to operate or manage another chain, franchise system, group or portfolio of at least five (5) hotels, and one (1) or more of which hotels are located within Restricted Areas, Hyatt and/or its Affiliates shall have the unrestricted right to convert, or cause to be converted, one (1) of the acquired hotels within the Restricted Areas from its original trade identity to a Park Hyatt Hotel or, in the case of the restriction described in point (2), above, an "Andaz" hotel, and then to operate, or authorize any other party to operate, such hotel as a Park Hyatt Hotel or an "Andaz" hotel.

Except as expressly herein set forth in this Section, and except with respect to the Restricted Areas, there shall be no limitations or restrictions on Hyatt or any of its Affiliates with respect to the management, franchising, leasing, investing in, owning, licensing or operation of any hotels or other hospitality facilities, including, without limitation, any timeshare or vacation ownership resort or any fractional ownership or whole-ownership residential property.

**Section 11. Corrupt Practices.**
A.  Neither party, nor any person acting for or on behalf of such party, shall make, and each party acknowledges that the other party will not make, any expenditure for any unlawful purposes (i.e. unlawful under the laws or regulations of the United States or the Country) in the performance of its obligations under this Agreement and in connection with its activities in relation thereto. Neither party, nor any person acting for or on behalf of such party, shall, and each party acknowledges that the other party will not, bribe or offer to bribe any government official, any political party or

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

56

**PRIVATE & CONFIDENTIAL**

official thereof, or any candidate for political office, for the purpose of influencing any action or decision of such person in their official capacity or any governmental authority of any jurisdiction.

B.   Owner represents and warrants to Hyatt that as of the Effective Date of this Agreement and throughout the Operating Term, that Owner, its directors, officers, senior management, shareholders, members, partners, and persons having a controlling interest in Owner are not, and are not owned or controlled by, or acting on behalf of any "Restricted Persons" (defined, below). Owner shall notify Hyatt in writing immediately upon the occurrence of any event that would render the foregoing representation and warranty incorrect. Owner acknowledges and agrees that should any event occur which would cause Owner to be in breach of the foregoing representation and warranty, notwithstanding any contrary provision of this Agreement, Hyatt shall have the right to terminate this Agreement immediately upon written notice to Owner, and in any such event, without fee or penalty, Hyatt shall have no liability toward Owner on account of early termination of this Agreement pursuant to this Section. "**Restricted Persons**" shall mean persons identified from time to time by any government or legal authority under applicable laws as a person with whom dealings and transactions by Hyatt and/or its Affiliates are prohibited or restricted, including but not limited to persons designated on the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) List of Specially Designated Nationals and Other Blocked Persons (including terrorists and narcotics traffickers), and similar restricted party listings, including those maintained by other governments pursuant to applicable United Nations, regional or national trade restrictions.

C.   Hyatt represents and warrants to Owner that as of the Effective Date of this Agreement and throughout the Operating Term, that Hyatt, its directors, officers, senior management, shareholders, members, partners, and persons having a controlling interest in Hyatt are not, and are not owned or controlled by, or acting on behalf of any "Restricted Persons" (defined, below). Hyatt shall notify Owner in writing immediately upon the occurrence of any event that would render the foregoing representation and warranty incorrect. Hyatt acknowledges and agrees that should any event occur which would cause Hyatt to be in breach of the foregoing representation and warranty, notwithstanding any contrary provision of this Agreement, Owner shall have the right to terminate this Agreement immediately upon written notice to Hyatt, and in any such event, without fee or penalty, Owner shall have no liability toward Hyatt on account of early termination of this Agreement pursuant to this Section.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

57

**PRIVATE & CONFIDENTIAL**

### Section 12. Non-Recourse.

Except as provided below, Hyatt shall look solely and only to the Owner's interest in the Hotel and, after receipt by Owner, the revenues of the Hotel and the net insurance proceeds, net condemnation or similar taking awards, net sale or refinancing proceeds thereof, for the payment, performance and observance of any amount, obligation or provision on the Owner's part to be paid, performed or observed to, or for the benefit of, the Hyatt under this Agreement. Neither any partner, member, manager, director, officer or shareholder in the Owner nor any disclosed or undisclosed principal for whom the Owner may be acting ("**shareholder or principal**"), nor any of the respective heirs, administrators, executors, personal representatives, successors or assigns of any of the shareholders or principals of the Owner, shall have any personal liability hereunder and except as otherwise provided herein, Hyatt agrees not to seek or obtain a money or other judgment against any shareholder of the Owner or against any disclosed or undisclosed principal for whom the Owner may be acting or against any of their respective heirs, administrators, executors, personal representatives, successors or assigns; provided, however, (i) nothing herein contained shall be construed to impair the rights or remedies of the Hyatt to proceed against the Owner's interest in the Hotel, revenues of the Hotel, the insurance proceeds, compulsory purchase or similar taking awards, sale or refinancing proceeds thereof, in the event of an Owner's Event of Default on the Owner's part hereunder to the extent permitted above; (ii) that the foregoing provisions of this Section 12 shall not (a) constitute a waiver by the Hyatt of any obligation of the Owner in this Agreement or (b) limit the right of the Hyatt to name any shareholder or principal of the Owner as a party defendant in any action or suit seeking enforcement of the provisions of this Agreement so long as, in either case, no judgment in the nature of a personal monetary judgment shall be enforced against any shareholder or principal of the Owner; and (iii) Hyatt shall have the right to seek or obtain a money or other judgment against the Owner and any of its direct members or partners (excluding, however, holders of LP Interests and/or the equity owners of any of the direct partners or members of Owner) or against any of their respective heirs, administrators, executors, personal representatives, successors or assigns for any costs, claims, damages or causes of action arising out of fraud or Owner's violation of clause (b) of Section 2 of Article XXII relating to the sale or marketing of the LP Interests or Residences (if developed).

### Section 13. Waiver of Certain Damages.

TO THE EXTENT PERMITTED BY LAW, EACH OF HYATT AND OWNER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES THE RIGHT WHICH ANY OF THE UNDERSIGNED MAY HAVE TO CLAIM OR RECEIVE CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES WITH RESPECT TO ANY DISPUTE BETWEEN THE PARTIES, INCLUDING, BUT NOT LIMITED TO, WITH RESPECT TO ANY AND ALL CAUSE OR CAUSES OF ACTION, DEFENSES, COUNTERCLAIMS, CROSS-CLAIMS, THIRD PARTY CLAIMS, AND INTERVENOR'S CLAIMS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT, EQUITY OR OTHERWISE,

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

58

**PRIVATE & CONFIDENTIAL**

REGARDLESS OF THE CAUSE OR CAUSES OF ACTION, DEFENSES OR COUNTERCLAIMS ALLEGED OR THE RELIEF SOUGHT BY ANY PARTY, AND 'REGARDLESS OF WHETHER SUCH CAUSES OF ACTION, DEFENSES OR COUNTERCLAIMS ARE BASED ON, OR ARISE OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ITS SUBJECT MATTER, OUT OF ANY ALLEGED CONDUCT OR COURSE OF CONDUCT, DEALING OR COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR OTHERWISE. ANY PARTY HERETO MAY FILE A COPY OF THE PERTINENT PORTIONS OF THIS AGREEMENT WITH ANY COURT OR ARBITRATION PANEL AS CONCLUSIVE EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MAY HAVE TO CLAIM OR RECEIVE CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR PUNITIVE DAMAGES.

**Section 14. Ground Leases.**

Hyatt and Owner agree that as to each Ground Lease, Hyatt and the respective ground lessor thereunder (each, a "<u>Ground Lessor</u>") have entered into (as to the Ground Lease for the Hotel Site) and will enter into (as to the Ground Lease for the Residences Site) a mutual recognition agreement as of the Effective Date, according to which Hyatt and such Ground Lessor have agreed that upon termination for any reason of the Ground Lease, Hyatt and the Ground Lessor, respectively, shall accept an attornment from each other and agree (i) that the rights of Hyatt shall be recognized by such Ground Lessor, and (ii) Hyatt shall recognize such Ground Lessor as the owner hereunder.

**Section 15. Ownership Representation.**

Hyatt represents and warrants to Owner as of the Effective Date that Hyatt Services Caribbean, L.L.C. is indirectly (through one (1) intermediate entity) one hundred percent (100%) owned and controlled by Hyatt Hotels Corporation and that Hyatt Hotels Corporation is publicly traded on the New York Stock Exchange.

**Section 16. Intentionally Omitted.**



Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

**Section 17. Use of Hotel Facilities.**

Except as otherwise provided for in this Agreement, Owner, including its agents, representatives and employees, shall have access and use of the Hotel and all of its facilities at the current rates and charges then applicable to third parties. Any charges to Owner (or by another authorized to charge on behalf of Owner) shall be paid by Owner in the same manner as all other Hotel guests. Hyatt shall be entitled to conduct national or regional staff meetings and similar functions of general benefit to the hotel management operations of Hyatt, but Hyatt and/or its staff shall pay for the goods and services used at any such regional staff meetings or similar functions, at the current rates and charges then applicable to third parties or, subject to Owner's prior written approval, at discounted rates. Any charges to Hyatt (or by another authorized to charge on behalf of Hyatt) shall be paid by Hyatt in the same manner as all other Hotel guests. The appropriate allocable share of such costs may, to the extent otherwise permitted under this Agreement, be included in the allocation of costs among Hyatt and its Affiliates.

**Section 18. Reasonable Access to Property.**

Owner or its agents shall have the right of reasonable access to the Hotel and all of its facilities at all times upon reasonable advance notice to the Hotel General Manager. Any concern, comment or question Owner may have during or after any such visit shall be directed to Hyatt through the General Manager of the Hotel and not to any other employees engaged at the Hotel. In all respects, Owner shall minimize any disruptions to the operation of the Hotel resulting from its access thereto.



Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

60

PRIVATE & CONFIDENTIAL

### Section 19. Loyalty Program.

Owner acknowledges and agrees that Hyatt Hotels currently maintain a guest loyalty program known as Gold Passport (the "**Loyalty Program**"), and that the Loyalty Program offers guests various rewards and options, including complimentary hotel rooms. The terms of the Loyalty Program in effect as of the Effective Date have been provided to Owner.  Owner acknowledges and agrees that Hyatt may modify, amend, expand, reduce or eliminate the Loyalty Program in its sole discretion, and that the Hotel shall comply with the terms of the Loyalty Program in effect from time to time, provided, however, that (i) no modification, amendment, expansion, reduction or elimination of the Loyalty Program shall be made for the purpose of causing the Hotel to be disproportionately impacted from other Hyatt Hotels, and (ii) Hyatt shall inform Owner of any such changes.

### Section 20. Additional Hyatt Covenant.

Hyatt agrees that at all times during the Operating Term there shall be a minimum of fifteen (15) Park Hyatt-branded hotels open and operating worldwide. Owner's sole and exclusive remedy for breach of this provision shall be to terminate this Agreement, which right shall be exercised, if at all,  by notice from Owner to Hyatt provided no later than one hundred eighty (180) days following the date upon which Owner becomes aware that there are no longer fifteen (15) Park Hyatt-branded hotels open and operating worldwide.

## ARTICLE XX
## Owner Financing

### Section 1. Owner Financing.

Owner shall have the right to obtain financing, through banks or other lenders, for the construction, development, furnishing and equipping of the Site and the Hotel through equity and/or debt financing. Hyatt acknowledges that Owner has informed it that, as of the Effective Date, Owner anticipates financing the Hotel project with a combination of institutional, third party debt financing and the proceeds from the sale of limited partnership and/or beneficial ownership interests (or other equity interests) ("**LP Interests**"). Owner has previously provided to Hyatt, and Hyatt acknowledges receipt of, a plan for financing the construction, completion and opening of the Hotel.  Owner shall provide Hyatt prior written notice of any proposed material changes to such financing structure, in such detail as Hyatt may reasonably request.

### Section 2. Non-Disturbance.

Owner hereby agrees, for the benefit of Hyatt, that in connection with any debt financing or refinancing that utilizes the Hotel as collateral, Owner shall obtain from each lender a non-disturbance agreement in form reasonably satisfactory to Hyatt pursuant to which the lender shall agree, for itself and any successor-in-interest to lender with respect to the debt financing in question, that if any Foreclosure Purchaser (hereinafter defined) shall acquire title to the Hotel, the Foreclosure Purchaser shall

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

61

**PRIVATE & CONFIDENTIAL**

accept an attornment from Hyatt, and agree that the rights, interests, privileges, authority and power of Hyatt hereunder shall in no event be disturbed by the Foreclosure Purchaser, and that this Agreement shall continue in full force and effect for all the rest and remainder of the Operating Term, subject only to termination in accordance with its terms or in connection with the exercise of any available right or remedy hereunder. The provisions of this <u>Section 2</u> shall be independent of any other provisions of this Agreement. For purposes hereof, a "<u>**Foreclosure Purchaser**</u>" shall mean the (i) lender, and Affiliate of the lender, or any party designated by lender to take title to the Hotel, (ii) any successor in interest to lender under any of the instruments or documents evidencing or securing the financing in question, (iii) any purchaser at a foreclosure sale, (iv) any purchaser of the Hotel acquiring title to the Hotel in connection with the exercise of any remedies (or in lieu of the exercise thereof) by a lender, or its successor in interest, (v) any trustee in bankruptcy or Owner in its capacity as debtor-in-possession under bankruptcy, *concurso mercantil*, insolvency or reorganization laws, and (vi) any party acquiring the Hotel pursuant to a plan, reorganization or liquidation of Owner pursuant to applicable bankruptcy, insolvency or reorganization laws unless this Agreement is "rejected" in such proceeding (provided that Lender shall not have the right to vote for any plan that results in rejection of this Agreement). Upon written request at any time during the Operating Term (but not more often than once in any twelve (12) month period), Hyatt shall issue to Owner or lender, within no less than thirty (30) days after Hyatt's receipt of such request from Owner, an estoppel certificate: (a) certifying that this Agreement has not been modified and is in full force and effect (or, if there have been modifications and that the same is in full force and effect as modified); (b) stating whether, to the knowledge of the signatory of such certificate, any default by Owner exists, and if so, specifying each default of which the signatory has knowledge; and (c) providing any additional information reasonably requested by Owner or lender; provided, however, that in no event shall Hyatt be required to agree to any modifications or waivers with respect to this Agreement or other agreements in effect between the parties. Similarly, Hyatt shall be entitled to an estoppel certificate from Owner, upon the same notice and terms for an estoppel certificate issued by Hyatt.

### Section 3. Provisions Governing Sale of LP Interests.

Owner anticipates the offering and sale of LP Interests. In connection with the marketing of LP Interests, Hyatt would permit the preparation of marketing collateral (collectively, the "<u>**LP Marketing Collateral**</u>") in accordance with the terms of this <u>Section 3</u>. The preparation of LP Marketing Collateral is subject solely to the provisions set forth in this <u>Section 3</u>, and shall not be subject to the terms of the Marketing License Agreement. Hyatt agrees that Owner shall be permitted to include appropriate Hyatt Protected Marks in the LP Marketing Collateral. For such use, Owner shall not be obligated to pay Hyatt or any of its Affiliate any license or use fee, although Owner shall be obligated to reimburse Hyatt for any reasonable expenses Hyatt may incur, subject to the prior approval of Owner as to the incurring of the expense.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

62

**PRIVATE & CONFIDENTIAL**

At Hyatt's request, Owner shall include in the LP Marketing Collateral (or cause to be included) such reasonable disclaimers and disclosures as Hyatt shall require from time to time to be printed and displayed in any and all offering, marketing and sales materials, documents and scripts. All offering, marketing and sales materials, advertisements, documents and scripts relating to the LP Marketing Collateral shall be submitted to Hyatt for prior review and written approval, provided that no review and/or approval by Hyatt shall be deemed to mean that the approved item is in compliance with legal requirements, or that the same is accurate in any respect, and the Owner shall remain fully responsible for such item's contents.

All LP Marketing Collateral must be of the highest professional quality. The LP Marketing Collateral must be submitted to Hyatt for review and approval prior to publication of the material and any marketing of the LP Interests. All depictions of the Hyatt Protected Marks, statements concerning the Hyatt and its Affiliates including, without limitation, Hyatt's involvement with Owner, the Hotel and the Residences LP, are subject to Hyatt's review and written approval.

Owner shall be solely responsible for the creation and implementation of the program for the offering and sale of LP Interests including, without limitation, ensuring that the offer and sale of LP Interests shall be effected in a manner that complies with all applicable laws of the Country and any other jurisdiction where such interests may be marketed, including, without limitation, the laws of the United States. Owner shall indemnify, defend and hold harmless Hyatt and its Affiliates with respect to any claim or liability relating to the LP Interests including, without limitation, the sale and marketing of LP Interests or violation of laws. For so long as Hyatt maintains the Loyalty Program (or any successor to the Loyalty Program), all owners of LP Interests from time to time shall have, at no cost to such LP Interest owner or to Owner, rights equal to those members of the highest tier of the Loyalty Program for an initial period commencing on the closing on the acquisition of such owner's LP interests and ending on the two (2) year anniversary thereof. Thereafter, each owner shall only be permitted to maintain their Loyalty Program status according to the standard terms and conditions of the Loyalty Program.

**Section 4. Limited Cash Flow Guarantee.**

Subject to the terms and conditions of this Section 4 and to the limitations herein contained, Hyatt agrees that during the first seven (7) full Fiscal Years of the Operating Term following the opening of Phase I (the "**Guarantee Period**"), it shall pay to Owner the amount, if any, by which the Guaranty Threshold (as defined below) for any Fiscal Year exceeds the Net Operating Income (including without limitation, any negative Net Operating Income) for the Hotel for such Fiscal Year (each payment, a "**Guarantee Payment**" and, collectively, the "**Guarantee Payments**"); provided, however, in no event shall Hyatt be obligated to pay to Owner pursuant to this Section 4 (a) an amount, during the Guarantee Period, in excess of the Aggregate Guarantee Limit (as defined

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

63

PRIVATE & CONFIDENTIAL

below), or (b) an amount in any Fiscal Year an amount in excess of the Annual Guarantee Limit.

"**Aggregate Guaranty Limit**" shall mean an amount equal to ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the aggregate; provided, however, amounts funded by Hyatt pursuant to this <u>Section 4</u> as to any Fiscal Year and thereafter repaid to Hyatt pursuant to the last paragraph of this <u>Section 4</u> shall not thereafter be counted toward the Aggregate Guaranty Limit.

"**Annual Guaranty Limit**" shall mean an amount equal to ▮▮▮▮▮▮▮
▮▮▮▮▮▮

"**Guaranty Threshold**" shall be the amount set forth, below, as to a particular Fiscal Year:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Hyatt shall pay Owner any Guarantee Payments due in respect of a Fiscal Year during the Guarantee Period within sixty (60) days of the delivery of the Certified Financial Statements for such Fiscal Year. Guarantee Payments shall be deemed payments made by Hyatt in consideration of the execution and delivery of this Agreement, but shall not constitute loans. As to any Fiscal Year during the Guarantee Period, Hyatt's obligation to make any Guarantee Payment shall be equitably adjusted if there occurs (1) directly related to the Hotel a force majeure event that materially and negatively impacts the operations of the Hotel, (2) a Refurbishment Program, or (3) or a taking of all or a part of the Hotel by eminent domain, compulsory acquisition, condemnation or similar proceeding. If the parties cannot agree to the calculation of such equitable adjustment, either party may submit the matter to an Independent Expert for resolution consistent with the process set forth in <u>Article XXI, Section 1</u>.

Guarantee Payments shall be repayable to Hyatt, without interest, in future Fiscal Years to the extent that Net Operating Income achieved in a subject future Fiscal Year exceeds ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in an amount equal to 50% of such excess (and, to the extent not fully repaid in a single Fiscal Year, in future Fiscal Year(s)). Furthermore, Owner shall repay Hyatt the amount of any outstanding Guarantee Payments on any termination of this Agreement, other than on a termination of this Agreement by Owner on account of default by Hyatt under this Agreement. Hyatt

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

shall be entitled to remit itself repayments anticipated under the preceding sentences from available funds in the Hotel Operating Account(s) at the same time as payment of the Owner's Profit Distribution. Except as provided above, with respect to any termination of this Agreement, the obligation of Owner to repay to Hyatt the Guarantee Payments shall survive the termination of this Agreement. In the enforcement of the obligation, Hyatt shall have all rights and remedies available at law or in equity.

## ARTICLE XXI
### Early Termination

**Section 1. Performance Termination.**
Subject to the terms of this Section, Owner shall have the right to terminate this Agreement without penalty or payment of a termination fee if, beginning with the fifth (5th) full Fiscal Year of the Operating Term following the opening of Phase I, for any Performance Test Period (as defined below), the Hotel's operations do not equal or exceed in each of the Fiscal Years included in a Performance Test Period both (a) the Target RevPAR (as defined below) and (b) the GOP Standard (as defined below).

For purposes of this Section, the following terms shall have the following meanings:

(i) "**Annual Available Rooms**" with respect to the Hotel or any hotel that is a member of the Competitive Set, and with respect to any annual period, shall be the number of Available Rooms in such hotel multiplied by 365 (or by 366 for any leap year).

(ii) "**Annual Occupancy**" with respect to the Hotel or any hotel that is a member of the Competitive Set, and with respect to any annual period, the annual occupancy rate reported by that hotel for the period in question.

(iii) "**Annual RevPAR**" with respect to the Hotel or any hotel that is a member of the Competitive Set, and with respect to any annual period, shall be the result obtained by dividing (a) such hotel's Annual Rooms Revenue for such period by (b) Annual Available Rooms for that hotel.

(iv) "**Annual Rooms Revenue**" with respect to the Hotel or any hotel that is a member of the Competitive Set, and with respect to any annual period, shall be the product obtained by multiplying (a) Annual Available Rooms multiplied by (b) Annual Occupancy multiplied by (c) Average Daily Rate.

(v) "**Available Rooms**" with respect to the Hotel or any hotel that is a member of the Competitive Set, and with respect to any period, shall be the total number of guest rooms in such hotel that are available for occupancy by paying hotel guests.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

PRIVATE & CONFIDENTIAL

(vi)    "**Average Daily Rate**" with respect to the Hotel or any hotel that is a member of the Competitive Set, and with respect to any period, shall be that average daily rate achieved for all occupied rooms, as reported by that hotel for the period in question.

(vii)    "**Average RevPAR**" with respect to any period of time, shall be the weighted average (based on the number of Available Rooms) of the hotels within the Competitive Set.

(viii)    "**Competitive Set**" shall mean the hotels known as of the Effective Date as: The Four Seasons Nevis; The Ritz-Carlton, Grand Cayman; The Ritz-Carlton, St. Thomas; and Caneel Bay, a Rosewood Resort. If either Owner or Hyatt, in good faith, believes that any of the hotels identified in the previous sentence should be changed because such hotel is no longer competitive with the Hotel, whether on account of a major renovation, refurbishment or other change such that the subject hotel no longer has guest standards, quality, clienteles, facilities, sizes, prices, property ages, and location substantially similar to and directly competitive with those of the Hotel, such party shall propose a change to the other party, and if the other party agrees, the parties shall designate a new list of hotels, in writing, signed by each of them, which shall thereafter constitute the Competitive Set.

(ix)    "**GOP Standard**" shall mean the Adjusted Gross Operating Profit of the Hotel for each of the two (2) Fiscal Years in a Performance Test Period is less than ninety percent (90%) of the budgeted Adjusted Gross Operating Profit as set forth in the relevant Annual Plans for such Fiscal Years.

(vix)    "**Owner's Lost GOP**" shall mean, for a Fiscal Year, an amount equal to the difference between the Hotel's actual Adjusted Gross Operating Profit for the subject Fiscal Year and the minimum Adjusted Gross Operating Profit that would have been required in order for the Hotel to achieve the GOP Standard in the subject Fiscal Years.

(x)    "**Performance Test**" shall be the combined Target GOP and the Target RevPAR.

(xi)    "**Performance Test Period**" shall mean each rolling period of two (2) consecutive Fiscal Years commencing with the fifth (5th) full Fiscal Year of the Operating Term following the opening of Phase I. By way of illustration, if Phase I is completed and opened on July 1, 2015, the first Performance Test Period would commence on January 1, 2020, and conclude on December 31, 2021, and the second Performance Test Period would commence on January 1, 2021, and conclude on December 31, 2022.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

66

PRIVATE & CONFIDENTIAL

(xii)   "**Refurbishment Program**" shall mean: (a) any program for replacement of or additions to a major portion of Furnishings and Equipment as part of a program to renovate a block of not less than fifteen (15) guest rooms and suites; (b) any program of replacement of carpeting, furnishings, fixtures or wall coverings in ten percent (10%) or more of the Hotel public space, such as lobbies, guest room corridors, restaurants, banquet and meeting rooms and pre-function areas; or (c) any material change in theme of any of the Hotel's restaurants or bars that results in the closure of such outlet for more than two (2) months.

(xiii)   "**Target RevPAR**" shall be one hundred percent (100%) of the Average RevPAR of the Competitive Set.

Owner shall exercise its right to terminate this Agreement pursuant to this Section, if at all, by sending written notice of its election to Hyatt within sixty (60) days following issuance of the Certified Financial Statements for the second (2nd) Fiscal Year of the Performance Test Period on which the termination is claimed. Any such notice shall specify the proposed termination date, which shall be a date no earlier than ninety (90) days following the date of such notice nor later than one hundred eighty (180) days. In the event that Owner does not deliver a termination notice to Hyatt within the 60 day period, Owner shall be deemed to have waived its right to terminate this Agreement in connection with the Performance Test Period in question, and the first of such two Fiscal Years shall thereafter be disregarded for purposes of determining any subsequent failure of the Performance Test. Notwithstanding a termination of this Agreement pursuant to the provisions of this Section, Owner shall be liable to Hyatt for the payment of all amounts due or accrued to Hyatt under this Agreement through the date of termination, including any Unamortized Key Money or unpaid Guarantee Payments. All such amounts shall be paid to Hyatt on or before the date of termination as a condition to the effectiveness of termination.

Hyatt shall have the right to cure Performance Test failures by paying the Owner the Owner's Lost GOP in respect of each of the two Fiscal Years included in the Performance Test Period. Hyatt must choose to exercise (or not to exercise) its right to cure, in its sole and absolute discretion, within forty-five (45) days following receipt of a termination notice from the Owner. Cure payments from Hyatt shall be deemed a payment by Hyatt to Owner and shall not be repayable to Hyatt on any subsequent termination of this Agreement. Neither the failure of the Hotel to achieve the Performance Test nor the election of Hyatt not to cure a Performance Test failure shall be deemed a default by Hyatt under this Agreement, and the sole and exclusive remedy of Owner in such an event shall be to terminate this Agreement in accordance with this Section. Hyatt's right to cure shall be limited to two (2) times during the Initial Term and one (1) time during each Extension Term.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

67

**PRIVATE & CONFIDENTIAL**

The Performance Test shall be equitably adjusted for any Fiscal Year (or, Fiscal Years) if there occurs (1) a Refurbishment Program, (2) a taking of all or a part of the Hotel by eminent domain, compulsory acquisition. Condemnation or similar proceeding, or (3) an event of force majeure that is directly related to the Hotel or a continuation of the effects of an event of force majeure that is directly related to the Hotel that occurred in a prior Fiscal Year. If the parties cannot agree to the calculation of such equitable adjustment, either party may submit the matter to an Independent Expert for resolution consistent with the process set forth in Article XXI, Section 1.

Hyatt and the Owner agree to refer to an Independent Expert (as defined below) for resolution disagreements concerning calculations relating to the Performance Test (such as the Hotel´s Average RevPAR or the amount of the Owner´s Lost Room Profit) or disagreements over the constituency of the Competitive Set. The resolution of such disagreements by referral to an Independent Expert shall be the sole and exclusive process for resolution, and neither party shall attempt to adjudicate any dispute in any other forum. The decision of the Independent Expert shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration, in court or otherwise. Hyatt and the Owner agree that other disputes arising out of or related to this Section, including, without limitation, out of the interpretation of the provision, over the occurrence (or, non occurrence) of force majeure events, or the consequences of a termination of this Agreement pursuant this Section, shall be resolved by arbitration in accordance with the provisions of this Agreement. Each party shall be entitled to make written submissions to the Independent Expert, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission. The parties shall make available to the Independent Expert all books and records relating to the issue in dispute and shall render to the Independent Expert any assistance requested of the parties. The terms of engagement of the Independent Expert shall include an obligation on the part of the Independent Expert to: (i) notify the parties in writing of his decision within thirty (30) days from the date on which the Expert has been selected (or such other period as the parties may agree or as set forth herein); and (ii) establish a timetable for the making of submissions and replies. The costs of the Independent Expert and the proceedings shall be borne as directed by the Independent Expert, and the Independent Expert may direct that such costs be treated as operating expenses of the Hotel.

"**Independent Expert**" shall mean an independent, nationally recognized hotel consulting firm or individual who is qualified to resolve the issue in question, and who is appointed in each instance by agreement of the parties or, failing agreement, each party shall select one (1) such nationally recognized consulting firm or individual and the two (2) respective firms and/or individuals so selected shall select another such nationally recognized consulting firm or individual to be the Independent Expert (and not an arbitrator). Each party agrees that it shall not appoint an individual as an Independent Expert hereunder if the individual who will perform the duties of the Independent Expert (without regard to the firm he/she is affiliated with or employed by) is, as of the date of

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

68

**PRIVATE & CONFIDENTIAL**

appointment or within two (2) years prior to such date, employed by such party or its Affiliates, either directly or as a consultant, in connection with any other matter. In the event that either party calls for an Independent Expert determination pursuant to the terms hereof, the parties shall have ten (10) days from the date of such request to agree upon an Independent Expert and, if they fail to agree, each party shall have an additional ten (10) days to make its respective selection of a firm or individual, and within ten (10) days of such respective selections, the two (2) respective firms and/or individuals so selected shall select another such nationally recognized consulting firm or individual to be the Independent Expert. If either party fails to make its respective selection of a firm or individual within the ten (10) day period provided for above, then the other party's selection shall be the Independent Expert. Also, if the two (2) respective firms and/or individuals so selected shall fail to select a third nationally recognized consulting firm or individual to be the Independent Expert, then such Independent Expert shall be appointed by the American Arbitration Association and shall be a qualified person having at least ten (10) years recent professional experience as to the subject matter in question.

## ARTICLE XXII
### Provisions Relating to the Residences

**Section 1. Project Documents.**

(a)　　Owner has advised Hyatt that KHT, in its capacity as the developer of the Resort Project, shall execute and record the Master Declaration in compliance with all applicable laws. As sub-condominiums (or similarly divided parcels) to the Master Declaration, Owner shall be responsible for the creation of a declaration for the Hotel (the "**Hotel Declaration**") and a declaration for the Residences (the "**Residences Declaration**") (collectively, along with other documents generally described in <u>Section 6</u> of <u>Article I</u>, the "**Project Documents**"). The Project Documents shall contain such terms and conditions as are necessary, *inter alia*, to ensure (subject in all cases to applicable laws) that (i) Owner shall retain sufficient control over the Hotel and the Residences, and all improvements thereon to cause the use, operation, maintenance, repair, alteration and revision thereof at all times complements and is consistent with the Hyatt Operating Standards, (ii) the Hotel Declaration and the Residences Declaration shall be maintained in full force and effect throughout the Operating Term and any extensions thereof, and (iii) that the Association (as defined below) shall enforce compliance by all Residences Owners with the provisions of applicable laws and the Residences Declaration. Owner acknowledges and agrees that any successor to Owner's ownership interest in the Hotel or the Residences (other than those areas conveyed to the Residences Owner) shall be required to assume all obligations of Owner under the Required Documents (as defined below).

(b)　　Notwithstanding any contrary provision set forth in this Agreement or elsewhere, in the event that any provision of applicable law of the Country renders it impossible to (i) perpetually retain voting control over the Association (as defined

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

69

**PRIVATE & CONFIDENTIAL**

below), (ii) perpetually retain power to manage and direct all operations of the Association and (iii) maintain the Hotel Declaration, Residences Declaration and or other Required Documents (as defined below) in full force and effect, then in any such case, Owner and Hyatt shall use their mutual good faith efforts to restructure the Project Documents so as to give effect, as closely as possible, to the provisions of this Article XXII. If despite the mutual good faith endeavors of the parties, the parties cannot in good faith restructure the Project Documents, then at the election of Hyatt exercised by written notice to Owner, the Marketing License Agreement shall be terminated without liability to either party.

**Section 2. Rental Program.**
(a)     After the execution of this Agreement, Owner and Hyatt (or, an Affiliate of Hyatt) shall enter into the Marketing License Agreement, pursuant to which Hyatt shall grant to Owner a non-exclusive license or sub-license to use certain trademarks in connection with the marketing and sale of the Residences, and Owner shall agree to pay Hyatt a license fee in association with such use in accordance with the terms of the Marketing License Agreement.  The Marketing License Agreement shall be on the terms provided therefor in the Letter of Intent and shall otherwise be in form mutually acceptable to Owner and Hyatt.

(b)     Residences Owners shall be offered the opportunity to have their Residences rented as part of the Rental Program to be operated by the Hotel. The terms and conditions of the Rental Program shall be set forth in the form of an agreement (the "**Rental Program Agreement**"), which shall be subject to the mutual approval of Owner and Hyatt, and each in its reasonable discretion, and Owner shall cause the offer and sale of the Residences and shall cause the offer of participation in the Rental Program to be effected in a manner that complies with the Marketing License Agreement and all applicable laws (including, if there is to be any marketing of the Residences within the United States of America or any sale to American purchasers, the securities laws of the United States of America). Owner shall indemnify, defend and hold harmless Hyatt and its Affiliates and their respective officers, directors, agents and employees free and harmless of and from any and all liabilities, costs, damages and claims or expenses arising out of or related to any violation of such laws, unless caused by any Hyatt Party.

(c)     Hyatt and Owner shall consult with each other on the development of the Rental Program. Both Hyatt and Owner would have to mutually agree on all aspects of the Rental Program, each acting in good faith and reasonably. For Rental Program Units, the Hotel would provide standard hotel services including housekeeping, room services and maintenance. The costs to provide such services, as well as any reserve funds in addition to the Residences Replacement Fund (as defined below) to be assessed against the Rental Program Units, would be mutually agreed to by Owner and Hyatt after a review and examination of the customary practices in developments that are similarly positioned. The Rental Program Agreement shall contain the terms and

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

70

**PRIVATE & CONFIDENTIAL**

provisions setting forth the extent to which Residence Owners (when occupying their own Residences) shall have access to, or be entitled to the benefits of, the Hotel's facilities or services such as, without limitation, access to any on-site recreational facilities, room service, housekeeping services and the like, and the charges (or the method of determining charges) therefor and any other rules or regulations that may be promulgated with the agreement of Owner and Hyatt. Such rules and regulations shall protect the rights of the Hotel's regular guests to gain access to facilities and services along with the Rental Program Owners.

(d)    Residence Owners shall not be entitled to participate in the Rental Program until such time as Owner and each of the Rental Program Owners desiring to participate therein shall have entered into a separate Rental Program Agreement for each Residence participating in the Rental Program, the form of which shall have been approved by Owner and Hyatt in their reasonable discretion in accordance with the terms hereof. The Rental Program Agreement shall contain terms and provisions governing (i) Rental Program Owner's use and occupancy of its Residence, including charges to be assessed to Rental Program Owners therefore, (ii) the method for determining Residences to be selected for occupancy by transient guests, by Gold Passport® members redeeming points at the Hotel, or by Hyatt Hotel employees and others entitled to free or discounted rooms, in accordance with Hyatt's and its Affiliates' current policies regarding complimentary and company use rooms as limited elsewhere herein, which policies Owner agrees to incorporate into all Rental Program Agreements with Rental Program Owners, (iii) requirements for Furnishings and Equipment for each Rental Program Unit, (iv) requirements for the creation and maintenance of a reserve fund (the "**Residences Replacement Fund**") to cause the Furnishings and Equipment for each Rental Program Unit to be maintained in a manner consistent with the Hyatt Design Standards and the Hyatt Operating Standards, as applicable, and a mechanism for additional payments by Rental Program Owners for any repairs not covered by the Residences Replacement Fund, and (v) other requirements as are reasonably determined by Hyatt to ensure compliance with the Hyatt Design Standards and the Hyatt Operating Standards. Hyatt and Owner shall discuss and mutually agree to the amount of the Rental Program Owner Split, with each party acting reasonably, and which will be generally competitive with other rental programs in the Country and the Caribbean similar to the Rental Program. All other terms and provisions of the Rental Program Agreement shall likewise be subject to the approval of Hyatt.

(e)    Solely as agent of and designee of Owner, Owner has requested that Hyatt perform its obligations under the Rental Program Agreements, consistent at all times with the terms of this Agreement. Owner hereby delegates to Hyatt (as of the Formal Opening) all rights and remedies of Owner (but in all events, any obligation of Owner with respect to procuring, obtaining or maintaining insurance, if any, which responsibility shall remain with Owner) under the applicable Rental Program Agreements, for so long as Hyatt is providing the services under this Agreement, which rights and remedies shall be exercised by Hyatt in accordance with the terms of such

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

71

**PRIVATE & CONFIDENTIAL**

agreements. Hyatt accepts such rights and agrees, subject in all events to the availability of adequate funds in the Operating Accounts, to rent the Rental Program Units to transient guests as hotel rooms and establish procedures for the use of the Rental Program Units by Rental Program Owners (including the check-in and check-out procedures associated therewith), all in accordance with the Rental Program Agreements and otherwise perform the obligations of Owner thereunder, solely as agent of Owner, and otherwise to perform the Owner's obligations in all material respects under the Rental Program Agreements; provided, however, in doing so, Hyatt shall be acting under and pursuant to the provisions of this Agreement, as agent for Owner, fulfilling duties and responsibilities of Owner as undertaken by Owner, and with no direct liability or obligation to the Rental Program Owners. Owner acknowledges and agrees that Hyatt's obligations shall be limited to the rental of the Residences in the Rental Program to transient guests and the determination of rates therefore, the collection of the room revenue on behalf of Owner, maintenance of the Residences in the Rental Program in a manner consistent with the Hyatt Design Standards and Hyatt Operating Standards, subject to the availability of adequate working capital and funds in the Furnishings and Equipment reserve maintained under the Rental Program, maintenance of books and records and preparation of reports, remittance of the "owner splits" with appropriate calculations and reporting, all in a manner consistent with the terms of this Agreement and the Rental Program Agreements. In consideration for the performance of the obligations anticipated in the previous sentence, Owner, on behalf of the Rental Program, shall pay Hyatt a fee (the "**Rental Fee**"). The Rental Fee shall be equal to two percent (2%) of the annual gross rooms revenue generated from the transient rental of the Rental Program Units, and the Rental Fee shall be payable to Hyatt in the same manner and at the same time as the Management Fees are payable in accordance with the terms of <u>Article IV</u>

(f)      At Hyatt's request and in accordance with the Marketing License Agreement, Owner shall include (or cause to be included) such reasonable disclaimers and disclosures as Hyatt shall require from time to time to be printed and displayed in any and all offering, marketing and sales materials, documents and scripts relating to the Rental Program, and in the sales center and the model Residences.

(g)      The sales of the Residences and the offer of participation in the Rental Program shall be effected in a manner that complies with the Marketing License Agreement, including that no Hotel personnel shall be used in connection with the offering, marketing or sales of Residences or the Rental Program, and compliance with applicable laws.

(h)      All offering, marketing and sales materials, advertisements, documents and scripts relating to the Residences and the Rental Program shall be submitted to Hyatt for prior review and written approval as set forth the Marketing License Agreement, provided that no review and/or approval by Hyatt shall be deemed to mean that the approved item is in compliance with this Agreement or legal requirements, or

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

72

**PRIVATE & CONFIDENTIAL**

that the same is accurate in any respect, and the Owner shall remain fully responsible for such item's contents.

(i)     Notwithstanding any other provision of this Agreement to the contrary, Hyatt's obligations, liabilities, duties and expectations with respect to any Rental Program Agreement or any agreement relating to the Project Documents, the Rental Program, or the Association shall be subject to the following: (a) Owner having had delivered true and complete copies thereof to Hyatt in order to evaluate the scope of its obligations related thereto and put itself in a position to perform the obligations to be performed by Hyatt on behalf of Owner thereunder; and (b) without limiting Hyatt's absolute rights to disapprove of any amendments or modification to the Rental Program Agreement and other documents in its reasonable discretion, Hyatt may disapprove any amendments or modification if the provisions thereof and/or compliance with such provisions that (1) require contribution of capital or payments of Hyatt's own funds, (2) limit or purport to limit any corporate activity or transaction with respect to Hyatt or its Affiliates or any other activity, transfer, transaction, property or other matter involving Hyatt or its Affiliates, (3) are outside the scope of Owner's or Owner's rights, obligations and duties set forth in the Rental Program Agreements or the Master Declaration, (4) materially and adversely affect the operation, maintenance and management of the Hotel by Hyatt as contemplated by this Agreement, or (5) increase or expand Hyatt's obligations, liabilities, duties, exposure, standards of performance or expectations hereunder or decrease Hyatt's rights, remedies or benefits under this Agreement. Owner acknowledges and agrees, without limiting the foregoing, that any failure of Hyatt to comply with the provisions of any Rental Program Agreement shall not be a default under this Agreement unless such failure is also a breach or violation of a specific obligation, covenant, duty or agreement of Hyatt as specifically provided in this Agreement. Hyatt shall perform the Owner's obligations in all material respects under the Rental Program Agreements. If there is any conflict between the scope of Hyatt's duties, liabilities, undertakings and services set forth in this Agreement and those set forth in the Rental Program Agreement, the terms of this Agreement shall control.

(j)     Notwithstanding anything contained herein to the contrary, Owner and Hyatt agree that Owner shall use its best endeavors to enforce the obligations of any Rental Program Agreement pursuant to the terms of the Rental Program Agreement, including, without limitation, any failures on the part of any Rental Program Owners to pay for any Capital Expenditures, any fees (including, the Rental Fee), charges or reimbursement to Hyatt and its Affiliates, Furnishings and Equipment replacements or repairs or other expenses not otherwise covered by the amounts in the Residences Replacement Reserve for the Rental Program Unit.

(k)     Owner and Hyatt agree that Hyatt is performing the Owner's obligations under the Rental Program Agreements solely as agent of and under the direction of Owner. Hyatt has not provided and does not provide any representation or warranty in connection with the viability of the Rental Program or any of its terms, and any review

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

undertaken or which will be undertaken by Hyatt of the Rental Management Agreement terms and agreement form has been and will be solely for its own benefit to ensure that they are clear and workable from the perspective of Hyatt performing its duties hereunder and shall in no way be construed as an endorsement of any aspect of the Rental Program.

### Section 3. Required Documents.

(a)    Owner shall deliver or cause to be delivered to Hyatt, for its approval in accordance with the terms of the Marketing License Agreement, all of those documents listed in the Marketing License Agreement ("**Required Documents**") prior to the finalization of same and prior to the commencement of sales of the Residences. The Required Documents shall conform to all applicable laws, and Owner shall indemnify, defend and hold harmless Hyatt and its Affiliates with respect to any violation by Owner in respect of such applicable laws whether or the Country or other jurisdiction. Any costs or expenses incurred to create the Project Documents and the other Required Documents shall be borne by Owner and not by Hyatt or the Hotel.

(b)    After the execution of this Agreement but prior to the commencement of sales of the Residences, Owner and Hyatt or an Affiliate of Hyatt, as may be the case, shall enter into the Marketing License Agreement.

(c)    Owner shall cause the association of Residences Owners (the "**Association**") to enter into a management agreement (the "**Owners Agreement**") pursuant to which the Association shall appoint Owner to fulfill the obligations of the Association under the Residences Declaration, and which shall be subject in all respects to Hyatt's review and approval (such approval not to be unreasonably denied, delayed or conditioned). The terms of the Owners Agreement shall commence upon recordation of the Residences Declaration, and shall remain in full force and effect for so long as this Agreement shall remain in effect. The Owners Agreement shall specifically provide, among other things, (i) that Owner (or Hyatt, as agent of Owner) shall have the authority to enter into long term contracts with third parties to assist Owner in performing its obligations under the Owners Agreement, including without limitation the Residences Management Agreement (defined, below), (ii) that the Association acknowledges that each of the Owners Agreement and the Residences Management Agreement shall remain in full force and effect throughout the Operating Term, and (iii) that the Association acknowledges that any and all rights to the Hyatt Protected Marks, as between Owner and the Association, are vested solely in Owner, and that the Association shall have no rights whatsoever in and to the Hyatt Protected Marks. Owner shall at all times comply with its obligations under the Owners Agreement and Residences Management Agreement, and shall take all necessary action to cause such agreements to remain in full force and effect throughout the entire Operating Term, and any extension thereof, and that any permitted successor to Owner's ownership interest in the Hotel shall be required to assume, in form reasonably satisfactory to Hyatt, all obligations of Owner under the Residences Management Agreement, the

74

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

Hotel Condominium Declaration, the Marketing License Agreement, and the Owners Agreement.

(d)    The parties agree that Owner shall delegate to Hyatt, and Hyatt shall accept delegation of, certain of Owner's obligations relative to the Owners Agreement and administration of the Association. As soon as reasonably practicable following the Effective Date, and in no event later than the date on which Owner begins to market the Residences for sale, Owner and Hyatt shall negotiate in a good faith and timely manner the terms of a separate management agreement (the **"Residences Management Agreement"**) upon terms and conditions consistent with those set forth in this Agreement and pursuant to which, as applicable: (a) Owner shall appoint Hyatt, acting through the General Manager, to provide oversight and assistance to Owner in the day-to-day operation of the Association and in the fulfillment of Owner's obligations with respect thereto and in consideration for which Owner shall pay Hyatt in consideration for Hyatt's services in respect of the Residences, a management fee (the **"Residential Management Fee"**) in an amount to be agreed upon between Owner and Hyatt; (b) Owner shall agree to maintain a reserve for replacements of Furnishings and Equipment for the Residences; (c) in consideration for the aforementioned services, Owner shall cause the Association to reimburse the Hotel for all out of pocket costs incurred in connection therewith (including, without limitation, reimbursement of employee costs attributable to services provided to the Residences pursuant to the Residences Management Agreement, costs for goods and materials expended and charges for third-party services incurred in connection therewith, and an equitable percentage of the annual depreciation of assets commonly used to service each of the Hotel and the Residences); and (d) Owner shall agree, on behalf of the Association, to take all actions necessary, including without limitation the levy and collection of appropriate assessments, in order to cause the quality and fitness of the Residences to at all times remain consistent with the quality and fitness of the Hotel and the Hyatt Operating Standards.

**Section 4. Unsold Residences.**
Until such time as the Residences have been sold to unaffiliated third parties (collectively, **"Unsold Residences"**), Owner shall retain ownership of the Unsold Residences and shall make them available to Hyatt to rent them to transient guests just as any other hotel room contained within the Hotel. In so doing, Owner acknowledges that the Unsold Residences will not receive any preferential treatment in the rental of same as compared to the Rental Program Units. Owner will enter into a modified Rental Program Agreement in respect of the Unsold Residences, in form mutually acceptable to Owner and Hyatt, each acting reasonably; provided that all revenues and expenses related to the rental of such Unsold Residences shall for all purposes be included in Gross Revenues and operating expenses, respectively. Owner shall not be subject to the Rental Fee for the rental of Unsold Residences nor shall Owner receive an "owner's split" as to the rental of any Unsold Residences.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

**Section 5. Miscellaneous.**

(a)    If Owner, in its sole discretion, elects to maintain a reasonably sized real estate sales office within the Hotel for the purpose of marketing and selling the Residences and other Resort Project real estate, the parties shall mutually agree on the exact size and location of such sales office. The location of such office shall be determined, and the sales operations conducted therefrom shall be conducted, so that the sales office operations will not be disruptive to the operations of the Hotel or interfere with the ambiance of the Hotel or the overall guest experience of the Hotel's guests. In particular, Owner covenants that any marketing or sale of the Residences shall be undertaken in a manner consistent with the Hyatt Operating Standards and in a manner that does not (i) imply or suggest to Hotel guests or prospective purchasers that such activities are being undertaken by or on behalf of Hyatt or its Affiliates or (ii) interfere with the operation of the Hotel in accordance with the Hyatt Operating Standards. No employees of the Hotel shall be used in connection with the offering, marketing or sales of the Residences.

(b)    To the Residences that are not Rental Program Units, Hyatt agrees to provide, on Owner's behalf and at the written direction of Owner, certain on-going hotel services and/or a la carte optional services (including room service and recreational amenities) as may be agreed upon by Hyatt and Owner prior to the commencement of sales activities with respect to the Residences and from time to time thereafter modified as mutually agreed upon by Owner and Hyatt (collectively, the "**Additional Services**"). Hyatt shall provide the Additional Services on such terms and conditions as are agreed to by Owner and Hyatt and may, if Hyatt or Owner determines it to be advisable, be embodied in a form of services agreement, in form acceptable to Owner and Hyatt, between Owner and the applicable Residences Owners. Hyatt shall have and retain the right to discontinue the provision of some or all of the Additional Services upon ten (10) days notice to Owner and the applicable Residences Owners, as appropriate, if the provision of such Additional Services has, or is anticipated to, have a more than de minimis negative impact on the Gross Operating Profit of the Hotel or is unreasonably logistically difficult to provide.

**ARTICLE XXIII**
**Development Milestones**

If Owner shall not have achieved any of the following milestones by the relevant outside date provided below, then Hyatt as sole and exclusive remedy shall have the right to terminate this Agreement without any fee or penalty payable by Owner upon thirty (30) days' notice to Owner:

| Milestones | Outside Date for Achievement of Milestones |
|---|---|
| (1) Owner raised at least twenty five percent (25%) of the Total Capital (as | The date that is eight (8) months after the later of (i) the Effective Date, or (ii) the |

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

76

**PRIVATE & CONFIDENTIAL**

| | |
|---|---|
| defined below) necessary to develop and complete construction of Phase I. | date Hyatt approves Owner's equity sales materials |
| (2) Owner raised at least sixty percent (60%) of the Total Capital necessary to develop and complete construction of Phase I. | The date that is sixteen (16) months after the later of (i) the Effective Date, or (ii) the date Hyatt approves Owner's equity sales materials |
| (3) Commencement of Construction of Phase I. | The date that is twenty-four (24) months after the Effective Date (2nd anniversary of the Effective Date) |
| (4) Completion of Phase I and Formal Opening. | The date that is forty-eight (48) months after the Effective Date (4th anniversary of the Effective Date) |

For purposes of this Section, "**Total Capital**" means the entire capital, whether in equity and debt financing or any combination of the two, necessary to acquire, develop and complete the construction of the Phase I. "**Commencement of Construction**" shall mean physical construction (including, at a minimum, excavation for foundations or the installation or erection of improvements, and not merely a ceremonial groundbreaking) has begun.

Owner shall use diligent efforts to achieve each of the foregoing milestones on or before the dates set forth above and in a manner consistent with this Agreement. However, failure by Owner to achieve any milestones shall not constitute a default by Owner. Upon the request of Hyatt, Owner shall promptly supply Hyatt with such information as Hyatt may reasonably request to demonstrate achievement of the milestones.

The first, third and fourth milestone dates set forth, above, are subject to extension on account of delays caused by force majeure events for a reasonable period of time following the passage of the force majeure event. The second milestone is not subject to extension under any circumstances other than as may be agreed by the parties, each acting in their sole discretion.

In addition to the termination rights afforded to Hyatt under this Section, if at any time following the Commencement of Construction, Owner ceases work on the Hotel, for reasons other than force majeure, for a period longer than one hundred twenty days (120) days, then, in such event, Hyatt may terminate this Agreement upon thirty (30) days' advance written notice to Owner provided that such termination notice shall be deemed to have been withdrawn and this Agreement shall remain in effect if Owner recommences construction within such thirty (30) day period.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

By way of clarification, any failure by Owner to commence, continue or complete Phase II or Phase III for any reason whatsoever shall not constitute a default and shall not give rise to any termination right by Hyatt or any other remedy to Hyatt.

If Hyatt terminates this Agreement pursuant to this Section and, at any time within two (2) years following any such termination, Owner (or any Affiliate of Owner) nevertheless commences to construct (or resumes construction of) a hotel on the Hotel Site, Hyatt shall have the right (but not the obligation), exercisable at any time within one hundred eighty (180) days after Hyatt has actual knowledge of such commencement or resumption of construction, to elect to manage and operate such hotel in accordance with the provisions of this Agreement from the opening date of such hotel and for the entire Operating Term contemplated hereunder. The provisions of this Section shall survive any termination of this Agreement. This provision shall terminate and be of no further force or effect if Owner transfers the Hotel Site to an unaffiliated third party after the termination of this Agreement (*i.e.*, the provisions of this paragraph shall not run with the Hotel Site).

### ARTICLE XXIV
### Range Limited Guaranty

Range Capital Partners represents and warrants that, as of the Effective Date, it is the beneficial owner of 100% of the outstanding ownership interests of Owner with the effective control of the power to direct or cause the direction of Owner's management and policies. In consideration of, and as an inducement to, the execution of this Agreement by Hyatt, Range Capital Partners unconditionally guarantees to Hyatt and its successors and assigns, that (i) for the term of the Agreement (including all extensions) and afterward as provided in the Agreement, it shall continue to maintain effective control of Owner until such time as it may meet the requirements of Article XV, Section 2, for transfer of such controlling interest; (ii) it shall ensure the fulfillment of the obligations of Owner (as limited and qualified elsewhere in this Agreement and in the Technical Services Agreement) with respect to the obligations of  Article XX, Section 3 and for the construction and opening of the Hotel consistent with Hyatt Design Standards under this Agreement and the Technical Services Agreement; and (iii) it shall ensure the fulfillment of the obligations of Owner with respect to the sale of LP Interests.

### ARTICLE XXV
### Special Conditions

Hyatt shall have, as its sole and exclusive remedy, the right, which may be exercised notwithstanding any claim of force majeure by Owner, to terminate this Agreement upon thirty (30) days written notice to Owner if Hyatt shall not, with the cooperation and assistance of Owner, prior to acceptance of the Hotel and throughout the Operating Term, have the right and such situation continues for sixty (60) days after notice to Owner by Hyatt:

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

A.  for key personnel needed to establish and operate the Hotel to enter and work in the Country and to be reasonably compensated in currency readily convertible into US Dollars and to repatriate said compensation;

B.  to receive in US Dollars the Management Fees and reimbursements in accordance with the terms of this Agreement at non-discriminatory rates of exchange, with the right to remit the same to such place as Hyatt may designate;

Owner and Hyatt, together shall register this Agreement and the other Hyatt agreements, as required, with relevant governmental authorities of the Country and shall execute and deliver all other appropriate supplemental agreements and other instruments, and take any other action, including obtaining any government approval, necessary to make this Agreement and the other Hyatt agreements fully and legally effective, binding, and enforceable as between the parties. Any fees or expenses incurred in connection therewith shall be borne by Owner and shall not be charged as operating expenses of the Hotel.

Owner acknowledges and agrees that Hyatt's review of the information described, above, namely, the feasibility study, financing plan and documents pertaining to the ownership of the site, shall not constitute an endorsement of any kind. Such review is conducted for Hyatt's internal purposes, and Owner agrees that it shall not rely on Hyatt for any kind of determination or opinion in respect of such information or review including, without limitation, as to the financial viability of the Hotel operation, the suitability of the financing plan or confirmation of ownership of the Site.

[SIGNATURE PAGES FOLLOW]

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement the day and year first above written.

Hyatt:

HYATT SERVICES CARIBBEAN
L.L.C.

By: _____
Name: _H. Charles Floyd_
Title: _Vice President_

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

80

**PRIVATE & CONFIDENTIAL**

Owner:
RANGE DEVELOPMENTS LIMITED
By: _____
Name: _____
Title: _____



Witnessed by:

Ian Griffin
Legal Consultant
Dubai



Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

## <u>JOINDER</u>

The undersigned, Range Capital Partners, joins in the execution of this Agreement solely for the purpose of acknowledging <u>Article XXIV</u> hereof.

**RANGE CAPITAL PARTNERS LIMITED**

By: _____
Name: _____
Title: _____



Witnessed by:

Ian Garitta
Legal Consultant
Dubai, UAE.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

82

**PRIVATE & CONFIDENTIAL**

## EXHIBIT A1
## Hotel Site Description

**Phase 1**

ALL THAT parcel of land situate, lying and being in the Parish of Saint George, in the Island of Saint Christopher, being that portion of the lands of KHT Land Holdings Limited designated as Phase 1 containing 821,074 square feet or 18.85 acres as shown on a plan prepared by Dwight C. Francis, Licensed Land Surveyor, titled "BOUNDARY PLAN OF BANANA BAY HOTEL TRACT PHASES 1 THROUGH 3 CONTAINING 29.27 ACRES TOTAL" and dated the 18th day of April 2012, and bounded and measuring as follows, that is to say, on the South by Bluff Company, LTD as shown on said plan; on the west by Phases 2 & 3 other lands of KHT Land Holdings Limited, and David Ongley as shown on said plan; on the North by David J. Ongley and Salt Pond Estates as shown on said plan; on the Northeast by other lands of KHT Land Holdings Limited as shown on said plan; and on the Southeast by Banana Bay as shown on said plan; and being described by the following metes and bounds to wit:

Beginning at the northern common corner between Lot 3 Salt Pond Estates and lands of KHT Land Holdings Limited;
Thence S 17°47'32" W a distance of 93.09' to a corner;
Thence S 72°21'36" E a distance of 304.93' to a corner;
Thence N 62°21'37"E a distance of 125.00' to a corner;
Thence S 25°28'46" E a distance of 400.52' to a corner;
Thence S 39°21'37" W a distance of 125.00' to a corner;
Thence N 53°01'36" W a distance of 15.01 feet to a corner;
Thence N 53°30'36" W a distance of 26.19 feet to a corner;
Thence N 58°42'41" W a distance of 80.20 feet to a corner;
Thence S 64°08'09" W a distance of 184.49 feet to a corner;
Thence S 48°15'34" W a distance of 144.23 feet to a corner;
Thence S 38°44'14" W a distance of 148.66 feet to a corner;
Thence S 43°12'46" W a distance of 206.38 feet to a corner;
Thence S 25°56'46" W a distance of 702.97 feet to a corner;
Thence N 87°06'14"W a distance of 31.58 feet to a corner;
Thence N 02°36'45" W a distance of 137.30 feet to a corner;
Thence N 16°25'32"W a distance of 149.79 feet to a corner;
Thence N 07°07'22" W a distance of 273.04 feet to a corner;
Thence N 04°04'57" W a distance of 320.72 feet to a corner;
Thence N 16°53'03" W a distance of 82.12 feet to a corner;
Thence N 33°19'21" W a distance of 43.13 feet to a corner;
Thence N 58°42'35" W a distance of 34.99 feet to a corner;
Thence N 04°01'34" E a distance of 13.72 feet to a corner;
Thence N 67°02'43" E a distance of 60.32 feet to a corner;
Thence N 11°51'18" E a distance of 67.48 feet to a corner;
Thence N 40°13'18" W a distance of 88.39 feet to a corner;
Thence N 55°41'50" E a distance of 23.52 feet to a corner;

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

Thence S 83°35'57" E a distance of 40.18 feet to a corner;
Thence N 53°51'26" E a distance of 65.59 feet to a corner;
Thence N 31°46'53" E a distance of 124.55 feet to a corner;
Thence N 33°35'17" E a distance of 106.55 feet to a corner;
Thence N 48°48'44" E a distance of 78.58 feet to a corner;
Thence S 10°48'28" E a distance of 238.63 feet to a corner;
Thence N 31°08'32" E a distance of 322.28 feet to a corner;
Thence S 72°11'30" E a distance of 24.76 feet to a corner;
Thence N 17°47'32" E a distance of 113.10 feet to the Point of Beginning.

**PHASE 2**

ALL THAT parcel of land situate, lying and being in the Parish of Saint George, in the Island of Saint Christopher, being that portion of the lands of KHT Land Holdings Limited designated as Phase 2 containing 136,558 sq. ft. or 3.135 acres as shown on a plan prepared by Dwight C. Francis, Licensed Land Surveyor, titled "BOUNDARY PLAN OF BANANA BAY HOTEL TRACT PHASES 1 THROUGH 3 CONTAINING 29.27 ACRES TOTAL" and dated the 18th day of April 2012, and bounded and measuring as follows, that is to say, on the South by Bluff Company, LTD as shown on said plan; on the North and West by Phase 3, other lands of KHT Land Holdings Limited as shown on said plan; on the East by Phase 1, other lands of KHT Land Holdings Limited as shown on said plan and being described by the following metes and bounds to wit:

Beginning at the common corner between Phases 1, & 2 Lands of KHT Land Holdings, Limited and Bluff Company Limited;
Thence N 87°06'14" W a distance of 131.48 feet to a corner;
Thence N 04°53'09" W a distance of 860.71 feet to a corner;
Thence N 43°54'56" W a distance of 94.17 feet to a corner;
Thence N 23°12'01" W a distance of 49.47 feet to a corner;
Thence N 49°47'28" W a distance of 47.74 feet to a corner;
Thence N 05°02'50" E a distance of 15.64 feet to a corner;
Thence N 36°52'22" E a distance of 161.69 feet to a corner;
Thence N 33°18'04" E a distance of 37.51 feet to a corner;
Thence N 07°17'25" W a distance of 30.99 feet to a corner;
Thence N 41°20'49" E a distance of 9.47 feet to a corner;
Thence S 38°46'29" E a distance of 53.01 feet to a corner;
Thence S 40°13'18" E a distance of 88.39 feet to a corner;
Thence S 11°51'18" W a distance of 67.48 feet to a corner;
Thence S 67°02'43" W a distance of 60.32 feet to a corner;
Thence S 04°01'34" W a distance of 13.72 feet to a corner;
Thence S 58°42'35" E a distance of 34.99 feet to a corner;
Thence S 33°19'21" E a distance of 43.13 feet to a corner;
Thence S 16°53'03" E a distance of 82.12 feet to a corner;
Thence S 04°04'57" E a distance of 320.72 feet to a corner;
Thence S 07°07'22" E a distance of 273.04 feet to a corner;

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

Thence S 16°25'32" E a distance of 149.79 feet to a corner;
Thence S 02°36'45" E a distance of 137.30 feet
to the Point Of Beginning.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

## EXHIBIT A2
### Residences Site Description

ALL THAT parcel of land situate, lying and being in the Parish of Saint George, in the Island of Saint Christopher, being that portion of the lands of KHT Land Holdings Limited designated as Phase 3 containing 317,211 sq. ft. or 7.28 acres as shown on a plan prepared by Dwight C. Francis, Licensed Land Surveyor, titled "BOUNDARY PLAN OF BANANA BAY HOTEL TRACT PHASES 1 THROUGH 3 CONTAINING 29.27 ACRES TOTAL" and dated the 18th day of April 2012, and bounded and measuring as follows, that is to say, on the South by Bluff Company, LTD as shown on said plan; on the West by other lands of KHT Land Holdings Limited and Simon Wittes as shown on said plan; on the North by a 20' Road, and lands of Calvin & Rita Cable as shown on said plan; on the East by David J. Ongley, Phases 1 & 2, other lands of KHT Land Holdings Limited as shown on said plan and being described by the following metes and bounds to wit:

Beginning at the Northern most common corner between Calvin & Rita Cable and Lands of KHT Land Holdings, Limited;

Thence S 17°47'32" W a distance of 93.00 feet to a corner;
Thence S 72°12'28" E a distance of 112.93 feet to a corner;
Thence N 17°47'32" E a distance of 93.00 feet to a corner;
Thence S 72°12'28" E a distance of 130.00 feet to a corner;
Thence S 10°48'28" E a distance of 118.58 feet to a corner;
Thence S 48°48'44" W a distance of 78.58 feet to a corner;
Thence S 33°35'17" W a distance of 106.55 feet to a corner;
Thence S 31°46'53" W a distance of 124.55 feet to a corner;
Thence S 53°51'26" W a distance of 65.59 feet to a corner;
Thence N 83°35'57" W a distance of 40.18 feet to a corner;
Thence S 55°41'50" W a distance of 23.52 feet to a corner;
Thence N 38°46'29" W a distance of 53.01 feet to a corner;
Thence S 41°20'49" W a distance of 9.47 feet to a corner;
Thence S 07°17'25" E a distance of 30.99 feet to a corner;
Thence S 33°18'04" W a distance of 37.51 feet to a corner;
Thence S 36°52'22" W a distance of 161.69 feet to a corner;
Thence S 05°02'50" W a distance of 15.64 feet to a corner;
Thence S 49°47'28" E a distance of 47.74 feet to a corner;
Thence S 23°12'01" E a distance of 49.47 feet to a corner;
Thence S 43°54'56" E a distance of 94.17 feet to a corner;
Thence S 04°53'09" E a distance of 860.17 feet to a corner;
Thence N 87°06'14" W a distance of 109.38 feet to a corner;
Thence N 04°14'04" W a distance of 733.04 feet to a corner;
Thence N 28°11'52" W a distance of 241.50 feet to a corner;
Thence N 45°54'00" W a distance of 89.15 feet to a corner;
Thence N 28°16'41" E a distance of 131.66 feet to a corner;
Thence N 03°55'32" E a distance of 158.10 feet to a corner;
Thence N 17°19'32" E a distance of 438.80 feet to a corner;
Thence S 72°12'28" E a distance of 147.05 feet to the Point Of Beginning.

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

## EXHIBIT B
### Addendum to Management Agreement

### ADDENDUM TO MANAGEMENT AGREEMENT

This Addendum is made and entered into this ___ day of _____, 20__ by and between **RANGE DEVELOPMENTS LIMITED**, a company incorporated in the Federation of St. Kitts and Nevis ("**Owner**"), and **HYATT SERVICES CARIBBEAN, L.L.C.**, a limited liability company organized under the laws of the United States, State of Delaware ("**Hyatt**").

### PRELIMINARY STATEMENT

Owner and Hyatt have heretofore entered into a certain Management Agreement, dated as of _____, 2012, pursuant to which Owner has appointed Hyatt, and Hyatt has accepted the appointment, as agent for and on behalf of Owner to manage and operate the Hotel property referred to therein. The "Hotel" has now opened for business to the public, and Owner and Hyatt wish to document certain relevant dates under the "Management Agreement".

**NOW, THEREFORE**, it is hereby agreed, by and between Owner and Hyatt as follows:

1.    Definitions. All terms used herein, including quoted terms used in the Preliminary Statement, shall have the same meaning as set forth, or incorporated, in the Management Agreement.

2.    Term. For all purposes of the Management Agreement, the "Formal Opening Date of the Hotel" shall be _____, 20___, and the "initial Operating Term" shall end December 31, 20___.

3.    Reconfirmation. In all other respects, the Management Agreement shall continue in full force and effect.

**IN WITNESS WHEREOF**, the parties hereto, have caused this instrument to be duly executed as of the date and year first above written.

**OWNER:**

**RANGE DEVELOPMENTS LIMITED**

By: _____
Name: _____
Title: _____

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.

**PRIVATE & CONFIDENTIAL**

**HYATT:**

**HYATT SERVICES CARIBBEAN, L.L.C.:**

By: _____
Name: _____
Title: _____

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



PRIVATE & CONFIDENTIAL

### EXHIBIT C
### <u>Statement of Profit and Loss</u>

Rooms

    Revenue

    Payroll and related expenses

    Other expenses

        Departmental income

Food and beverage

    Revenue

        Food

        Beverage

    Cost of Sales

        Food

        Beverage

    Other income

    Payroll and related expenses

    Other expenses

        Departmental income

Telephone departmental income

Net income from minor operated departments

Rentals and other income

(A)    Total Operating Department Income

Undistributed operating expenses

    Administrative and general

        Payroll and related expenses

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.



**PRIVATE & CONFIDENTIAL**

Other expenses (including Operational Insurance)

Sales & Marketing

Energy costs

Property operation and maintenance

Association fees and other related costs

(B)    Subtotal: Undistributed Hotel Operating Expenses

(C)    Gross Operating Profit (A less B)

(D)    Basic Fee and "Owner Splits" paid by Residence Owners of Rental Program Units under any Rental Program Agreement and any costs and expenses to be paid from rental proceeds pursuant to the terms of the Rental Program Agreements

**Adjusted Gross Operating Profit** (C less D)

LESS

Incentive Fee

Rental Fee

Contribution to Replacements of and additions to Furnishings and Equipment (Replacement Reserve)

Property Insurance

Property Taxes

Net Operating Income

Confidential and Proprietary Information of
Hyatt Services Caribbean, L.L.C.